# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| WELLS FARGO BANK, N.A. TRUSTEE FOR | : | CIVIL ACTION NO. |
| THE REGISTERED HOLDERS OF SALOMON | : | 3:05CV1924 (CFD) |
| BROTHERS MORTGAGE SECURITIES VII, | : | |
| INC., MORTGAGE PASS-THROUGH | : | |
| CERTIFICATES, SERIES 2000 C-2, BY ORIX | : | |
| CAPITAL MARKETS, LLC, ITS ATTORNEY | : | |
| IN FACT | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| vs. | : | |
| | : | |
| MICHAEL KONOVER, | : | |
| KONOVER DEVELOPMENT CORP., | : | |
| KONOVER CONSTRUCTION CORP., | : | |
| KONOVER & ASSOCIATES, INC., | : | |
| BLACKBOARD LLC, AND RIPPLE LLC | : | |
| | : | |
| Defendants | : | October 22, 2009 |

## SECOND AMENDED COMPLAINT

1.      Wells Fargo Bank, N.A., Trustee for the Registered Holders of Salomon Brothers

Mortgage Securities VII, Inc., Mortgage Pass-Through Certificates, Series 2000 C-2 ("Trustee")

is a national banking association with its main office located in South Dakota.  This action is

brought on behalf of the Trustee by ORIX Capital Markets, LLC ("ORIX") pursuant to a written

limited power of attorney dated December 18, 2002 given by the Trustee to ORIX for the

purpose of, among other things, enforcing the obligations of the Defendants as set forth herein.

ORIX is a Delaware limited liability corporation with its principal place of business in Dallas,

Texas.

2.      Michael Konover is an individual and a citizen of the State of Connecticut.

3.      Konover Development Corp. ("KDC") is a Connecticut corporation with its

principal place of business in Farmington, Connecticut.

4.      Konover Construction Corp. ("KCC") is a Connecticut corporation with its principal place of business in Farmington, Connecticut.

5.      Konover & Associates, Inc. ("K&A") is a Connecticut corporation with its principal place of business in Farmington, Connecticut.

6.      Blackboard LLC is a Connecticut Limited Liability Company with its principal place of business in Farmington, Connecticut.

7.      Ripple LLC is a Connecticut Limited Liability Company with its principal place of business in Farmington, Connecticut.

8.      This court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332 because the citizenship of the parties is diverse and the amount in controversy exceeds $75,000, exclusive of interest, costs and attorneys' fees.

**The Maryland Litigation and Judgment**

9.      On December 5, 2005, pursuant to an order dated November 16, 2005, the Circuit Court for Baltimore County, Maryland entered an Amended Final Judgment (the "Judgment") in favor of the Trustee and against Diamond Point Plaza, L.P., ("Diamond Point"), Oriole Commercial Associates, L.P. ("Oriole"), Konover Management Corp., now known as Peerless Corporation ("KMC"), Diamond Point Management Corp. ("DPMC"), American Way Commercial Associates, L.P. ("American Way"), and Michael Konover (the "Judgment Debtors"), as well as others, in an action entitled Wells Fargo Bank Minnesota, N.A., Trustee v. Diamond Point Plaza Limited Partnership, et al., No. 03-C-03-002449, Circuit Ct. for Baltimore County, Maryland (the "Maryland Action").[1]  The Maryland court found that Diamond Point –

_____

[1] The Judgment awards the Trustee damages against the Judgment Debtors:  (1) equal to the entire debt – more than $22.8 million (the "Judgment Indebtedness") – against Diamond Point, Oriole, KMC, DPMC; (2) $633,000 against Michael Konover and Oriole; and (3) $243,500 against American Way.

and the other entities held liable for the full judgment amount (i.e., Oriole, KMC and DPMC) –

had committed fraud to obtain a $15.3 million loan (the "Loan").  Michael Konover and

American Way were held liable for a fraudulent transfer which the Trustee discovered during the

course of depositions and document production in the Maryland Action – relating to the transfer

of $633,000 of rents of Diamond Point.

10.     The Judgment remains substantially unsatisfied, after foreclosure upon the

collateral that secured the Loan – approximately 26 acres of commercial real estate located in

Baltimore, Maryland improved by a 251,365 square foot retail shopping center (the "Property").

The Circuit Court for Baltimore County, Maryland confirmed the foreclosure sale of the Property

over objections filed by Diamond Point.[2]  Additionally, the Trustee has obtained payment from

others held liable on the Judgment of more than $1.3 million.  Under the terms of the Judgment,

these payments reduced the Judgment Indebtedness.  After credit for the payments from the third

parties, the foreclosure proceeds, and net receiver collections between trial and the foreclosure

sale, the Judgment Debtors remain indebted to the Trustee for more than $13.4 million.

11.     The Maryland trial court's findings of fact supporting the judgment in the

Maryland Action detail the fraudulent acts of the Judgment Debtors.  The trial court found that

Diamond Point, Oriole, KMC and DPMC committed fraud to obtain the $15.3 million Loan and

that Michael Konover and two companies he owns or controls, Oriole and American Way,

fraudulently transferred $633,000 of Diamond Point's rent collections, after Michael Konover

caused Diamond Point to default on the Loan.

**Alter Ego, Veil Piercing and Fraudulent Transfers**

---

[2] On May 8, 2007, the Maryland Court of Special Appeals affirmed the confirmation of
the sale.  The Court of Appeals granted Diamond Point's petition for writ of certiorari on
September 12, 2007, but on January 10, 2008, after the appeal was briefed and argued, dismissed
the appeal as improvidently granted.

12.     In the course of post-judgment discovery, the Trustee learned of various fraudulent transfers by the Judgment Debtors and additional facts showing that the Judgment Debtors and the Defendants in this action disregarded their separate existence – to the harm and detriment of the Trustee, making each of the Defendants jointly and severally liable for the amount remaining unpaid under the Judgment.  Additionally, certain of the Judgment Debtors have engaged in transfers prohibited by the Connecticut Uniform Fraudulent Transfer Act, Conn. Gen. Stat. Section 52-552a (the "CUFTA").

13.     Michael Konover is the sole shareholder, sole director and an officer of KDC, K&A and, until March, 2007, KCC.  He is the sole member of Blackboard and Ripple. Additionally, Michael Konover is the sole shareholder, director and an officer of KMC.  Michael Konover also controls and substantially owns – directly or indirectly – Diamond Point and all of the other Judgment Debtors which collectively (and with other entities owned and controlled by Michael Konover including, but not limited to, the entities listed on Exhibit A) constitute a single business enterprise (collectively, the "Konover Organization") controlled by Michael Konover and operated for his financial benefit.  The principal business of the Konover Organization is the development, construction and ownership of commercial real estate in the United States.

14.     The constituent entities of the Konover Organization have a unity of interest and ownership that is evidenced, *inter alia*, by the facts that they consistently disregard corporate formalities, and are operated as a single business and share the same officers, employees, bank account, website and some of the same office space.  Prior to the start of the Maryland Action, Michael Konover utilized KMC as the principal vehicle by which he controlled and operated the business activities of Konover Organization.  When he learned that it was likely that KMC would be held liable for the Judgment Debtors' fraud in the Maryland Action, Michael Konover started

to use the other defendants to play the role formerly assigned to KMC.  Michael Konover also caused the business activities formerly conducted by KMC to be shifted to entities in the Konover Organization and transferred KMC's assets to himself and other entities in the Konover Organization.

16.     The Defendants have caused the assets of the Judgment Debtors to be transferred to, or for the benefit of, Michael Konover or to other entities he owns and controls in an effort to put them beyond the reach of the Trustee.

16.     With the impending maturity of the then existing Diamond Point loan, Michael Konover, KDC, KCC and KMC found it necessary to secure a replacement loan, and ultimately obtained the Loan for that purpose through the fraud found in the Maryland Action.  The Judgment Debtors and Defendants obtained the Loan, knowing that the foreclosure of a Konover shopping center occupied by Wal-Mart as the anchor tenant would injure them and their substantial relationship with Wal-Mart, Inc. ("Wal-Mart") and Wal-Mart related companies.

17.     Michael Konover and the other Defendants used their pervasive control of the Judgment Debtors to conduct the frauds and related activities for which the Judgment Debtors have been found liable, including taking actions that benefited other parts of the Konover Organization and Michael Konover to the detriment of the Trustee.

18.     The essence of the Maryland court's fraud finding was that Diamond Point intentionally misrepresented that it had no knowledge of any tenant's intention to leave the Property when it accepted the Loan, even though at the time Diamond Point knew that its largest single tenant, Sam's P.W., Inc. ("Sam's"), a subsidiary of Wal-Mart, was actively marketing its space at the Property for sublease and intended to relocate within the same market.

19.     As the lender was considering whether KMC would be a suitable guarantor for the Loan, Susan Larkin, who was employed by Konover Capital Advisors, the entity within the Konover Organization responsible for obtaining the loan for Diamond Point, represented to the lender that KMC was a substantial company that managed more than 80 retail properties and had an ownership interest in 100 properties.  Based in part on this representation, Diamond Point was able to refinance its maturing mortgage with Paine Webber.

20.     In addition, KMC submitted financial statements for 1997 and 1998 which showed substantial revenues and included footnotes representing that its actual performance would be even better than the numbers reflected.  The financial statements submitted by KMC also showed substantial revenues from leasing and other commissions.  KMC's financial statements also noted that "corporate allocations include[d] expenses which would not necessarily be incurred by a stand alone property management company."  In light of this, the KMC Guaranty included a provision prohibiting corporate allocation payments.  The KMC financial statements showed very little in the way of liabilities.

21.     Paine Webber sold the mortgage loan and related security interests to the Trustee.

22.     When Sam's vacated the Property, approximately two years after the Loan closed, and opened not one – but two – Sam's stores within seven miles of the Property, Diamond Point did nothing to enforce a section of the Sam's lease which prohibited Sam's from owning, managing, operating or having a financial interest in similar stores within seven miles of the Property.

23.     Diamond Point had no independent existence. Michael Konover and his subordinates within the Konover Organization concluded that the viability of Diamond Point was secondary to the interest of the Konover Organization's interest in maintaining and growing its

lucrative Wal-Mart relationship.  Many of the Konover Organization's properties had Wal-Mart

companies as tenants and Wal-Mart was one of KCC's major clients.  Because it was not an

independent entity, Diamond Point did not enforce its rights against Sam's which caused

Diamond Point to devolve into insolvency.

24.     Michael Konover, KCC, KDC, and K&A used their pervasive control of Diamond

Point and KMC to cause the harm found by the Court in the Maryland Action and to injure the

Trustee by liquidating and disbursing the assets of those Judgment Debtors which prevented the

Trustee from recovering on the Judgment.

25.     KMC, the former operations hub of the Konover Organization's businesses,

served as the focal point for Michael Konover to manage the real estate assets and the entities

which directly owned them.  KMC typically served as general partner of limited partnerships

which owned properties and also was designated the property manager by the limited

partnerships.

26.     KDC was in the business of developing shopping centers and real estate for the

Konover Organization

27.     KCC was in the business of constructing shopping centers and other real estate

projects.  A major client for KCC was the Wal-Mart group of entities.

28.     K&A was used as the corporate office for the Konover Organization for the time

before and some of the time after the Loan default.  Up until the end of 2004, K&A arranged for

employees, joint insurance coverage, employee benefits, accounting services and general

logistical support for the members of the Konover Organization.

29.     K&A was also used as the bank for KDC, the Judgment Debtors and over 70

other entities (the "Cash Group") through a cash management account maintained in its name at

Webster Bank.  Michael Konover served as the investment banker for the Konover Organization as he was a source of funding for the cash management account.  Michael Konover, either personally or through MCK, Inc. ("MCK") now known as Sentinel Corp, which is wholly owned by Michael Konover, deposited and withdrew money from the cash management account at his discretion when it served his purposes.  Members of the Cash Group were required to use the common account for deposits and withdrawals rather than maintaining their own independent accounts.  By pooling funds, the Konover Organization was able to use larger balances to earn greater rates of interest than the individual companies could have earned on their own.  Also, by using only one account, the liquidity needs of the various members of the Konover Organization were pooled at all times.  Minimum capital and liquidity was required for the group as a whole and members would in essence be loaning to other members in need of overnight or longer term liquidity.

30.     None of these cash "loans" were recorded on the Konover Organization's general ledgers.  The Konover Organization treated the Cash Group as a single entity without any regard to the separate existences of each of the Cash Group members.  The entities would make deposits and receive cash transfers without accurately accounting for each of the members' individual cash balances.

31.     During post-judgment discovery in Maryland, the Trustee learned some of the facts which evidence the Defendants' total disregard of the purported independence of the constituent members.  The Trustee learned that all liquidity and cash management decisions for members of the Cash Group were controlled at  K&A both prior to Diamond Point's default on the Loan and for a significant period of time after the default.  The members of the Cash Group could not and did not make any cash management decision of their own.  Rather, Michael

Konover controlled all of those decisions through his control of K&A.  Members did not pay interest to each other and were not allocated a fair share of the interest income K&A earned on their funds.

32.     Through post-judgment discovery, the Trustee learned that when the Konover Organization found itself in need of cash, Michael Konover would cause MCK, which maintained lines of credit with Fleet Bank (n/k/a Bank of America), People's Bank and other lenders, to provide necessary funding.  MCK had essentially no assets of its own.  Lending institutions required that Michael Konover and KMC sign guarantees for MCK before lending money or issuing a line of credit to MCK.  KMC provided collateral in order for MCK to secure a loan or line of credit.  The Konover Organization utilized MCK's borrowed funds to provide just enough cash in the K&A common cash management account and to fund all constituent members of the Konover Organization.  KMC was not compensated for providing collateral for MCK's loans and credit lines.

33.     K&A, for its overhead role, charged and collected allocations of its expenses to each of the constituent members, including Diamond Point and KMC.

34.     In disregard of the separateness of the constituent members of the Konover Organization, Michael Konover caused K&A to transfer the common cash management account to KDC in March 2005.  KDC then held the funds of KMC, the Judgment Debtors and the other members of the Konover Organization in the same manner as K&A had before.  KDC continued this role until November 2005 when another account was opened at Webster Bank in the name of Account Management LLC.  The Account Management LLC account was opened shortly the post-judgment discovery deposition of James Ainsworth, then the CFO and Treasurer of several

Konover entities, in October 2005 where he had been questioned regarding the Judgment

Debtors' use of joint bank accounts.

35.     Account Management LLC is the alter ego of K&A.  The bank statements for

Account Management LLC and KDC demonstrate that the transactions which previously had

occurred in the K&A/KDC account had been transitioned to the Account Management LLC

account at Webster Bank.  Additionally, several months after the account was opened, the names

on the checks for Account Management LLC were changed to "Konover & Associates dba

Account Management LLC," although no formal assumed name filing exists.  In 2007, Account

Management LLC ceased providing this function and KDC resumed its role as the holder of the

common bank account.

36.     Minimal documented agreements, if any, exist between the entities of the

Konover Organization, to govern the substantial business transactions that occur between them

on almost a daily basis.

37.     The Judgment Debtors, KDC, K&A, Blackboard, Ripple and other constituent

members of the Konover Organization maintain and use common office space located in

Farmington, Connecticut, share common officers and employees and have utilized a common

website, www.konover.com.  Constituent members purport to have leased their common office

space from two entities owned and controlled by Michael Konover, Munson Road LLC and 135

South Road LLC.

38.     As employees and officers of the Konover Organization knew would happen prior

to the Loan being closed, Wal-Mart vacated its anchor tenant space at the Diamond Point

property and moved the Diamond Point Sam's to the Golden Ring Shopping Center.  Several

months later, another major tenant, Ames, rejected its lease in bankruptcy court.  Given the

impaired viability of the shopping center with the empty Ames' space and the near certainty of not being able to secure a suitable tenant in light of the empty Wal-Mart space, Michael Konover chose to cause Diamond Point to default on the Loan by failing to make its monthly mortgage payment of approximately $122,000 in November 2002.

39.     The Konover Organization used their control over the cash to maintain the Judgment Debtor entities as insolvent or within the zone of insolvency from the inception of the Loan.  Michael Konover, as a shareholder and director of KMC, owed a fiduciary duty to the creditors of KMC – including the Trustee -- and breached such duty by directing, approving and engaging in systematic transfers and transactions disposing of the assets and business activities of KMC described below.

40.      The transfers and transactions involved substantially all of  the assets of certain of the Judgment Debtors and were made with the actual intent to hinder, delay and defraud creditors of the transferor Judgment Debtors, including the Trustee, without receiving reasonably equivalent value in exchange.  Additionally, the transferor Judgment Debtors were engaged or about to engage in business or transactions for which the remaining assets of the transferor Judgment Debtors were unreasonably small in relation to the business or transaction or the transferor Judgment Debtors intended to incur, or believed or reasonably should have believed that they would incur, debts beyond their ability to pay as they became due.

41.     When he caused the Loan default, Michael Konover controlled approximately $633,000 of rent payments that had been collected from Diamond Point's tenants.  Further, Wal-Mart continued to pay Sam's rent – approximately $110,000 monthly – even after Sam's had vacated the Property.

42.     Diamond Point's $633,000 was not kept in a separate bank account for the use of Diamond Point to pay its creditors including the Trustee, but had instead been commingled with the funds of other entities of the Konover Organization in the bank account then owned by K&A.

43.     Michael Konover directed that the $633,000 of the Property's rents be transferred to him.  The money was never delivered to the Receiver who was appointed to manage the Property after the default in November 2002.

44.     The Trustee learned of this illegal transfer in discovery in the Maryland Action and brought that claim in the Maryland Action.  The Maryland Judgment includes judgment for this fraudulent transfer against Michael Konover.

45.     Additionally, post-judgment discovery exposed that, on or about December 10, 2002, Michael Konover caused KMC to transfer $1.1 million to himself as an "excess cash distribution."  This transfer was made after the default on the Loan and just weeks after the fraudulent transfer of $633,000 of Diamond Point's rents to Michael Konover.  Realizing that its guarantee obligation to the Trustee would be called due to the fraud surrounding the inception of the Loan and that the value of the collateral securing the Loan would be insufficient to retire the Loan, KMC made this $1.1 million transfer with the actual intent to hinder, delay and defraud the Trustee.

46.     The $1.1 million distribution in December 2002 brought KMC's current assets to within $48,000 of its current liabilities as of December 31, 2002.  By March 2003, KMC's then current liabilities exceeded its then current assets.  Further, given KMC's guarantee of the Diamond Point loan, KMC was insolvent as defined by CUFTA, Conn. Gen. Stat. Sec. 52-552c.

47.     After choosing to allow Diamond Point to default on the Loan, the Konover Organization closed portfolio sales in November 2002 and February 2003 (the "Portfolio Sales")

-12-

of a number of properties held by entities in which KMC had an ownership interest.  In addition

to the Portfolio Sales, other properties held by KMC entities were sold by the Konover

Organization.  As part of these sales, the selling entities transferred more than $9.3 million to

KDC, which were described as brokerage and renewal option leasing commissions and fees and

more than $1.1 million to K&A for "sales expenses."  Upon completion of the sales, $7 million

was transferred from KDC to Michael Konover, upon information and belief, as part of a tax

savings plan for Michael Konover and to permit Michael Konover to repay debts owed to KCC

or Konover Family Limited Partnership.  To the extent there was any right to or basis for the

payment of brokerage or renewal option leasing commissions out of the proceeds from the

Portfolio Sales, such payments should have been made to KMC, not KDC.  Michael Konover

represented to outside partners with interests in the sold properties that the payment of brokerage

commissions was called for in the partnership agreements to which KMC, not KDC, was a party.

Moreover, substantially all, if not all, of the leases for which renewal option leasing commissions

were paid to KDC had actually been obtained by KMC prior to the transfer of its leasing

business to KDC; thus, payments for such commissions in connection with the Portfolio Sales

should have been made to KMC, not KDC.  The total transferred to KDC was higher than the

fees paid to CB Richard Ellis who the Konover Organization had retained to broker the sale.  The

transfers to KDC and K&A were for no consideration and in total disregard for the separateness

and independence of the entities involved, including KMC.

      48.    On May 4, 2005, at the conclusion of the bench trial in the Maryland action, the

Maryland court announced its intention to award judgment to the Trustee.  Almost immediately,

KMC was caused to change its name to Peerless Corporation – to prevent a fraud judgment from

being entered against an entity bearing the name "Konover" and to permit the Defendants to

distance themselves from the Maryland Judgment.  Additionally, in furtherance of its efforts to distance the Konover name from potential suits, the Konover Organization also caused MCK, Inc. to change its name to the Sentinel Corporation.

49.    Michael Konover caused KMC to engage in many fraudulent transfers (described below) to shield its assets and ultimately divest KMC of as many assets as possible, to attempt to preserve value for Michael Konover and to prevent any lawful collection of the Judgment by the Trustee.

50.    Soon after the trial in the Maryland Action and after the Maryland court announced that judgment would be awarded to the Trustee, Michael Konover and the Konover Organization formed Blackboard and Ripple for the purpose of receiving transfers of KMC's assets.  Both Blackboard and Ripple are owned and controlled by Michael Konover and are entities within the Konover Organization.

51.    Beginning in June of 2005, certain KMC assets were transferred to Blackboard, Ripple and Michael Konover for amounts arbitrarily and/or improperly determined by Michael Konover and the Konover Organization.  Those transfers were effected at the direction of Michael Konover as KMC's sole shareholder and its sole board member.  Konover commissioned his outside accounting firm to provide valuations for the transferred interests of KMC.  In providing such valuations, the accounting firm used a valuation method that it had never used before on the several occasions when it previously valued the same assets.  In addition, the accounting firm's valuation of KMC's interest in Mattatuck Realty Associates Limited Partnership, did not include a $248,000 loan made by Mattatuck to a former Konover employee, Richard Liljedahl, shortly before Mr. Liljedahl was going to testify at the trial in Maryland, even though valuations provided for other interests included line items for "loan

receivables." The loan to Mr. Liljedahl was either not accounted for at all or concealed in a general category of other assets and not shown as a loan receivable.

52. On or about June 24, 2005, KMC transferred its partnership interest in the Konover Family Limited Partnership to Ripple for a purported consideration of $187,885.

53. Ripple was capitalized in early June 2005 with a General Ledger entry transferring $250,000 directly from MCK to Ripple with the memo "Capital Contribution 80091 (aka Ripple) fbo MK." The funds remained in the common cash account, which was unaffected by the contribution "transaction."

54. KMC also made the following transfers to Blackboard:

(a) On or about August 3, 2005, KMC transferred an interest in Diamond Point Plaza Phase II, LLC to Blackboard for a purported consideration of $7,402.

(b) On or about September 1, 2005, KMC transferred its interest in K Meriden Associates, LLC to Blackboard for a purported consideration of $6,468.

(c) On or about October 10, 2005, KMC transferred its interest in K Exchange, LLC to Blackboard. Blackboard's General Ledger does not show a payment for its purchase of the interest in K Exchange.

(d) On or about November 30, 2005, KMC transferred its interest in Saratoga Commercial Associates Limited Partnership for a purported consideration of $2,870 and its interest in Waterbury Plaza Phase II Limited Partnership for a purported consideration of $3,546 to Blackboard.

(e) On or about December 5, 2005, KMC transferred 1% of its 6.49% interest in Riverdale Commercial Associates Limited Partnership to Blackboard for a purported consideration of $26,585.

(f)     On or about December 15, 2005, KMC transferred its interests in Brookfield Commercial Associates Limited Partnership, Norwich Hotel Associates Limited Partnership, Parkside Associates Limited Partnership, Weibel Commercial Associates Limited Partnership, and Mattatuck Realty Associates Limited Partnership to Blackboard for purported considerations of $5,627.00, $8,984.00, $19,674, $1,325.00 and $20,602 respectively.

(g)     Also on or about December 15, 2005, KMC transferred its interests in ASantonio TX Realty Limited Partnership, ASan Antonio TX LLC and WPawtucket Holding LLC to Blackboard for a purported consideration of $29,875.

(h)     On or about December 21, 2005, KMC transferred its interests in Meriden Commercial Associates Limited Partnership, Sturbridge Realty Associates Limited Partnership, and Taunton Realty Associates, LLC to Blackboard for purported considerations of $10,131, $36,213 and $13,746 respectively.

(i)     On or about December 28, 2005, KMC transferred its interest in Dewitt Commercial Associates Limited Partnership to Blackboard for a purported consideration of $15,919.  In the same month, Blackboard's General Ledger reflects a distribution payment of $13,200 to Entity 10138, which was the Dewitt, NY ownership entity.

55.    Prior to the purchase of the KMC assets, Blackboard was insolvent, without the funds necessary to purchase the KMC interests.  Blackboard was never capitalized.  Instead, Blackboard carried a negative General Ledger balance and the funds for the six verified payments for the 17 plus interests purchased came from the common cash management account at Webster Bank.

56.    KMC also made the following transfers to Michael Konover:

(a)      On or about August 3, 2005, KMC transferred its interest in 666 Merrill Road LLC to Michael Konover for a purported consideration of $36,376.

(b)      Additionally, in December 2005, KMC transferred a 0.495% interest in Mattatuck Realty Associates Limited Partnership for a purported consideration of $10,198, $10,000 less then what Blackboard was purportedly paid for the same percentage interest, and its remaining 5.49% interest in Riverdale Commercial Associates Limited Partnership for a purported consideration $145,950.  Funds for Michael Konover's purchase of KMC's interest in the Riverdale Commercial Associates Limited Partnership came directly from the Konover Organization's common cash management account at Webster Bank and was booked in the General Ledger for Account Management LLC as "Purchase Riverdale CALP fbo MK."

(c)      In 2005, KMC was removed from the Cash Group and the Konover Organization established a separate zero balance account in KMC's name.  KMC's zero balance account operated to automatically transfer funds received by KMC to a bank account in Michael Konover's name.  Most of the proceeds KMC was to receive from the transfers above were automatically transferred upon receipt by KMC to Michael Konover by operation of the zero balance account.

57.      At the end of 2005, Michael Konover transferred what he claimed to be his single member 100% interest in WAvondale LLC to Blackboard.  KMC's representative, James Ainsworth, had testified in post judgment discovery in the Maryland action that KMC held an interest in the WAvondale asset at year end 2003.  He also provided a list of KMC assets allegedly disposed of over time and did not disclose any transfer to Michael Konover.  Kononver and KMC have never explained how the KMC interest was supposedly held by Michael Konover at year end 2005.   In October, 2006, Blackboard transferred the interest it had received in

-17-

WAvondale LLC back to Michael Konover, who in turn transferred it to an entity which, upon information and belief, Michael Konover owns.  The transfers of this asset from KMC to Michael Konover, from Michael Konover to Blackboard and  from Blackboard to Michael Konover was either for no consideration or done to delay, hinder or defraud the Trustee.

58.     Additionally, through post-judgment discovery, the Trustee discovered that on August 26, 2005, KMC transferred its interest in Bishop's Corner West, LLC to BCW Management Corporation for a purported consideration $886.00.  BCW Management Corporation's principals include Michael Konover as Chairman of the Board and Michael Goman as President.  However, a review of Blackboard's general ledger and check register indicates that it, not BCW Management, paid for this interest on September 30, 2005, demonstrating that the Defendants failed to follow the proper formalities in making these transfers from KMC.

59.     The above transfers, some apparently for no consideration, left KMC with virtually no assets capable of satisfying the Judgment.  KMC – formerly the management entity for scores of Michael Konover related properties ceased to serve in that function.  In October 2005, James Ainsworth testified during his post-judgment discovery deposition that all KMC employees had been terminated as of December 31, 2004.  At that time, KDC began to provide the services previously provided by KMC.  The transfer of these management services was a full scale transfer of business activities, ongoing contracts and prospective business and prospective contracts from KMC to KDC.  The transfer of these services contributed to the total liquidation of KMC by draining it of all its sources of revenue and potential revenue.

60.     KMC retained at least two management contracts, the operation of a property in Franklin New Hampshire and BJ's Wholesale in Torrington, Connecticut, for a period of time

after 2005.  However, in 2007, after the Trustee filed a Motion for Turnover Order in

Connecticut Superior Court directed at KMC's management fees for these two properties, KDC

assumed the management contracts from KMC for no consideration.

  61. After the Maryland Court indicated it would rule in the Trustee's favor, but before

the ruling was final, KMC was removed from the Cash Group.  At the time of removal, KMC

supposedly had a negative cash position.  In June 2005, K&A booked the alleged cash deficiency

as a receivable in its general ledger.  This was the first time K&A recognized a cash deficiency

or surplus on its ledgers for any member of the Cash Group.

  62. In July 2005, KMC granted K&A a blanket security interest in its assets.  Upon

information and belief, the debt collateralized by this asset pledge was the cash deficiency

booked on K&A's general ledger in June 2005.  On October 17, 2005, K&A's security interest in

KMC's assets terminated.  On September 6, 2005, KMC granted a security interest in its assets

to Vigilent LLC.  Vigilent LLC was formed on September 1, 2006 by Michael Konover, who

serves as its manager.

  63. The transfers and transactions described above were made with the actual intent to

hinder, delay and defraud the Trustee.  KMC was not paid reasonably equivalent value for the

assets transferred.  Based on the KMC's general ledgers, it appears that most of its available cash

was used to pay legal fees and to pay KDC for management of the two properties.  While some

consideration was paid to KMC, it was soon delivered to Michael Konover through the zero

balance account arrangement, used to pay for the costs of the fraudulent transfer transactions or

to pay legal fees and litigation costs in the failed defense in the Maryland action.  Those

payments were improper since the Judgment Debtors were then insolvent.   Furthermore, KMC

was insolvent or within the "zone of insolvency" when the transfers and transactions were made. KMC's balance sheets further establish KMC's insolvency at the time of the transfers.

64.     The Konover Organization's ability to accomplish the wholesale dismantling of KMC demonstrates the disregard of the separate corporate existence and manipulation of the Judgment Debtors by Michael Konover. These actions demonstrate it is the regular course of business for the Konover Organization to disregard the separateness and independent obligations and duties of the various constituent members of the Konover Organization, to the detriment of the creditors of the different constituent members and for the overarching goal of enriching Michael Konover.

65.     The Konover Organization has such unity of interest that the constituent entities have no independence from one another, the interests of some can be and have been subordinated to the interests of others and, ultimately, all are operated as a single unit to benefit the common ultimate owner, Michael Konover.

66.     Additionally, most of the entities within the Konover Organization are inadequately capitalized.  Michael Konover acts as the source of capital for the entities within the Konover Organization.  Collectively, the entities maintain just enough working capital to continue business on a day to day basis but each stand alone entity has insufficient working capital to sustain its own business activities on a day to day basis.  Michael Konover requires that all excess cash is transferred either to other members of the Konover Organization in need of capitalization (if he approves) or to him.  This left the Judgment Debtors inadequately capitalized to the detriment of the Trustee.

67.     Representations regarding the business operations and financial condition of KMC to induce Paine Webber to make the Diamond Point loan have been discovered in this case

to have been materially false and misleading.  Although KMC's financial statement showed significant leasing commission income, the KMC leasing department had been transferred to KDC at the start of 2000 for no consideration to KMC.  Although financial statements and ledgers show KMC owed Michael Konover $2.27 million as of at least January 1, 2000 and repaid the amount within months after the Diamond Point loan closing, no such liability was disclosed to the Diamond Point lender.  Because the KMC financial statements showed significant payments for allocated corporate overhead, Section 3.6 of KMC's Guaranty Agreement provided that "all payments (whether voluntary or mandatory), including without limitation, corporate allocation payments, made by Guarantor to any affiliate, subsidiary, division, or shareholder of Guarantor shall be subordinate to Guarantor's obligations under this Guaranty."  From the closing of the loan, KMC made numerous payments and transfers for allocated corporate overhead and other payments and transfers in violation of this obligation.

68.     The payments were made at the direction and control of Michael Konover, K&A and KDC.

69.     Also, payments were made directly to Michael Konover.

70.     Payments were also made indirectly to or for the benefit of Michael Konover through a myriad of entities through which the Konover Organization operated including those entities outlined on Exhibit A.

71.     Payments were also made for expenses "allocated" to K&A, KDC and KCC at differing times.

72.     All entities taking such payments were on specific notice of the payment subordination and prohibition because each of them had common owners, directors and officers with KMC.

73.     The financial books and records of the Judgment Debtors and the Defendants can only be fully understood by reviewing and comparing the financial books and records of all members of the Konover Organization.  Michael Konover and KDC maintained two sets of books at certain times.  The second set of books was maintained on a separate program, on a standalone computer for a period of time.  Eventually, data from the second set of books was added to the same computer network utilized by others in the Konover Organization.  The standalone computer was thrown out by a senior Konover officer, James Ainsworth at some time after September 22, 2004.  The electronic data maintained for the second set of books on the Konover Organization network and servers by KCC was purged.  Upon information and belief, the full electronic versions of the second set of books would reveal more about the commingling and use of funds and disregard of KMC's separate existence than has been disclosed by the Defendants and the computer and data were destroyed and purged to avoid discovery.

**Tortious Interference with Wal-Mart/Wire Payment**

74.     Because Diamond Point, through Michael Konover, refused to take any action to enforce the various breaches of the Sam's lease, the Trustee asserted claims against Sam's and Wal-Mart in the Maryland Action pursuant to the Trustee's rights under the Assignment of Rents and Leases that Diamond Point had executed in connection with the Loan.

75.     The Trustee was successful in its pursuit of certain of these claims.  It recovered judgment against Sam's and Wal-Mart for more than $1.3 million for certain of the lease breaches.  The Maryland court specified the bases for this recovery in its findings.

76.     As the Judgment requires, each of these recoveries and any other cash flow from the operations of the Diamond Point Plaza shopping center are credits to the judgment debt of the Judgment Debtors.  Another potential recovery was presented when Wal-Mart/Sam's continued to permit The Wire to license the space Wal-Mart/Sam's had under lease at the shopping center

for the non-retail use which the Maryland trial court determined to be in breach of the Sam's lease.

77.     The Trustee and the court-appointed receiver began to press for a termination of The Wire's non-retail use. Wal-Mart/Sam's and The Wire proposed that The Wire continue, for a limited time, its occupancy and that a payment be made which would credit the Judgment by $650,000. During the continued occupancy, Wal-Mart/Sam's would continue to honor and pay its monthly rent obligation to the receiver for payment to the Trustee which were credits on the Judgment until the receiver foreclosed on the Property.

78.     Defying rational business logic and economic sense, for single purpose entities, Michael Konover, acting through either the former general partner of the owner of the adjacent property – KMC – or another undisclosed general partner, objected and insisted, for the first time in more than 2½ years, that the Diamond Point shopping center observe its reciprocal obligation to this neighboring property to permit only retail use of the Sam's space. Ironically, Michael Konover and the Konover Organization, on information and belief, could have – but did not – assert this same position at any time since the offending use commenced, either in a separate lawsuit or by joining in the claims asserted against Wal-Mart/Sam's in the Maryland Action.

79.     The actions of Michael Konover, Blackboard and the Konover Organization tortiously interfered with Wells Fargo's contract with Wal-Mart/Sam's and prospective contract with The Wire, without justification, causing additional damages to Wells Fargo of $650,000.

80.     The conduct described in paragraphs 1 through 78 shows a reckless indifference to the rights of the Trustee and/or an intentional and wanton violation of those rights, entitling the Trustee to an award of common law punitive damages and recovery of its attorneys' fees.

81.     Pursuant to Sections 22, 26, 36 and 55 of the Diamond Point mortgage and Section 1.8 of the Guaranty and corresponding provisions of the Diamond Point note, the Trustee is entitled to the recovery of its attorneys' fees in the enforcement of the debt it is owed, including its attorneys' fees incurred in this action.

## CAUSES OF ACTION

## FIRST COUNT – Instrumentality Rule Veil Piercing as to All Defendants

1.-81.   The Trustee incorporates paragraphs 1–81 above, as paragraphs 1-81 of the First Count.

82.     Pursuant to an order dated November 16, 2005, on December 5, 2005, the Trustee obtained the Judgment against the Judgment Debtors in the Circuit Court for the Baltimore County in the State of Maryland to recover $22,862,399.66 in damages, plus pre-judgment interest, and statutorily allowed post-judgment interest.  An additional judgment for attorneys fees and expenses of over $1.4 million should be entered soon by the trial court in Maryland, as ordered by the Maryland Court of Appeals.

83.     Upon final determination of all post-judgment credits applied to the outstanding indebtedness, the remaining unpaid and unsatisfied balance will exceed $13.4 million, plus post-judgment interest.

84.     The Defendants completely dominated and controlled the financial, policy and business practices of the Judgment Debtors such that the Judgment Debtors had no separate mind, will or existence of their own.  Defendants were required to provide a sufficient guarantor of recourse liability in order to obtain the Diamond Point loan.  To do so, they caused Diamond Point and KMC to misrepresent the then current and future financial condition and business plan of KMC, knowing that it would soon be wound down and only a shell of its represented

-24-

substance.  Once it became clear that a substantial judgment would enter in favor of the Trustee against KMC, the Konover Organization took steps to dissipate the remaining assets of KMC in an attempt to ensure that the Trustee did not collect its judgment.

85.     The Defendants' aforesaid control and acts were used to commit the abovementioned dishonest or unjustified acts in an effort to defeat the Trustee's legal rights, which proximately caused damages to the Trustee.

86.     As a result of the Defendants' aforesaid control and acts, Defendants are jointly and severally liable for the full amount of the Maryland Judgment and the attorney's fees that will be awarded by the Maryland Court after remand of the Maryland appellate courts.

**SECOND COUNT– Identity Rule Veil Piercing as to All Defendants**

1.-81.  The Trustee hereby incorporates paragraphs 1-81, above, as paragraphs 1-81 of the Second Count.

82.     At all relevant times, there was such a unity of interest and ownership among the Defendants and the Judgment Debtors that the independence of the Judgment Debtors had in effect ceased or never begun, and an adherence to the fiction that the Judgment Debtors were separate identities would serve only to defeat justice and equity by permitting the economic entities to escape liability arising out of an operation conducted by Judgment Debtors for the benefit of the Defendants.

83.     As a result of the aforesaid unity of interest and ownership, Defendants are jointly and severally liable for the full amount of the Maryland Judgment and the Trustee's attorney's fees that will be awarded by the Maryland Court after remand of the Maryland appellate courts..

**THIRD COUNT– Fraudulent Transfers as to All Defendants**

1.-81.   The Trustee incorporates paragraphs 1-81, above, as paragraphs 1-81 of the Third Count.

82.   The transfers described in Paragraph 81 below were made by the transferor and were either:

    (a)   made with the intent to hinder, delay or defraud the Trustee;

    (b)   made without receiving reasonably equivalent value in exchange and the transferor was engaged or about to engage in business or transactions for which the remaining assets of the transferor were unreasonably small in relation to the business or transaction or the transferor intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due;

    (c)   made without receiving a reasonably equivalent value in exchange for the transfer and the transferor was insolvent or became insolvent as a result of the transfer.

    (d)   made to an insider for an antecedent debt, the transferor was insolvent at that time and the insider had reasonable cause to believe that the transferor was insolvent.

83.   The transfers described in Paragraph 83 below may be voided pursuant to CUFTA section 52-552h, and the transferee should be held accountable by money judgment for the value of the asset(s) transferred pursuant to CUFTA section 52-552i(b).

84.   The transfers complained of are

    (a)   the $1.1 million excess cash "distribution" by transferor KMC to transferee Michael Konover in December 2002;

    (b)   the brokerage and renewal option leasing commissions paid to KDC instead of KMC from the proceeds of the Portfolio Sales as well as other

individual property sales subsequent to the June 2000 Diamond Point loan closing and/or KMC's interest in any commissions or fees paid by the property owning entity to KDC and K&A from the proceeds of the Portfolio Sales as well as other individual property sales subsequent to the June 2000 Diamond Point loan closing;

(c)    transfers made by the Judgment Debtors into the common bank account;

(d)    transfers of Judgment Debtor funds from the common bank account made to any of the Defendants;

(e)    the transfers of KMC's assets to transferee Blackboard:

    (i)    KMC's transfer of its interest in K Meriden Associates, LLC to Blackboard on or about September 1, 2005;

    (ii)    KMC's transfer of its interest in K Exchange, LLC to Blackboard on or about October 10, 2005;

    (iii)    KMC's transfer of its interest in Saratoga Commercial Associates Limited Partnership to Blackboard on or about November 30, 2005;

    (iv)    KMC's transfer of its interest in Norwich Hotel Associates Limited Partnership to Blackboard on or about December 15, 2005;

    (v)    KMC's transfer of its interest in Riverdale Commercial Associates Limited Partnership to Blackboard on or about December 5, 2005;

    (vi)    KMC's transfer of its interest in Brookfield Commercial Associates Limited Partnership to Blackboard on or about December 15, 2005;

    (vii)    KMC's transfer of its interest in Dewitt Commercial Associates Limited Partnership to Blackboard on or about December 28, 2005;

    (viii)    KMC's transfer of its interest in Parkside Associates Limited Partnership to Blackboard on or about December 15, 2005;

    (ix)    KMC's transfer of its interest in Weibel Commercial Associates Limited Partnership to Blackboard on or about December 15, 2005;

    (x)       KMC's transfers of its interests in ASan Antonio TX Realty Limited Partnership to Blackboard on or about December 15, 2005;

    (xi)      KMC's transfers of its interests in ASan Antonio TX LLC to Blackboard on or about  December 15, 2005;

    (xii)     KMC's transfers of its interests in WPawtucket Holding LLC to Blackboard on or about  December 15, 2005;

    (xiii)    KMC's transfer of its interest in Sturbridge Realty Associates Limited Partnership to Blackboard on or about December 21, 2005;

    (xiv)    KMC's transfer of its interest in Meriden Commercial Associates Limited Partnership to Blackboard on or about  December 21, 2005;

    (xv)     KMC's transfer of its interest in Taunton Realty Associates LLC to Blackboard on or about December 21, 2005;

    (xvi)    KMC's transfer of its interest in Mattatuck Realty Associates Limited Partnership to Blackboard on or about December 15, 2005;

    (xvii)   KMC's transfer of its interest in Diamond Point Phase II LLC to Blackboard on or about August 3, 2005;

    (xviii)  KMC's transfer of its interest in Waterbury Plaza Phase II, Limited Partnership to Blackboard on or about November 30, 2005;

(f)    KMC's transfer of its interest in Konover Family Limited Partnership to

 Ripple on or about June 24, 2005;

(g)    the transfers of KMC's property interests to transferee Michael Konover:

    (i)        KMC's transfer of its interest in 666 Merrill Road LLC to Michael Konover on or about August 3, 2005;

    (ii)      KMC's transfer of its interest in Riverdale Commercial Associates Limited Partnership to Michael Konover on or about December 14, 2005;

    (iii)     KMC's transfer of its interest in Mattatuck Realty Associates Limited Partnership to Michael Konover on or about December 22, 5005;

    (h)    the transfers of interests in the Avondale asset and/or WAvondale LLC to Michael Konover between January 1, 2004 and year end 2005, from Michael Konover to Blackboard in late 2005 and from Blackboard to Michael Konover in or about October, 2006;

    (i)    KMC's share of interest earned on commingled funds in the Konover Organization's joint bank account; and

    (j)    transfers from KMC's zero balance account established in 2005 to Michael Konover.

## FOURTH COUNT– Tortious Interference with Wal-Mart Arrangement as to Michael Konover

1.-81.   The Trustee incorporates paragraphs 1-81, above, as paragraphs 1-81 of the Fourth Count.

82.   Michael Konover tortiously interfered with Wells Fargo's contract and prospective contract with Wal-Mart/Sam's and The Wire.

83.   The interference was without justification or excuse.  The interference was willful and wanton.  The interference caused damages to the Trustee of $650,000.

## FIFTH COUNT– Breach of Fiduciary Duty as to Michael Konover

1.-81.   The Trustee incorporates paragraphs 1-81, above, as paragraphs 1-81 of the Fifth Count.

82.   Michael Konover owed a fiduciary duty to the Trustee as a creditor of KMC.

83.   Michael Konover breached that duty as a director and shareholder of KMC by failing to preserve the assets of KMC for its creditors when it reached the zone of insolvency. KMC was in the zone of insolvency at the time of the default on the Loan, and at least as early as the time when Michael Konover decided to pursue the Portfolio Sales, which was no later

than the Spring of 2001.  As the shareholder and Chairman of the Board of KMC, Michael

Konover transferred assets and ownership interests to the detriment of creditors when KMC

was in the zone of insolvency.

84.     The breach of duty caused harmed to the Trustee and benefited Michael Konover.

85.     As a result of Michael Konover's breach of fiduciary duty, he is liable for the

damages the Trustee has suffered as a result of the transfers he effectuated as a director and

shareholder of KMC.  Michael Konover should be required to pay to the Trustee the amount

necessary to restore the value of what was lost by his breach and the amount necessary to

prevent Michael Konover from benefiting personally from the breach.

**SIXTH COUNT– Successor Liability as to KDC, Blackboard and Ripple**

1.-81.   The Trustee incorporates paragraphs 1-81, above, as paragraphs 1-81 of the Sixth

Count.

82.     KDC, Blackboard and Ripple are jointly and severally liable to the Trustee for

KMC's debt as successors in interest to KMC because they are a mere continuation of KMC.

There is a continuity of management, personnel, physical location, assets and general business

operations between KMC and KDC, Blackboard and Ripple.

83.     There is a continuity of shareholders between KMC and KDC, Blackboard and

Ripple.

84.     KMC has ceased its normal business operations.

85.     KDC, Blackboard and Ripple have assumed the liabilities and obligations of

KMC ordinarily necessary for the uninterrupted continuation of normal business operations of

KMC.

86.     As a result, KDC, Blackboard and Ripple and KMC are jointly and severally

liable for KMC's debt to the Trustee as a successor in interest.

-30-

**SEVENTH COUNT– Tortious Interference with the KMC's Subordination Agreement as to All Defendants**

1.-81.   The Trustee incorporates paragraphs 1-81, above, as paragraphs 1-81 of the Sixth Count.

82.     The Trustee had a contractual relationship with KMC by virtue of the Guaranty.

83.     Section 3.6 of KMC's Guaranty Agreement provides that "all payments (whether voluntary or mandatory), including without limitation, corporate allocation payments, made by Guarantor to any affiliate, subsidiary, division, or shareholder of Guarantor shall be subordinate to Guarantor's obligations under this Guaranty."

84.     The Defendants, knowing of the Trustee's contractual relationship with KMC, intentionally sought to interfere with it.

85.     KMC made transfers and payments to other affiliates, subsidiaries, divisions or shareholders when it was obligated under the Guaranty.  Many of the transfers were made as direct payments or credits from KMC to the related entities.  Some of the transfers were indirectly made, as in the case of the brokerage fees and lease renewal option commissions in connection with property sales that should have been paid to KMC but which were diverted to KDC.  The Konover entities that received those payments and transfers took them with actual knowledge that those payments were subordinate to the KMC's obligations under the Guaranty. The entities had knowledge because Michael Konover, KMC's Chairman of the Board and sole shareholder, wholly owns them.  Additionally, those entities had actual knowledge because they share officers, directors and employees with KMC, including but not limited to R. Michael Goman, Alan Smith, Lisa Whitney, Richard Liljedahl, John Anderson and James Ainsworth, and they knew or should have known those payments were subordinate to KMC's obligations under the Guaranty.

-31-

86.     The interference was without justification or excuse.  The interference was willful and wanton in an effort to keep the Trustee from collecting on the Judgment.

87.     As a result of Defendants' conduct, the Trustee has suffered an actual loss.

88.     The payments and transfers made are subordinate to the Trustee's right under the Guaranty.  The Defendants are liable to the Trustee for transfers and payments they received after the Loan closed on June 2, 2000.

## **DAMAGES**

WHEREFORE, Plaintiff demands judgment that:

(a)     Defendants be held jointly and severally liable for the full amount of the Maryland Judgment for which the Judgment Debtors are liable;

(b)     Defendants be held liable for damages for the alternate claims and damages as outlined above;

(c)     Defendants be held jointly and severally liable for the reasonable and necessary attorneys' fees, expenses, and collection costs to the full extent of the Judgment Debtor's liability under the Maryland Judgment and the judgment entered in the Maryland Court on remand;

(d)     Defendants be held jointly and severally liable for pre- and post-judgment interest at the applicable rates to the full extent of the Judgment Debtors' liability under the Maryland Judgment;

(e)     Defendants be held jointly and severally liable for all compensatory damages;

(f)     Defendants be held jointly and severally for all punitive damages;

(g)     Defendants be held jointly and severally for attorneys' fees; and

(h)     Defendants be held jointly and severally liable for any other relief, in law and in equity, to which Plaintiff may be justly entitled.

## **JURY DEMAND**

Plaintiff demands trial by jury.

PLAINTIFF,
WELLS FARGO BANK, N.A., TRUSTEE


By:   /s/ Erick M. Sandler
      John B. Nolan (ct 05583)
      Erick M. Sandler (ct 25029)
      Day Pitney LLP
      242 Trumbull Street
      Hartford, CT 06103-1212
      Telephone:  860-275-0100
      Facsimile:  860-275-0343
      E-mail:  jbnolan@daypitney.com
           emsandler@daypitney.com

Of Counsel:

   Jeff Joyce
   Joyce, McFarland + McFarland LLP
   910 Louisiana Street, Suite 5000
   Houston, TX 77002
   Phone: (713) 222.1113
   Fax: (713) 513.5577
   Email:  jjoyce@jmmllp.com

## <u>CERTIFICATION</u>

I hereby certify that on this 22nd day of October, 2009, the foregoing Second Amended Complaint was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's CM/ECF system.

/s/ Erick M. Sandler                
Erick M. Sandler (ct#25029)

Houston_1\939354\4
23633-45 10/17/2007

**EXHIBIT A**

KONOVER ORGANIZATION MEMBER ENTITIES
(In addition to Judgment Debtors and Defendants)

| | |
|---|---|
| 1. | 666 Merrill Road LLC |
| 2. | ASan Antonio TX LLC |
| 3. | ASan Antonio TX Realty LP |
| 4. | ASharonville OH Holding LLC |
| 5. | AShreveport LA Holding I LLC |
| 6. | AShreveport LA Holding II LLC |
| 7. | AShreveport LA Realty I LLC |
| 8. | AShreveport LA Realty II LLC |
| 9. | AZ #3853 Sharonville LLC |
| 10. | Abington Commercial Associates LP |
| 11. | Account Management LLC |
| 12. | Albany 2410 Associates |
| 13. | Albany-Woodland Associates, LP |
| 14. | Allen West Associates LP |
| 15. | Altamonte Properties Inc. |
| 16. | Amenia Commercial Associates LP |
| 17. | Amenia Management Corp. |
| 18. | Amenia Realty Associates, LP |
| 19. | Amherst Associates |
| 20. | Amherst Commercial Associates LP |
| 21. | Amherst II Commercial Associates LP |
| 22. | Avon Simsbury Mall Associates, LP |
| 23. | BMerritt Island Holding LLC |
| 24. | BMerritt Island Realty LLC |
| 25. | Barall & Konover Floors, Inc. |
| 26. | Barall & Konover, Inc. |
| 27. | BCMC Associates, LP |
| 28. | BCW Management Corp. |
| 29. | Bishop's Corner Associates |
| 30. | Bishop's Corner Associates, LP |
| 31. | Bishop's Corner West LLC |
| 32. | Bishops Corner/FL, LP |
| 33. | Broadcast Management of Connecticut Inc. |
| 34. | Brookfield Commercial Associates LP |
| 35. | Brunswick Georgia Commercial Associates, LP |
| 36. | Carbondale Commercial Associates LP |
| 37. | Carbondale Realty Associates, LP |

| 38. | CClifton LLC |
|-----|--------------|
| 39. | CGlen Raven, NC, LLC |
| 40. | CGlen Raven, NC Realty LP |
| 41. | CHouston TX LLC |
| 42. | CHouston TX LP |
| 43. | CJackson OH Holding LLC |
| 44. | CKaty TX LLC |
| 45. | CKaty TX LP |
| 46. | CLionville LLC |
| 47. | CPhiladelphia LLC |
| 48. | CSomerset LLC |
| 49. | CSouderton LLC |
| 50. | Centennial Inns, Inc. |
| 51. | Century Executive Offices Inc. |
| 52. | Century-New Haven LP |
| 53. | College Park Associates |
| 54. | College Park Commercial Associates LP |
| 55. | Commerce Center Association Inc. |
| 56. | Commerce Center One LP |
| 57. | Connecticut Boulevard Associates LP |
| 58. | Connecticut/Montville Hotel Associates, LLC |
| 59. | Cranberry Commercial Associates LP |
| 60. | Deming Realty Corp. |
| 61. | Dewitt Commercial Associates LP |
| 62. | Diamond Point Management Corp. |
| 63. | Diamond Point Plaza Phase II, LLC |
| 64. | Diane Drive Homeowners Association Inc. |
| 65. | Doris and Simon Konover Family Foundation |
| 66. | East Greenbush Commercial Associates LP |
| 67. | Edgewood Associates |
| 68. | Edgewood Commercial Associates LP |
| 69. | Eighty Darling Drive LP |
| 70. | Enfield International Flee Market Inc. |
| 71. | Evergreen Plaza LP |
| 72. | Fairview Commercial Associates LP |
| 73. | Forty Winter Street Partnership |
| 74. | Franklex, Inc. |
| 75. | Franklin MayesBrook LP |
| 76. | Freshwater Management Corp |
| 77. | Freshwater Realty Associates, LP |
| 78. | FVM-North, LP |
| 79. | FVM-South, LP |
| 80. | GEM Commercial Associates, LP |

| 81. | GEM Newington Commercial Corp. |
| 82. | Gentry Konover, LLC |
| 83. | Glassboro Commercial Associates LP |
| 84. | Glastonbury Commercial Associates LP |
| 85. | Glastonbury II Commercial Associates LP |
| 86. | Gouverneaur Commercial Associates LP |
| 87. | Great Meadow Associates LP |
| 88. | Gulf Breeze Commercial Associates LP |
| 89. | Hadley Commercial Associates LP |
| 90. | Hadley Holdings, Inc. |
| 91. | Hadley Realty Associates, LP |
| 92. | Hamburg Commercial Associates LP |
| 93. | Hammonton Commercial Associates LP |
| 94. | Hartland Realty Development Corp. |
| 95. | Haynes Brook LP |
| 96. | Hazard Avenue Associates, LLC |
| 97. | Hazard Avenue LP |
| 98. | Henry Porter Associates, LP |
| 99. | Henry Porter Commercial Associates LP |
| 100. | Historic Window Installation and Manufacturing Corp. |
| 101. | HP Commercial Associates LP |
| 102. | Innkeepers Of Norwich, Inc. |
| 103. | Innkeepers of Waterbury Inc. |
| 104. | Innkeepers of Wethersfield Inc. |
| 105. | Interstate Building and Maintenance Corp. |
| 106. | Jensen Realty Inc. |
| 107. | K & P Development Inc. |
| 108. | K Construction Company Inc. |
| 109. | K Exchange LLC |
| 110. | K Meriden Associates LLC |
| 111. | K Souderton LLC |
| 112. | K-Five Associates, LP |
| 113. | Kolff Mastera Konover Architects, LLC |
| 114. | Koncal Realty Associates LP |
| 115. | Konover & Associates South, Inc. |
| 116. | Konover Central, Inc. |
| 117. | Konover Colorado Associates, LLC |
| 118. | Konover Construction Corp. South |
| 119. | Konover Family LP |
| 120. | Konover Holdings II, LLC |
| 121. | Konover Holdings III, LLC |
| 122. | Konover Holdings, LLC |
| 123. | Konover Hotel Corp |

| 124. | Konover Mobile, Inc. |
|------|----------------------|
| 125. | Konover Montville Hotel Associates, LLC |
| 126. | Konover Office & Commercial Corp. |
| 127. | Konover Promenade, LLC |
| 128. | Konover Properties Corp. |
| 129. | Konover Property Mngmt Srvcs Corp |
| 130. | Konover Realty Associates, LLC |
| 131. | Konover Residential Corp. |
| 132. | Konover Richmond, LLC |
| 133. | Konover Windsor Locks, LLC |
| 134. | Konover/Kenney Associates, Inc. |
| 135. | Konover/Santee Corp. |
| 136. | Konover/Simons, LLC |
| 137. | Konover NE Portfolio |
| 138. | Konover Swinerton Construction |
| 139. | KPT Properties, LP |
| 140. | KR Commercial Associates LP |
| 141. | Lewington Commercial Associates LP |
| 142. | Liberty Commercial Associates LP |
| 143. | Malone Associates |
| 144. | Malone/Saranac Commercial Associates LP |
| 145. | Mattatuck Plaza Associates |
| 146. | Mattatuck Realty Commercial Associates LP |
| 147. | Mattatuck Realty Associates LP |
| 148. | MCK, Inc. n/k/a Sentinel Corp. |
| 149. | Meridian Commercial Associates LP |
| 150. | Middleborough Hotel Corp. |
| 151. | Monticello Commercial Associates LP |
| 152. | Newington Commercial Associates LP |
| 153. | Ninety Retreat, LLC |
| 154. | Northampton Associates LP |
| 155. | Norwich Hotel Associates LP |
| 156. | Norwich Realty Associates LP |
| 157. | Norwichton Mall Realty Associates, LP |
| 158. | Norwichtown Commercial Associates LP |
| 159. | One Century Tower Bldg Association |
| 160. | Parkedge Commercial Associates LP |
| 161. | Parkside Associates LP |
| 162. | Pennsville Commercial Associates LP |
| 163. | Pennsville Realty Associates, LP |
| 164. | Reidville Commercial Associates LP |
| 165. | Retreat Avenue Development LP |
| 166. | Riverdale Commercial Associates LP |

| 167. | RK Bradley Associates LP |
| 168. | S&A Retail LC |
| 169. | SDallas, TX, LLC |
| 170. | SDallas TX Realty LP |
| 171. | SFort Worth TX, LLC |
| 172. | SFort Worth TX Realty LP |
| 173. | SLewisville TX LLC |
| 174. | SLewisville TX Realty LP |
| 175. | SPlano TX LLC |
| 176. | SPlano Realty LP |
| 177. | SCP 2001A-CSF-40 LLC |
| 178. | SCP 2001A-CSF-58 LLC |
| 179. | SCP 2001A-CSF-67 LLC |
| 180. | SCP 2001A-CSF-68 LLC |
| 181. | SCP 2001A-CSF-69 LLC |
| 182. | Saratoga Commercial Associates LP |
| 183. | Saratoga Realty Associates, LP |
| 184. | Schoolhouse Associates of Westfield |
| 185. | Sea Properties LLC |
| 186. | Shalen & Konover, Inc |
| 187. | Shalen & Konover Interiors |
| 188. | Shawmet Commercial Associates LP |
| 189. | Silas Deane Associates, LP |
| 190. | SK Commercial Corp. |
| 191. | Society Plaza Commercial Associates LP |
| 192. | Southington Commercial Associates, LP |
| 193. | Southington Commercial Management Corp. |
| 194. | Southington Realty Associates, LP |
| 195. | St. Mary's Commercial Associates LP |
| 196. | St. Mary's Realty Associates, LP |
| 197. | Stateline Management Corp. |
| 198. | Stateline Realty Associates, LP |
| 199. | Stroudsburg Commercial Associates LP |
| 200. | Stroudsburg Realty Associates, LP |
| 201. | Sturbridge Commercial Associates LP |
| 202. | Sturbridge Realty Associates, LP |
| 203. | Taunton Commercial Associates, LP |
| 204. | Taunton Realty Associates, LLC |
| 205. | Three L Commercial Associates LP |
| 206. | Torrington Commercial Associates LP |
| 207. | Towanda Commercial Associates LP |
| 208. | Transit Commercial Associates LP |
| 209. | TRI-State Commercial Associates LP |

| 210. | Troy Commercial Associates LP |
|------|-------------------------------|
| 211. | Troy Commercial LP |
| 212. | Troy Management Corp. |
| 213. | Tunxis Plaza Associates |
| 214. | Tyrone Commercial Associates LP |
| 215. | Tyrone Realty Associates, LP |
| 216. | Union Place Realty Associates, LP |
| 217. | Vigilent LLC |
| 218. | Vernon Pitkin Associates, LLC |
| 219. | Vernon Pitkin Management Corp. |
| 220. | WHope Mills GP LLC |
| 221. | WHope Mills Realty LP |
| 222. | WJohnston Holding LLC |
| 223. | WJohnston LLC |
| 224. | WKettering OH Holding LLC |
| 225. | WKettering OH Realty LLC |
| 226. | WLakeway TX LLC |
| 227. | WLakeway TX Realty LP |
| 228. | WPawtucket Holding LLC |
| 229. | WPawtucket LLC |
| 230. | WPorter TX LLC |
| 231. | WPorter TX Realty LP |
| 232. | WRoswell Holding LLC |
| 233. | WRoswell Realty LLC |
| 234. | WWarwick Holding LLC |
| 235. | WWarwick LLC |
| 236. | WEC 2001A-DC-4 LLC |
| 237. | Warren Commercial Associates, LP |
| 238. | Warren Realty Associates, LP |
| 239. | Waterbury Chase Associates, LLC |
| 240. | Waterbury Plaza Management Corp. |
| 241. | Waterbury Plaza Phase II LP |
| 242. | Weibel Commercial Associates LP |
| 243. | West Hill Commercial Associates LP |
| 244. | Westerly Commercial Associates, LP |
| 245. | Wethersfield Commercial Associates, LP |
| 246. | Willimantic Management Company, LLC |
| 247. | Willimantic Realty Associates, LP |
| 248. | Wiscasset Commercial Associates, LP |
| 249. | Wiscasset Management Corp. |
| 250 | **Entities that have ownership interest in the following properties:** |
| 250.1 | Ames Plaza – Amonia, NY |
| 250.2 | Ames Plaza – Carbondale, PA |

| 250.3 | Ames Plaza – West Hartford, CT |
|---|---|
| 250.4 | Ames Plaza – St. Mary's, PA |
| 250.5 | Ames Plaza – Stroudsburg, PA |
| 250.6 | Ames Plaza – Towanda, PA |
| 250.7 | Ames Plaza – Edgewood, MD |
| 250.8 | Ames Plaza – Tyrone, PA |
| 250.9 | Ames Plaza – Saranac Lake, NY |
| 250.10 | Ames Plaza – Brunswick, ME |
| 250.11 | Ames Plaza – Gouverneur, NY |
| 250.12 | Bishops Corner East |
| 250.13 | Campus Plaza |
| 250.14 | Central Tractor |
| 250.15 | Chamberlain Plaza |
| 250.16 | Crossroad Plaza |
| 250.17 | Enfield Commons |
| 250.18 | Fairview Plaza |
| 250.19 | Frank's Plaza |
| 250.20 | Freshwater Plaza |
| 250.21 | Glassboro Plaza |
| 250.22 | Goff Brook Plaza |
| 250.23 | Hannaford Plaza |
| 250.24 | JoAnne's Plaza |
| 250.25 | Mattatuck Plaza |
| 250.26 | Norwichtown Mall |
| 250.27 | Old National Village |
| 250.28 | Plaza 44 |
| 250.29 | Queen Plaza |
| 250.30 | Quality Market Plaza |
| 250.31 | Shop Rite Plaza |
| 250.32 | Simsbury Commons |
| 250.33 | Simsbury Commons North |
| 250.34 | Simsbury Commons South |
| 250.35 | Stateline Plaza |
| 250.36 | Stepney Place II |
| 250.37 | Stop & Shop Plaza – Wethersfield, CT |
| 250.38 | Stop & Shop Plaza – Westerly, RI |
| 250.39 | Stop & Shop Plaza – Enfield, CT |
| 250.40 | Upper Albany Plaza |
| 250.41 | Waterbury Plaza |
| 250.42 | West Hill Plaza |
| 250.43 | Willimantic BJ's Plaza |