# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

WELLS FARGO BANK, N.A.,       :
      Plaintiff,           :
                              :
v.                           :      3:05-cv-1924 (CFD)
                              :
MICHAEL KONOVER,           :
KONOVER DEVELOPMENT CORP.,   :
KONOVER CONSTRUCTION CORP.,   :
KONOVER & ASSOCIATES, INC.,    :
BLACKBOARD LLC, and RIPPLE LLC, :
      Defendants.         :

## RULING ON MOTIONS FOR SUMMARY JUDGMENT

The plaintiff, Wells Fargo Bank, N.A. ("Wells Fargo"), brought this suit seeking to recover upon a judgment entered by the Circuit Court for Baltimore, Maryland in 2005 (the "Maryland Action").[1]  That judgment was in Wells Fargo's favor against Diamond Point Plaza, L.P. ("DPPLP"), Diamond Point Management Corporation ("DPMC"), Konover Management Corporation ("KMC"), and Oriole Commercial Associates, L.P. ("Oriole") (collectively, the "Judgment Debtors").[2]  In its Second Amended Complaint in the instant action, Wells Fargo asserts, among other claims, that Michael Konover, Konover Development Corporation ("KDC"), Konover Construction Corporation ("KCC"), Konover & Associates, Inc. ("K&A"),

---

[1] Wells Fargo Bank Minn., N.A. v. Diamond Point Plaza L.P., No. 03-C-03-002449 (Md. Cir. Ct. Nov. 16, 2005).

[2] Judgment in the Maryland Action was also entered for Wells Fargo against Michael Konover, American Way Commercial Associates, L.P. ("American Way"), Sam's P.W., Inc. ("Sam's Club"), and Wal-Mart Stores, Inc. ("Wal-Mart"), as later described in this Opinion.

Blackboard LLC, and Ripple LLC (collectively the "defendants") wrongfully prevented Wells

Fargo from collecting on the judgment entered in the Maryland Action.

The defendants have moved for summary judgment on Counts One, Two, Four, Five, Six,

and Seven of the Second Amended Complaint.  Wells Fargo opposes the defendants' motions

and has moved for summary judgment on certain of the defendants' affirmative defenses.

## I.    Factual Background[3]

### A.    The Konover Organization[4]

Michael Konover is the sole shareholder, sole director, and an officer of defendants

KMC, KDC, K&A, and, until March 2007, KCC.  He is also the sole member of defendants

Blackboard and Ripple, and it is claimed that he controls and substantially owns the Judgment

Debtors.  Wells Fargo alleges that together the Judgment Debtors, the defendants, and other

entities owned and controlled by Michael Konover constitute a single business enterprise.

The principal business of the various Konover entities is the construction, development,

or management of commercial real estate in the United States.  KMC was formerly the

"operations hub" of the Konover Organization's business, and typically served as the general

partner for many of the limited partnerships that owned particular properties.  KMC had

ownership interests in those properties and also served as the property manager for many of

---

[3] The following facts are taken from the parties' Local Rule 56(a) statements, summary
judgment briefs, and other evidence submitted by the parties, including depositions.  They are
undisputed unless otherwise indicated.

[4] The Court will refer to the various entities here as part of the "Konover Organization,"
but without the implication that such a reference is intended to resolve the issues in this Opinion.

them.[5]  As detailed below, KDC often served as the developer of the properties and KCC constructed them.  Each of the properties typically was owned by a limited partnership, such as DPPLP.  K&A managed a common cash account (the "Common Cash Account") for many of the Konover entities and also managed much of the Konover Organization's administrative matters, including insurance, benefits, and logistical support.  There is also substantial overlap among the directors and officers of the various entities within the Konover Organization and, except for KCC, some of the Judgment Debtors and defendants have shared the same office space, employees, and website.

      B.       The Diamond Point Plaza in Maryland

One of the properties developed by entities within the Konover Organization was a shopping center known as the Diamond Point Plaza in Baltimore, Maryland.  The Diamond Point Plaza was constructed in 1988 and consists of three buildings, each containing commercial leasing space.  DPPLP owned and operated the Diamond Point Plaza and KMC managed the plaza.  The Diamond Point Plaza was originally financed with a $20 million construction loan.  A subsequent loan, in the amount of $16.25 million, replaced the construction loan.  This loan had a maturity date of January 1, 2000, when a balloon payment of $15.3 million was due.

On June 2, 2000, DPPLP borrowed $15.3 million from Pinnacle Capital Group, L.P. ("Pinnacle") to refinance its note and mortgage on the Diamond Point Plaza.  Paine Webber immediately purchased the loan from Pinnacle after the closing.  As a condition of purchasing the loan, Paine Webber insisted that KMC provide a limited guaranty, which would be in effect only in the event of fraud or certain other inequitable conduct by DPPLP or KMC in connection with

_____

[5] Prior to 2002, KMC managed over sixty properties.

the refinance.[6]  Prior to execution of the KMC guaranty, Paine Webber also expressed concern as

to KMC's financial condition due, in part, to corporate allocations that KMC had made to other

entities within the Konover Organization and because KMC had recently posted a negative

income and had less than $1.3 million in liquid assets.  To satisfy Paine Webber, a subordination

provision was included in the KMC guaranty, which subordinated KMC's corporate allocations

to any claims made by the lender pursuant to the guaranty.  The guaranty was signed on June 1,

2000, by Steven Abney, Executive Vice-President of DPMC and KMC, on behalf of KMC (the

"Guaranty" or "KMC Guaranty").

 After acquiring the Diamond Point Plaza loan from Pinnacle, Paine Webber sold and

assigned the loan to Wells Fargo.  Wells Fargo served as trustee for the loan and ORIX Capital

Markets, LLC ("ORIX") served as special servicer for the loan.

 As of 2000, the two major tenants in the Diamond Point Plaza were a Sam's Club

warehouse store and an Ames department store ("Ames").  On July 31, 2002, Wal-Mart closed

the Sam's Club store in the Diamond Point Plaza, although it continued to make its lease

payments.[7]  Wal-Mart subsequently violated two of the conditions in its Diamond Point lease.

First, Wal-Mart opened a new Sam's Club store in the Golden Ring Mall, which was located

approximately three miles from the Diamond Point Plaza, in violation of the radius restriction in

---

[6] Michael Konover had refused to personally guarantee the loan for the Diamond Point
Plaza refinancing.  Consequently, Paine Webber settled for KMC serving as a guarantor.

[7] Sam's Club is a Wal-Mart affiliate.  Wal-Mart originally held the lease to the Sam's
Club space in the Diamond Point Plaza but transferred the lease to Sam's Club in 1994.  Upon
closing the Sam's Club store, Wal-Mart assumed all of the rights and liabilities under the lease
and Sam's Club assigned all of its rights under the lease to Wal-Mart.

its Diamond Point lease.[8]  Second, Wal-Mart violated Article 8A of its Diamond Point lease,

which limited the use of the leased space to retail-purposes only,[9] when it entered into a license

agreement with "The Wire," an HBO television series, on October 4, 2002, to use the vacant

space created by Sam's Club's departure for filming its episodes.[10]  Wal-Mart also did not notify

DPPLP of its license with The Wire, even though it was obligated to do so under its lease.

In late October 2002, after rejecting its Diamond Point lease in bankruptcy proceedings,

Ames also closed its store in the Diamond Point Plaza and stopped making rent payments.[11]  On

November 1, 2002, following the closing of the Sam's Club store and Ames's default, Michael

Konover instructed DPPLP to not make its mortgage payment on the Diamond Point loan.

Consequently, DPPLP went into default on its note and mortgage on November 6, 2002.  Wells

---

[8] The radius restriction in Wal-Mart's Diamond Point lease prohibited Wal-Mart from opening any other Sam's Club or Wal-Mart store within seven miles of the Diamond Point Plaza. In addition to opening the Sam's Club store in the Golden Ring Mall, Wal-Mart also opened a Wal-Mart store and an additional Sam's Club store in the Port Covington Plaza, which was located in South Baltimore—both in violation of the lease's radius restriction.

[9] A June 7, 1995, Declaration of Easements, Restrictions, and Obligations limited all stores in the Diamond Point Plaza to sales and services typically found in a retail shopping center.  On May 19, 2000, the Declaration of Easements was amended to include another phase of the Diamond Point Plaza, Phase II, which was a nearby 5.28 acre commercial development parcel.  Phase II of the Diamond Point Plaza was also restricted to sales and services typically found in retail shopping centers or office use.

[10] Pursuant to the license, The Wire paid Wal-Mart $53,157.75 per month for rent, approximately one-half of Wal-Mart's monthly rent obligation under its Diamond Point lease ($108,000).

[11] Ames had filed for bankruptcy protection in August 2001.

Fargo then petitioned a Maryland state court for the appointment of a receiver and, on November 26, 2002, one was appointed to manage the Diamond Point Plaza property.[12]

    C.    <u>The Maryland Action Concerning the Diamond Point Plaza and the KMC Guaranty</u>

In March 2003, Wells Fargo brought suit in the Circuit Court for Baltimore, Maryland, seeking to hold DPPLP and KMC liable for the Diamond Point Plaza note and mortgage.[13]  The third, and final, amended complaint was filed in the Maryland Action in July 2004.  That complaint asserted claims seeking to hold DPPLP, DPMC, and Oriole liable under the Diamond Point Plaza note and mortgage for fraud, intentional misrepresentation, and gross negligence

---

[12] On May 16, 2006, following the foreclosure sale of the Diamond Point Plaza, the Circuit Court for Baltimore County terminated the receivership and discharged the receiver.  <u>See Wells Fargo Bank Minn., N.A. v. Diamond Point Plaza L.P.</u>, No. 03-C-02-012947 (Md. Cir. Ct. May 16, 2006).

[13] In addition to the appointment of a receiver and the Maryland Action, two other related actions were also litigated in Maryland.  First, on January 17, 2003, Wells Fargo filed a complaint for foreclosure of the Diamond Point Plaza in the Circuit Court for Baltimore County. The foreclosure sale was held on November 21, 2005, and the Circuit Court ratified the sale, despite DPPLP's objections.  <u>See Wells Fargo Bank Minn., N.A. v. Diamond Point Plaza L.P.</u>, No. 03-C-03-000604 FC (Md. Cir. Ct. Feb. 10, 2006).  The Maryland Court of Special Appeals affirmed the Circuit Court's order.  <u>See Diamond Point Plaza L.P. v. Wells Fargo Bank Minn., N.A.</u>, No. 116 (Md. Ct. Spec. App. May 8, 2007).

On November 11, 2005, Diamond Point Plaza Phase II, LLC, at the direction of Michael Konover, brought suit against Wells Fargo, ORIX, and the receiver of the property in the Circuit Court for Baltimore County, claiming a violation of certain use restrictions.  This suit was dismissed with prejudice on May 9, 2007.  <u>See Diamond Point Plaza Phase II, LLC v. Wells Fargo Bank N.A.</u>, No. 03-C-05-012167 CN (Md. Cir. Ct. May 9, 2007).

The several actions litigated in Maryland are described in further detail later in this Opinion in the Court's analysis of Wells Fargo's motion for summary judgment on certain of the defendants' affirmative defenses.

based on misrepresentations made by DPPLP near the time the Pinnacle loan closed.[14]  The

complaint also sought to impose liability on KMC for breach of the Guaranty.  In addition, Wells

Fargo brought allegations of misappropriation and fraudulent conveyance against Michael

Konover and MCK, Inc.[15] for a $633,000 rental payment transfer that DPPLP made to Konover

in November 2002,[16] and asserted several claims against Wal-Mart and related entities.

In May 2005, the Maryland court announced its intent to enter a substantial judgment for

Wells Fargo and, in November 2005, the amended final judgment was entered.  That judgment

awarded over $22.8 million to Wells Fargo for DPPLP, DPMC, and Oriole's intentional

misrepresentation and gross negligence under the Diamond Point loan and for KMC's breach of

the Guaranty.  The Circuit Court also entered judgment against Michael Konover for the

fraudulent transfer of rents he received from DPPLP in the amount of $633,000.[17]  Finally, the

Circuit Court held Wal-Mart and Sam's Club liable for breach of contract in the amount of

approximately $1.3 million.

---

[14] DPMC is the general partner of Oriole; Oriole is the general partner of DPPLP.

[15] MCK, Inc. is a Konover related entity that is wholly owned and controlled by Michael Konover.  MCK, Inc. provided funding for the Konover Organization.

[16] On November 22, 2002, following its default on the Diamond Point note and mortgage, DPPLP transferred $633,000 to Michael Konover.

[17] American Way, which is a limited partner of DPPLP, was held jointly and severally liable for the judgment entered against Konover up to its share of funds transferred by DPPLP ($243,500).

D.        Collection of the Judgment from the Maryland Action

Following entry of the judgment in the Maryland Action, Wells Fargo engaged in

post-judgment discovery aimed at locating the assets of KMC and the other Judgment Debtors.

That discovery involved the following.

Prior to 2000, KMC's primary business was managing the Konover Organization's

properties through its leasing division.  KMC also had ownership interests in a number of the

properties it managed and received leasing commission fees from the properties.  In late 1999,

prior to DPPLP closing on the Diamond Point loan from Pinnacle, KMC transferred its leasing

division to KDC for no consideration.  In 2001, Michael Konover announced a plan to sell a

significant portion of the Konover Organization's property portfolio through a series of

transactions (the "Portfolio Sales").  Then, in November 2002 and February 2003, following

DPPLP's default on the Diamond Point note and mortgage, Michael Konover and the Konover

Organization carried out the planned Portfolio Sales.[18]  Certain properties that were sold as part

of the Portfolio Sales were held by entities in which KMC had an ownership interest.  As a result

of the Portfolio Sales, KDC received $6.3 million in renewal option leasing commissions that

KMC may have otherwise received.  In total, KDC received $9.3 million from the Portfolio

Sales, $7 million of which was subsequently transferred to Michael Konover.  K&A also

received $1.1 million from the Portfolio Sales for sales expenses.

Wells Fargo also claims that during its discovery following the Maryland Action, it

learned that KMC sold nearly all of its remaining assets while the Maryland Action was pending.

---

[18] In addition to the Portfolio Sales, the Konover Organization also sold other properties
held by KMC in separate, "one-off," transactions and made a $1.1 million cash distribution to
Michael Konover in December 2002.

Specifically, in May 2005, as it became increasingly apparent that DPPLP, DPMC, Oriole, and KMC would be held liable for the Diamond Point loan in the Maryland Action, KMC transferred and sold its assets to other entities within the Konover Organization, including KDC.  In addition, Michael Konover formed Blackboard and Ripple for the sole purpose of receiving KMC's assets—in twenty-two separate transactions in 2005, KMC transferred its assets to Blackboard and Ripple, totaling over $200,000 and $187,000, respectively.  Also in 2005, Konover removed KMC from the Konover Organization's Common Cash Account and K&A obtained a security interest in KMC's assets.

Approximately $17 million of the $23 million judgment Wells Fargo obtained in the Maryland Action remains unpaid.[19]  Wells Fargo now brings multiple claims against the defendants: Wells Fargo seeks to pierce the corporate veil of DPPLP, DPMC, Oriole, and KMC to reach the defendants' assets and collect the remaining unpaid balance from the Maryland Action (Counts One and Two); claims tortious interference (Counts Four and Seven); asserts a breach of fiduciary duty against Michael Konover (Count Five); and alleges successor liability as to KDC, Blackboard, and Ripple (Count Six).[20]

## II.   Legal Standard

In a summary judgment motion, the burden is on the moving party to establish that there are no genuine disputes of material fact and that it is entitled to judgment as a matter of law.  See

---

[19] Both Michael Konover and American Way have satisfied the judgments entered against them in the Maryland Action.  The $22.8 million judgment entered against DPPLP, DPMC, Oriole, and KMC, however, remains largely unpaid.

[20] Wells Fargo also brings a fraudulent transfer claim in Count Three of the Second Amended Complaint.  The defendants, however, have not moved for summary judgment as to Count Three at this time.

Fed. R. Civ. P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Eng'g Corp., 221 F.3d 293, 300 (2d Cir. 2000); Carlton v. Mystic Transp., Inc., 202 F.3d 129, 133 (2d Cir. 2000) (citing Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1223 (2d Cir. 1994)).  Once the moving party has met its burden, in order to defeat the motion the non-moving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor. Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

In assessing the record, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought.  See Anderson, 477 U.S. at 255; Graham, 230 F.3d at 38.  "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party."  Carlton, 202 F.3d at 134. Consistent with this standard, all evidence favorable to the non-moving party must be credited if a reasonable jury could credit it.  Evidence favorable to the moving party, on the other hand, must be disregarded unless a reasonable jury would have to credit it because it comes from a disinterested source and is uncontradicted and unimpeached.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150–51 (2000).  "When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised on the basis of the evidence presented, the question must be left to the jury.  Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

III.    **Discussion**

    A.    Counts One & Two: Piercing the Corporate Veil

In Counts One and Two, Wells Fargo seeks to pierce the corporate veils of DPPLP, DPMC, Oriole, and KMC, and hold the defendants in this action liable for the $17 million that is outstanding from the judgment entered in the Maryland Action.

Generally, a corporation is a distinct legal entity that shields its shareholders from the corporation's liabilities. 1 Phillip I. Blumberg et al., Corporate Groups, § 10.02(B) (2d ed. 2010). The corporate form should only be disregarded when "[the corporate] entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime." Blumberg, supra, § 10.02(B) (quoting United States v. Milwaukee Refrigerator Transit Co., 142 F. 247, 255 (C.C.E.D. Wis. 1905)); see also Toshiba Am. Med. Sys., Inc. v. Mobil Med. Sys., Inc., 730 A.2d 1219, 1224 (Conn. App. Ct. 1999) ("When the statutory privilege of doing business in the corporate form is employed as a cloak for the evasion of obligations, as a mask behind which to do injustice, or invoked to subvert equity, the separate personality of the corporation will be disregarded." (internal quotations and citations omitted)). Where the corporate entity is not used to contravene legal rights and liabilities, the corporate form should not be disregarded. See Angelo Tomasso, Inc. v. Armor Constr. & Paving, Inc., 447 A.2d 406, 413 (Conn. 1982).

Connecticut courts recognize two theories under which the corporate veil may be pierced—the instrumentality rule and the identity rule.[21] See Zaist v. Olson, 227 A.2d 552,

---

[21] "The law of the state of incorporation determines when the corporate form will be disregarded." Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995); see also Weber v. U.S. Sterling Sec., Inc., 924 A.2d 816, 822–23 (Conn. 2007). Here, KMC, KDC, KCC, and K&A are Connecticut corporations, Blackboard and Ripple are Connecticut limited liability companies, and Michael Konover resides in Connecticut. Thus, Connecticut law applies to Wells Fargo's

557–58 (Conn. 1967).  To prevail under either rule, the plaintiff must prove "exceptional

circumstances, for example, where the corporation is a mere shell, serving no legitimate purpose,

and used primarily as an intermediary to perpetuate fraud or promote injustice."  <u>Tomasso</u>, 447

A.2d at 412 (internal quotations omitted).  Under Connecticut law, determining whether the

circumstances of a case rise to the level necessary to pierce the corporate veil is a factual inquiry.

<u>See</u> <u>id.</u> at 414.  "The concept of piercing the corporate form is equitable in nature. . . . No hard

and fast rule . . . as to the conditions under which the entity may be disregarded can be stated as

they vary according to circumstances of each case."  <u>Id.</u> at 411 (internal quotations and citations

omitted).

As a threshold matter, this case presents a set of facts and claims not customarily found in

most veil-piercing cases.  Unlike the usual veil-piercing inquiry, which typically involves a single

parent company and its subsidiary or a single corporation and its controlling shareholder, in this

case Wells Fargo seeks to pierce the corporate veil of multiple entities and hold multiple

corporations and an individual liable.  Thus, the Court must analyze Wells Fargo's veil-piercing

claims as they relate to each Judgment Debtor and defendant, individually.  <u>See</u> <u>AG Worldwide</u>

<u>v. Red Cube Mgmt. AG</u>, No. 01CIV.1228, 2002 WL 417251, at *4 (S.D.N.Y. Mar. 15, 2002).

*1.    Count One: Instrumentality Rule*

Under Connecticut law, "[c]ourts will disregard the fiction of separate legal entity when a

corporation 'is a mere instrumentality or agent of another corporation or individual owning all or

most of its stock.'"  <u>Epperson v. Richter</u>, No. 3:01CV1798, 2004 WL 2211715, at *10 (D. Conn.

Sept. 24, 2004) (quoting <u>Hoffman Wall Paper Co. v. City of Hartford</u>, 159 A. 346, 348 (Conn.

---

veil-piercing claims.

1932)).  To pierce the corporate veil under the instrumentality rule, the plaintiff must prove three

elements:

> (1) Control, not mere majority or complete stock control, but complete
> domination, not only of finances but of policy and business practice in respect to
> the transaction attacked so that the corporate entity as to this transaction had at the
> time no separate mind, will or existence of its own; and (2) [s]uch control must
> have been used by the defendant to commit fraud or wrong, to perpetrate the
> violation of a statutory or other positive legal duty, or a dishonest or unjust act in
> contravention of plaintiff's legal rights; and (3) [t]he aforesaid control and breach
> of duty must proximately cause the injury or unjust loss complained of.

Zaist, 227 A.2d at 558.  In determining whether a corporation was so controlled or dominated,

courts look at several factors, including:

> (1) the absence of corporate formalities; (2) inadequate capitalization; (3) whether
> funds are put in and taken out of the corporation for personal rather than corporate
> purposes; (4) overlapping ownership, officers, directors, personnel; (5) common
> office space, address, phones; (6) the amount of business discretion by the
> allegedly dominated corporation; (7) whether the corporations dealt with each
> other at arm's length; (8) whether the corporations are treated as independent
> profit centers; (9) payment or guarantee of debts of the dominated corporation;
> and (10) whether the corporation in question had property that was used by other
> of the corporations as if it were its own.

Litchfield Asset Mmgt. Corp. v. Howell, 799 A.2d 298, 313 (Conn. App. Ct. 2002).  Although

no single factor is dispositive, the Connecticut Supreme Court has stated that the element of

control is the "key factor" in deciding whether to disregard the corporate entity.  See Tomasso,

447 A.2d at 412.

In Tomasso, the Connecticut Supreme Court held that, under the instrumentality rule, the

plaintiff must prove that the defendant exercised control or dominance over the business affairs

of the corporation "with respect to the *specific transaction* attacked."  Tomasso, 447 A.2d at 412

(emphasis added).  Thus, to prove causation, the plaintiff must prove control over the fraudulent

-13-

transactions, not just general control over the dominated entity.  See Epperson, 2004 WL

2211715, at *13 ("[T]he injured party must show some connection between its injury and the

parent's improper manner of doing business . . . .").  Connecticut courts have held that "use of

the corporate form to avoid paying an obligation incurred by contract that is reduced to a

judgment could be sufficient to satisfy the instrumentality rule."  Id. at *12 (citing Davenport v.

Quinn, 730 A.2d 1184, 1197 (Conn. App. Ct. 1999)); see Toshiba, 730 A.2d at 1224.  In this

case, Wells Fargo has presented evidence that the defendants used the corporate form and their

control of the Judgment Debtors to avoid paying the substantial judgment entered in Wells

Fargo's favor in the Maryland Action.  Thus, the "specific" transactions attacked in Wells

Fargo's veil-piercing claims are the transfers KMC engaged in during both the Portfolio Sales

and the asset dispositions in 2005 that Michael Konover directed immediately preceding the

Maryland court entering its judgment against KMC and the other Judgment Debtors.[22]  See

McCarthy v. State Five Indus. Park, Inc., No. HHDCV054015888S, 2009 WL 104287, at *22–23

(Conn. Super. Ct. Jan. 5, 2009) (finding that the causation element of the instrumentality rule was

---

[22] The defendants assert that Wells Fargo is barred by *res judicata* from relying on issues
that were tried in the Maryland Action for support of its veil-piercing claims.  This Court,
however, held in its March 2008 summary judgment opinion that *res judicata* did not bar Wells
Fargo's claims.  See Wells Fargo Bank, N.A. v. Konover, No. 3:05CV1924, 2008 WL 762195, at
*2–4 (D. Conn. Mar. 20, 2008).  The Court stated that "matters presented in the Maryland
[A]ction will be relevant to proving 'complete domination' of the Judgment Debtors or 'unity of
interest' of the entities within the Konover Organization. . . . Counts 1 and 2 are clearly
addressed at recovering for a loss distinct from those at issue in Maryland.  The claims here are
based on the Judgment Debtors' inability to satisfy the Maryland judgment, rather than the
mortgage default underlying that judgment."  Id. at *4.  The Court agrees with the defendants,
however, that evidence relating to DPPLP and KMC's fraudulent misrepresentation of its
finances in procuring the Diamond Point loan is not relevant to Count One as it does not satisfy
Tomasso's causation requirement.

satisfied where the defendants transferred away the judgment debtors' funds to avoid collection

of a judgment).

The defendants contend that the Portfolio Sales are not causally related to Wells Fargo's

veil-piercing claims.  Although Michael Konover announced the Portfolio Sales in early 2001,

prior to DPPLP defaulting on the Diamond Point loan, there remains a genuine dispute of

material fact as to the purpose and timing of these sales.  In August 2001, plans for the

construction of the nearby Port Covington Sam's Club store were already in place and Ames had

filed for bankruptcy.  Viewing the facts in the light most favorable to the plaintiff, a reasonable

jury could conclude that Konover foresaw the eventual default of the Diamond Point loan and

KMC's corresponding liability under the Guaranty, and therefore carried out the Portfolio Sales

prior to the Maryland Action to avoid liability.  Therefore, there is evidence that both the

Portfolio Sales and 2005 asset sales are causally connected to Wells Fargo's injury and relevant

to Wells Fargo's veil-piercing claims.

Wells Fargo has failed to produce any significant evidence of how the defendants

controlled or dominated DPPLP, DPMC, and Oriole in a manner that caused Wells Fargo the

injury complained of in this action.  Even though Konover personally instructed DPPLP to

default on the Diamond Point loan, there is no causal link between such control and Wells

Fargo's inability to collect the judgment.  Unlike the claimed fraudulent KMC conveyances,

Wells Fargo has not shown how Konover or the other defendants used their control of DPPLP,

DPMC, or Oriole to abuse the corporate form in an effort to avoid paying the judgment entered in

the Maryland Action.  Accordingly, with respect to Wells Fargo's attempt to pierce the corporate

veils of DPPLP, DPMC, and Oriole, the Court grants in part the defendants' motion for summary judgment as to Count One.

"The instrumentality rule imposes individual liability for corporate actions upon a shareholder, director, or officer of a corporate entity that is, in economic reality, the instrumentality of the individual." Campisano v. Nardi, 562 A.2d 1, 5–6 (Conn. 1989).  As the sole shareholder, Chairman, and Director of KMC, Michael Konover exercised significant control and domination over KMC's business practices and finances.  But see Naples v. Keystone Bldg. & Dev. Corp., 990 A.2d 326, 342 (Conn. 2010) (noting that an individual's significant role in the decision making of a company "is no more than a reflection of the reality that all corporations act through individuals").  Courts have held that the bad faith depletion of a company's funds or assets to interfere with the collection of a judgment is sufficient to satisfy both the fraud and proximate cause elements of the instrumentality rule.  See Litchfield Asset Mgmt., 799 A.2d at 315; see also Epperson, 2004 WL 2211715, at *12.  The Court finds that there are genuine disputes of material fact as to Michael Konover's role and motive in selling KMC's assets to KDC, Blackboard, and Ripple.  Konover claims that he sold KMC's assets to liquidate KMC so that KMC would be able to pay its legal bills in connection with the Maryland Action.  A reasonable jury, however, could conclude that the purpose of the Portfolio Sales and 2005 asset sales was to shield KMC's assets from Wells Fargo in connection with Wells Fargo's attempt to collect its judgment from the Maryland Action.  In fact, Michael Gorman, who was KMC's president at the time of the 2005 asset sales, stated in his deposition that he did not recall any discussion of KMC's need for liquidity at the time of the sales.  If Konover did not transfer away KMC's assets and a large source of KMC's revenue (the renewal option leasing

-16-

commissions), Wells Fargo may have been able to collect a larger portion of the Maryland judgment.  In addition, as de facto banker for the Konover Organization, there is evidence that Konover exercised significant control over KMC in determining how revenue and expenses were allocated.  For example, Konover decided that certain management fees that should have been paid to KMC were to be reallocated to KDC.  Ultimately, whether Konover's control of KMC rises to a level of "complete domination" with respect to KMC evading its obligation under the Maryland judgment is a question for the jury.  See, e.g., Epperson, 2004 WL 2211715, at *13 (denying plaintiffs' and defendants' cross-motions for summary judgment because of a material dispute as to the degree of control exercised in a veil piercing case).  Because Wells Fargo has presented genuine disputes of material fact as to Konover's control of KMC for the purpose of shielding KMC's assets from Wells Fargo, the Court denies the defendants' motion for summary judgment in Count One as to Michael Konover.

The Court also finds that there are genuine disputes of material fact as to whether KDC completely dominated KMC.  As a result of the Portfolio Sales, KDC received more than $9 million—$7 million of which KDC then transferred to Michael Konover.  In addition, two lease commission payments that were originally paid to KMC in December 2002, totaling $130,500, were later reclassified to KDC.  Finally, in October 2007, KMC transferred its two remaining management contracts, which generated management fees, to KDC for no apparent consideration.  Based on the evidence presented of these transactions, a reasonable jury could conclude that KDC, through Michael Konover's direction, dominated and controlled KMC's business practices in such a manner as to perpetuate KMC's attempt to shield its assets from

Wells Fargo.  Therefore, the defendants' motion for summary judgment as to Count One for KDC is denied.

Unlike KDC, there is no evidence that KCC was involved in any of the transactions involving the sale and transfer of KMC's assets.  There is no evidence that KCC dominated or controlled KMC in any manner, and KCC is not the proximate cause of Wells Fargo's inability to collect its judgment from the Maryland Action.  KCC was the construction arm of the Konover Organization, through which it had a construction contract with Wal-Mart.  Wells Fargo alleges that KCC was the direct beneficiary of Michael Konover's decision to ignore the radius restriction in Wal-Mart's Diamond Point Plaza lease because KCC was asked to bid on the construction of the Port Covington Sam's Club store.  Such a limited nexus to Wells Fargo's inability to collect the judgment, however, is insufficient for the extreme remedy of piercing the corporate veil.  Accordingly, the defendants' motion for summary judgment as to KCC in Count One is granted.

K&A was principally the administrative arm of the Konover Organization.  Prior to the Diamond Point loan default and for a period thereafter, K&A managed the Konover Organization's Common Cash Account, which KMC was a member of until June 2005.[23]  Through K&A's operation of the Common Cash Account, Michael Konover controlled the Konover Organization's finances, including KMC's, but there is no evidence that K&A itself, as an entity, dominated or controlled KMC through its management of the account.  K&A did,

---

[23] The parties dispute whether ownership of the Common Cash Account was transferred from K&A to KDC in March 2005.  KDC began receiving bank statements for the account around that time but Wells Fargo maintains that K&A remained the account holder.  Around November 2005, a new bank account was created to replace the Common Cash Account.  This new account was held in the name of a new Konover entity, Account Management LLC.

however, obtain a security interest in KMC's assets in July 2005, and received $1.1 million in

"sales expenses" from KMC as a result of the Portfolio Sales.  Although the security interest and

allocation of sales expenses may be evidence of Konover's alleged scheme to deplete KMC's

assets, it is not enough to create a genuine dispute of material fact as to K&A's alleged complete

domination and control of KMC's policy and business practices.  Furthermore, despite that K&A

was the corporate office for the Konover Organization and provided several central services for

the Konover Organization, such administrative support is distinct from the domination or control

of business policy and finances required under the instrumentality rule.  Therefore, the Court

grants the defendants' motion for summary judgment as to Count One for K&A.

Finally, the Court finds that there are genuine disputes of material facts as to whether

Blackboard and Ripple dominated and controlled KMC.  Michael Konover formed Blackboard

and Ripple in 2005 for the sole purpose of receiving KMC's property interests.  In June 2005,

after the Circuit Court in Maryland announced its intention to enter judgment against the

Judgment Debtors, there is evidence that Konover transferred KMC's interest in the Konover

Family Limited Partnership, valued at $187,885, to Ripple.  Then, from August 2005 through

December 2005, Konover apparently caused KMC to transfer eighteen of its interests in various

property holdings to Blackboard.  There is evidence that, other than receiving KMC's assets,

Blackboard and Ripple may have served no legitimate business purpose.  Although Konover

claims that the purpose of transferring KMC's assets was to raise funds for KMC's anticipated

legal bills from the Maryland Action, there is a genuine dispute of material fact as to the intent of

the transfers.  If the purpose of the transfers really was to increase KMC's liquidity, it is relevant

that all of the professional costs associated with the transfers, totaling more than $343,000, were

charged to KMC rather than split proportionately among KMC, Blackboard, and Ripple.  In addition, there has been evidence presented that no effort was made to sell KMC's assets for a higher value to market buyers.  Based on this evidence, a reasonable jury could conclude that, through Konover, Blackboard and Ripple dominated KMC in causing KMC to transfer its assets away in anticipation of the Maryland judgment.  Thus, the Court denies the defendants' motion for summary judgment as to Blackboard and Ripple in Count One.

> 2.    *Count Two: Identity Rule*

"The identity rule primarily applies to prevent injustice in the situation where two corporate entities are, in reality, controlled as one enterprise because of the existence of common owners, officers, directors or shareholders and because of the lack of observance of corporate formalities between the two entities."  <u>Tomasso</u>, 447 A.2d at 413.  Although the identity rule and the instrumentality rule have been characterized as "interchangeable," <u>id.</u> at 421 n.6 (Borden, J., dissenting), Connecticut's identity rule focuses less on control and more on economic integration and enterprise law.  <u>See</u> Blumberg, <u>supra</u>, § 11.02.  To pierce the corporate veil under the identity rule, the plaintiff must prove

> such a unity of interest and ownership that the independence of the corporations had in effect ceased or had never begun, an adherence to the fiction of separate identity would serve only to defeat justice and equity by permitting the economic entity to escape liability arising out of an operation conducted by one corporation for the benefit of the whole enterprise.

<u>Zaist</u>, 227 A.2d at 558.

In determining whether to pierce the corporate veil and hold an individual liable under the identity rule, courts have considered, most importantly, the manner in which the individual uses the corporate assets.  <u>See</u> <u>Litchfield Asset Mgmt.</u>, 799 A.2d at 315.  "[T]he separate corporate

-20-

entities or personalities of affiliated corporations will be recognized, absent illegitimate purposes,

unless: (a) the business transactions, property, employees, bank and other accounts and records

are intermingled; (b) the formalities of separate corporate procedures for each corporation are not

observed . . . (c) the corporation is inadequately financed as a separate unit from the point of

view of meeting its normal obligations . . . (d) the respective enterprises are not held out to the

public as separate enterprises; [or] (e) the policies of the corporation are not directed to its own

interests primarily but rather to those of the other corporation." SFA Folio Collections, Inc. v.

Bannon, 585 A.2d 666, 673 (Conn. 1991).  "Although the 'identity' or 'alter-ego' doctrine has

been primarily applied to reach beyond the veil to another corporation, it may also be employed

to hold an individual liable."  Klopp v. Thermal-Sash, Inc., 534 A.2d 907, 908 n.3 (Conn. App.

Ct. 1987).

 The Court finds that there is insufficient evidence to pierce the corporate veils of DPPLP,

DPMC, and Oriole under the identity rule.  Although Michael Konover and KMC have an

indirect ownership interest in DPPLP,[24] Wells Fargo has not produced any evidence that would

permit the Court to disregard the corporate entity of these Judgment Debtors.  While these

Judgment Debtors shared a common interest in the Diamond Point Plaza with some of the

defendants, piercing the corporate veil is an extreme remedy and there is no indication that

DPPLP, DPMC, or Oriole was not sufficiently independent of the defendants.  Accordingly, the

Court declines to pierce the corporate veils of DPPLP, DPMC, and Oriole, and grants the

defendants' motion for summary judgment as to Count Two in part.

---

 [24] KMC has a one percent interest in American Way, which is a limited partner of
DPPLP.

The Court finds, however, that there are triable disputes of material facts as to the unity of interest and ownership between KMC and Michael Konover, KMC and KDC, and KMC and K&A.  First, there is substantial overlap of the officers, directors, and employees of KMC, KDC, and K&A.  Furthermore, KMC, KDC, and K&A all share, or have shared, the same office space, website, and more importantly, the same bank account.  The Konover Organization's Common Cash Account, and the evidence of commingling of funds among members of that account, is significant evidence of the lack of identity among KMC, Konover, KDC, and K&A.  For example, in Litchfield Asset Management, the defendant failed to maintain any corporate formalities and regularly used corporate funds for personal uses; the defendant's disregard for the corporate form was enough evidence for the court to affirm the trial court's decision to pierce the corporate veil and hold the defendant liable for the outstanding judgment under the identity rule.  See 799 A.2d at 315–16; see also Davenport, 730 A.2d at 1197 (piercing the corporate veil under the identity rule where the owner commingled funds and removed assets from one entity to pay another entity's expenses).  As banker for the Konover Organization, Michael Konover managed the cash management decisions for KMC through the Common Cash Account.  In this role, Konover withdrew funds from the account at his discretion and there is evidence that he often failed to record personal loans to the Konover Organization in the organization's general ledgers.[25]  It also appears that revenue and expenses were often not properly allocated to the correct corporate entity, which indicates a lack of corporate separateness.  See Davenport, 730 A.2d at 1197 (finding that, among other evidence, "the failure to completely document various

---

[25] The Common Cash Account was linked to a separate account in Konover's name. Apparently, Konover would deposit and withdraw money from the Common Cash Account either directly or through MCK, Inc.

transactions [and] the free use by the entities and [the defendant] to make . . . loans and pay various debts" was sufficient for purposes of satisfying the identity rule).  In addition, through use of the Common Cash Account, it appears that KMC often did not receive management fees to which it was entitled and K&A earned interest on the funds in the account, despite that the interest should have been distributed proportionately to the various members of the account.

The defendants maintain that all financial transactions among and between the various entities that comprised the Konover Organization were conducted at arms' length.  When KMC's assets were sold to KDC, however, there is evidence that the sales were never made public to outside corporations and the accountants' valuation of KMC's assets was not finished until after the paperwork for many of the sales was already completed.  The defendants point to the fact that each Konover entity has filed its own tax returns and maintained its own corporate records.  Michael Konover, however, is a sophisticated business person and the filing of corporate records for the various entities within the Konover Organization is not, by itself, adequate proof of corporate separateness.  Given Konover's significant ownership stake in KMC, KDC, and K&A, the defendants' use of the Common Cash Account, the common office space and website, and the overlap in management, the Court finds that there are genuine disputes of material facts as to whether KMC was the alter ego of these defendants under the "identity" rule.[26]  Accordingly, the Court denies the defendants' motion for summary judgment as to Count Two for Michael Konover, KDC, and K&A.

---

[26] Even though it is unclear whether a causal link is required under the identity rule, the Court notes that evidence of causation exists here—due to the commingling of funds in the Common Cash Account, Konover was arguably able to strategically shift funds to or away from KMC, KDC, and K&A, thereby hindering Wells Fargo's ability to recover the judgment.

Unlike KDC and K&A, KCC did not share the same office space with KMC and was not a member of the Konover Organization's Common Cash Account.  Wells Fargo claims that a unity of interest exists between KCC and KMC because KCC was a frequent building contractor for Wal-Mart.  Such limited unity of interest, however, is insufficient for piercing the corporate veil and there is no additional evidence to support a finding that KMC was KCC's alter ego.  Accordingly, the Court grants the defendants' motion for summary judgment as to Count Two with respect to KCC.

As discussed in the foregoing instrumentality rule analysis, Blackboard and Ripple were apparently formed for the sole purpose of receiving KMC's assets.  Other than serving this function, there is evidence that Blackboard and Ripple had no legitimate business operations.  In fact, Blackboard and Ripple have no employees.  Furthermore, although stock ownership is not dispositive under the identity rule, Michael Konover was the sole shareholder of Blackboard, Ripple, and KMC, which indicates a strong unity of interest and ownership.  In addition, all three entities shared the same office space in Farmington, Connecticut, and they shared some of the same officers and directors.[27]  Because Wells Fargo seeks to pierce KMC's corporate veil due to its inability to recover the Maryland judgment, it is highly relevant that the transfers made to Blackboard and Ripple were allegedly arbitrarily valued.  A reasonable jury could find that Blackboard and Ripple are the alter egos of KMC and that it would "defeat justice" to allow Blackboard and Ripple to shield the assets they received from KMC from Wells Fargo.  Thus, the Court denies the defendants' motion for summary judgment as to Count Two for Blackboard and Ripple.

---

[27] James Ainsworth was the Treasurer of KMC, Blackboard, and Ripple.

B.      Count Four: Tortious Interference with Business Relations

In Count Four, Wells Fargo claims that Michael Konover tortiously interfered with its contract, or in the alternative, its prospective contract, with The Wire.

After judgment was entered in the Maryland Action, Wells Fargo demanded that Wal-Mart evict The Wire from its space at the Diamond Point Plaza due to Wal-Mart's continuing violation of the retail-only restriction contained in its lease. Prior to Wal-Mart taking such action, however, Wells Fargo made a separate proposal to The Wire on June 8, 2005. Wells Fargo made an offer to The Wire to remain in the Sam's Club space for one year in exchange for a $650,000 cash payment. The offer was non-negotiable and conditioned on the agreement of, among others, Michael Konover. The Wire's attorney responded to Wells Fargo's offer on June 13, informing Wells Fargo that it planned to accept its offer but had to first obtain the consent of certain parties. Prior to The Wire actually accepting the offer, however, Konover's lawyers for Phase II of the Diamond Point Plaza objected to the proposed offer. Specifically, on behalf of Diamond Point Plaza Phase II, Konover's lawyer, Bud Clark, sent a letter to Wells Fargo's lawyer on June 14, contesting the proposed non-retail use of the Sam's Club space. In the letter, Clark objected to the continued license of the commercial space to The Wire because such occupancy violated Section 5.1 of the Declaration of Easements. In compromise, Clark, on behalf of Phase II, offered to waive enforcement of the retail-only restriction in exchange for half of all the funds to be received from The Wire in rent. Wells Fargo rejected Konover's offer, subsequently withdrew its offer to The Wire, and demanded that The Wire vacate the premises. Wells Fargo now claims that Michael Konover tortiously interfered with its anticipated lease with The Wire by demanding a portion of the lease proceeds.

-25-

1.    *Choice of Law*

In deciding which law applies, a "federal court sitting in diversity applies the choice of law rules of the forum state."  Lee v. Bankers Trust Co., 166 F.3d 540, 545 (2d Cir. 1999).

Because the parties in this case are in federal court under diversity jurisdiction, this Court will apply Connecticut's choice of law rules.  In tort claims, Connecticut applies the law of the place of the injury; if, however, this yields an arbitrary result, then Connecticut applies the approach of the Restatement Second on Conflicts of Law, which utilizes the "most significant relationship" test.  See O'Connor v. O'Connor, 519 A.2d 13, 15, 21–22 (Conn. 1986).  Recently, courts applying Connecticut choice of law have used the "most significant relationship" approach, even where applying the law of the place of injury would lead to the same result.  See U.S. Fid. & Guar. Co. v. S.B. Phillips Co., Inc., 359 F. Supp. 2d 189, 206 (D. Conn. 2005).  In applying the "most significant relationship" test, courts consider four factors:

> (a) the place of the injury; (b) the place where the conduct causing the injury occurred; (c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (d) the place where the relationship, if any, between the parties is centered.

Id. (quoting Restatement (Second) Conflict of Laws, § 145(2)).  In applying these factors, it is clear that Maryland has the most significant relationship to Wells Fargo's tortious interference claim—the alleged injury occurred in Maryland and the relationship between the parties was created out of and based on the Diamond Point Plaza, which is also located in Maryland.

Therefore, Maryland law controls Wells Fargo's tortious interference claim in Count Four.

2.    *Tortious Interference*

To prove intentional interference with business relations under Maryland law, the plaintiff must produce evidence of: "(1) intentional and willful acts; (2) calculated to cause

damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause

such damage and loss, without right or justifiable cause on the part of the defendants; and (4)

actual damage and loss resulting." Berlyn, Inc. v. Gazette Newspapers, 223 F. Supp. 2d 718, 741

(D. Md. 2002) (citing Alexander & Alexander v. B. Dixon Evander & Assocs., Inc., 650 A.2d

260, 269 (Md. 1994)).

      Maryland recognizes two types of tort actions for interference with business relationships:

(1) inducing the breach of an existing contract and (2) maliciously interfering with economic

relationships in the absence of a breach of contract.  See Natural Design, Inc. v. Rouse Co., 485

A.2d 663, 674 (Md. 1984).

> The principle underlying both forms of the tort is the same: under certain
> circumstances, a party is liable if he interferes with and damages another in his
> business or occupation.  The two types of actions differ in the limits on the right
> to interfere which will be recognized in either case.  Thus, where a contract
> between two parties exists, the circumstances in which a third party has a right to
> interfere with the performance of that contract are more narrowly restricted.  A
> broader right to interfere with economic relations exists where no contract or a
> contract terminable at will is involved.

Id. (internal citations omitted).  Under either type of tort, the court must consider the relationship

among three parties: the parties to the contract or the prospective contract, and the alleged third-

party tortfeasor.  See K&K Mgmt., Inc. v. Lee, 557 A.2d 965, 973 (Md. 1989).

      *3.*     *Tortious Interference with Existing Contract*

      Wells Fargo alleges that Konover tortiously interfered with its existing contract with The

Wire.  This argument, however, must fail because, as a matter of law, no contract between Wells

Fargo and The Wire ever existed.

      It is fundamental contract law that a promise to accept does not constitute acceptance.

See Cochran v. Norkunas, 919 A.2d 700, 708–10, 713 (Md. 2007) (stating the principles of

Maryland contract law); <u>Duplex Envelope Co. v. Balt. Post Co.</u>, 163 A. 688, 691 (Md. 1933)

(requiring "unequivocal acceptance of the particular offer" in order to form a contract).  Without

both an offer and acceptance, no contract is formed.  <u>See</u> <u>Cochran</u>, 919 A.2d at 713.  Wells Fargo

incorrectly contends that The Wire accepted Wells Fargo's June 8 offer when it responded on

June 13.  The undisputed evidence shows otherwise.  The attorney for The Wire, Susanna

Felleman, left the following voicemail on June 13 in response to Wells Fargo's offer:

> Good news.  We are going to be able to accept your June 8 proposal.  I'm
> working out some final details with Wal-Mart but I don't think that should affect
> our ability to accept the $650,000.  I mean I know it shouldn't so we will be able
> to do that.  I'm just going to touch base again with Wal-Mart's lawyer, Don Rea.
> We're going to draft something.  I'll be able to get you that either by tomorrow or
> at the latest Wednesday.  So hopefully this will all work out very shortly.  Again I
> appreciate the offer and I am very hopeful that this will all work out.  Let's try to
> touch base tomorrow.

Assertions such as "[w]e are going to be able to accept" and "hopefully this will all work out" are

clear indications of a future intent to accept the offer.  Intent to accept, however, is not enough to

form a contract.  <u>See</u> <u>Cochran</u>, 919 A.2d at 708 ("If the parties do not intend to be bound until a

final agreement is executed, there is no contract.").  Furthermore, an attorney for Wal-Mart,

Donald Rea, testified in his deposition that "[n]o binding contract was entered into between Wal-

Mart and [Wells Fargo] regarding The Wire" and that "it was clear on all sides that if a deal was

going to be reached, it would have been reduced to writing and signed by authorized

representatives of the parties."[28]  Accordingly, no contract between Wells Fargo and The Wire

---

[28] "In the case of an oral contract, if the existence of the contract or its terms is disputed,
then, . . . a court may consider extrinsic evidence." <u>Cuffley v. State</u>, 7 A.3d 557, 569 (Md. 2010).

was ever formed and, thus, Konover did not tortiously induce the breach of an existing contract.[29]

See Eastover Stores, Inc. v. Minnix, 150 A.2d 884, 888 (Md. 1959) (stating that "if the parties

contemplate that an agreement between them shall be reduced to writing before it shall become

binding and complete, there is no contract until the writing is signed").

       4.     *Tortious Interference with Prospective Business Relations*

      To succeed on a claim for tortious interference with prospective business relations,

"[p]laintiffs have a heavy burden because when there is no contract between the parties . . . 'it is

necessary to prove both a tortious intent and improper or wrongful conduct.'" S. Volkswagen,

Inc. v. Centrix Fin., LLC, 357 F. Supp. 2d 837, 851 (D. Md. 2005) (quoting Macklin v. Robert

Logan Assocs., 639 A.2d 112, 119 (Md. 1994)). "As opposed to the tort of interference with a

specific contract, this broader business tort unquestionably requires more than purposeful

interference and allows a party to pursue a business advantage over a competitor in the

marketplace, absent a showing of conduct that is independently wrongful or unlawful." 180s,

Inc. v. Gordini U.S.A., Inc., 602 F. Supp. 2d 635, 639 (D. Md. 2009) (internal quotations

omitted).

      In the context of a claim for tortious interference with prospective business relations, the

alleged tortfeasor's wrongful motive does not have to be the only motive, but the primary motive.

See K&K Mgmt., 557 A.2d at 976. Here, the Court finds that there is a genuine dispute of

---

[29] "Contract construction or interpretation is initially a question of law for the court." Son
v. Margoulis, Mallios, Davis, Rider & Tomar, 689 A.2d 645, 656 (Md. Ct. Spec. App. 1997),
rev'd on other grounds, 709 A.2d 112 (Md. 1998). If there is a genuine dispute of material fact
as to the existence or terms of an oral contract, that issue must be presented to a jury. See id. In
this case, however, the facts are not in dispute and therefore it is the role of the Court to
determine whether a contract existed.

material fact as to Michael Konover's motive for interfering with Wells Fargo's proposed contract with The Wire.  Wells Fargo claims, circumstantially, that Konover's motive for interfering with its prospective contract with The Wire was to delay its collection of the Maryland judgment against the Judgment Debtors.  The evidence shows that for over two years prior to the judgment in the Maryland Action, The Wire occupied the Sam's Club space without any objection by Konover.  Only after judgment was rendered in the Maryland Action did Konover apparently attempt to enforce the retail-only restriction.  There is also evidence that during settlement negotiations with Wells Fargo following the Maryland Action, Konover indicated that he would make it difficult for Wells Fargo to redevelop the Diamond Point Plaza.  Konover claims that his motive for enforcing the retail-only restriction was to fulfill his fiduciary duty and protect the business interests of the other members of Phase II of the Diamond Point Plaza.  Given Konover's position about The Wire's previous occupancy of the Sam's Club space, however, a reasonable jury could conclude that the primary motive of Konover's interference with the proposed deal between Wells Fargo and The Wire was tortious and wrongful.

"[T]ortious or deliberate intent to harm a plaintiff's business relationship is not alone sufficient to support an intentional interference claim.  There also must be proof that the defendant's conduct in interfering with contract or business relations was accomplished through improper means."  Lyon v. Campbell, 707 A.2d 850, 860 (Md. Ct. Spec. App. 1998); see S. Volkswagen, 357 F. Supp. 2d at 851 (stating that both tortious intent and improper or wrongful conduct are required to prove tortious interference with business relations); see also Settlement Solutions of Am., Inc. v. Travelers Indem. Co., 30 F. Supp. 2d 874, 877 (D. Md. 1998) (finding that the plaintiff did not did not allege any wrongful conduct sufficient for intentional

-30-

interference with a prospective contract).  "Wrongful or unlawful acts include common law torts and violence or intimidation, defamation, injurious falsehood or other fraud, violation of criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith."  Alexander & Alexander, 650 A.2d at 271 (internal quotations omitted).[30]  In the present case, there is insufficient evidence of Konover's wrongful conduct.  In Ultrasound Imaging Corp. v. American Society of Breast Surgeons, the U.S. District Court for the District of Maryland stated that the "[d]efendants' conduct must be far more egregious than the sending of one letter . . . in order to be cognizable as a tort under tortious interference with economic relationships."  358 F. Supp. 2d 475, 480 (D. Md. 2005).  In Ultrasound, the defendant sent a letter to one of the plaintiff's principal customers, stating that it was not accrediting the plaintiff as a provider of ultrasound equipment and the customer subsequently terminated its business relationship with the plaintiff.  Id. at 478.  The court found that such action did not constitute "wrongful conduct" sufficient to satisfy a claim for tortious interference.  See id. at 480.  In this case, the only

---

[30] In deciding what constitutes wrongful conduct, Maryland courts often consider the factors set forth in the Restatement (Second) of Torts § 767.  See K&K Mgmt., 557 A.2d at 976.  Section 767 of the Restatement (Second) of Torts states:

In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the follow factors:

(a) the nature of the actor's conduct,
(b) the actor's motive,
(c) the interests of the other with which the actor's conduct interferes,
(d) the interest sought to be advanced by the actor,
(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
(f) the proximity or remoteness of the actor's conduct to the interference, and
(g) the relations between the parties.

relevant conduct Konover engaged in was sending the June 14 letter to Wells Fargo's lawyer objecting to, on behalf of Diamond Point Plaza Phase II, the proposed contract between Wells Fargo and The Wire.[31]  As owner of Phase II of the Diamond Point Plaza, Konover had a right to enforce the retail-only restriction,[32] or demand compensation in exchange for waiving the restriction.  The Declaration of Easements specifically granted all parties to the declaration, including Konover, the right to enforce the associated covenants.  Protecting one's business interest, such as Konover did in demanding the enforcement of the retail-only restriction, is not independently wrongful.  See Alexander & Alexander, 650 A.2d at 269 ("[A]cting to pursue one's own business interests at the expense of others is not, in itself, tortious.").  Thus, even if Konover's actions were self-motivated, Wells Fargo has not presented evidence adequate to suggest that Konover's conduct rises to the required level for this tort under Maryland law.

Maryland courts consider wrongful motive and wrongful conduct in conjunction with one another.  The more egregious the motive, the less wrongful the conduct need be and vice versa. See, e.g., K&K Mgmt., 557 A.2d at 976.  Although there is a genuine dispute of material fact as to whether Konover's primary motive was wrongful, there is insufficient evidence of Konover's wrongful conduct.  Because Wells Fargo did not have an existing contract with The Wire, the burden on Wells Fargo to prove tortious interference with prospective business relations is a high

_____

[31] In addition to sending the June 14 letter, Konover also filed suit in Maryland against Wells Fargo for failing to evict The Wire.  While the institution of a groundless lawsuit can constitute wrongful conduct, see Macklin, 639 A.2d at 119, the Maryland court did not find Konover's lawsuit "groundless."  Rather, the Maryland court dismissed Konover's claim because it found that Wells Fargo had no obligation to enforce the retail restrictions in the Declaration of Easements.

[32] Based on joint covenants between Phase I and Phase II of the Diamond Point Plaza.

standard.  Under this standard, Wells Fargo has not presented enough evidence of wrongful

conduct by Konover to withstand Konover's motion for summary judgment.  Therefore,

Konover's motion for summary judgment as to Count Four is granted.

      C.      Count Five: Fiduciary Duty Owed to a Creditor

In Count Five, Wells Fargo claims that as a director of KMC, Michael Konover breached

a fiduciary duty that he owed to Wells Fargo, a creditor of KMC, by conducting various sales and

transfers of KMC's assets while KMC was insolvent.[33]  Wells Fargo brings this fiduciary duty

claim as a direct action, not as a derivative action brought on behalf of all of KMC's creditors for

the benefit of the corporation.  Wells Fargo only seeks monetary damages for its own benefit.

Konover asserts that a director of a corporation does not owe a fiduciary duty directly to a

creditor.  Consequently, Konover contends that Wells Fargo does not have standing to assert its

breach of duty claim in this case.

While neither the Connecticut Supreme Court nor the Connecticut Appellate Court has

addressed the issue presented before the Court, recent decisions by this Court, the Connecticut

Superior Courts, and the Delaware Supreme Court provide some clarity.[34]  The Delaware

_____

[33] In its Second Amended Complaint, Wells Fargo alleges that Konover breached the
fiduciary duty while KMC was in the "zone of insolvency."  Wells Fargo, however, now claims
that KMC was *insolvent* (rather than in the "zone of insolvency") since the inception of the
Diamond Point loan on June 30, 2000.  Based on the evidence submitted to the Court,
specifically the plaintiff's expert report on KMC's solvency (Def. Exh. 35, at 20–31), the Court
finds that KMC was insolvent and analyzes Wells Fargo's claim in Count Five accordingly.
Konover has presented no evidence to dispute this issue.

[34] When there is no Connecticut case law on point, Connecticut courts "look[] to
Delaware case law for guidance on questions of corporate law, as it is the forum where the
majority of such issues are litigated."  Von Seldeneck v. Great Country Bank, No.
CV89029886S, 1990 WL 283729, at *5 (Conn. Super. Ct. Oct. 5, 1990); see also Metcoff v.
Lebovics, 977 A.2d 285, 290–97 (Conn. Super. Ct. 2007) (relying on a Delaware Supreme Court

Supreme Court has held that individual creditors of an insolvent corporation may not bring direct claims for a breach of a fiduciary duty against a corporation's directors.  See N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla, 930 A.2d 92, 103 (Del. 2007).  All three Connecticut courts that have addressed this issue rely on the Delaware Supreme Court's holding in Gheewalla.  See generally Master-Halco, Inc. v. Scillia, Dowling & Natarelli, LLC, No. 3:09cv1546, 2010 WL 1729172, at *1 (D. Conn. Apr. 5, 2010); Metcoff, 977 A.2d at 290–97; All Metals Indus., Inc. v. TD Banknorth, No. cv075003464S, 2008 WL 731954, at *1 (Conn. Super. Ct. Feb. 27, 2008).  In fact, no court has recognized a direct cause of action for creditors to bring a breach of fiduciary duty claim against corporate directors under Connecticut law.

> [A]s a matter of law, the general rule is that whether a corporation is solvent or insolvent, directors of the corporation do not owe a fiduciary duty to a corporate creditor that would expose them to personal liability to the creditor for an alleged breach of such duty.  The officers and directors of a corporation owe their fiduciary duties to the corporation and its shareholders, and corporate creditors are afforded rights and remedies under existing and extensive contract, tort and statutory protections.

Metcoff, 977 A.2d at 291.  Although Connecticut Superior Court decisions are not binding on this Court, and thus Metcoff is only of persuasive value, this Court in Master-Halco relied extensively on Metcoff in finding that a creditor may not bring a direct action for breach of fiduciary duty under Connecticut law.  See Master-Halco, 2010 WL 1729172, at *1 ("[T]he Court believes that Metcoff's holding is both well-reasoned and suggests the likely trajectory of the Connecticut courts' thinking on this issue.").

_____

decision for guidance in resolving a creditor's causes of action against a director for breach of fiduciary duty).

Notwithstanding the holdings in Metcoff and Master-Halco, Wells Fargo urges the Court to diverge from the apparent trend of Connecticut courts and recognize a cause of action under Connecticut law for creditors to bring a direct action for breach of fiduciary duty.  The Connecticut Supreme Court has recognized limited instances in which shareholders may bring direct claims against a corporation.  For example, in Yanow v. Teal Industries, Inc., the Connecticut Supreme Court stated that "if the injury is one to the plaintiff as a stockholder, and to him individually, and not to the corporation, as where an alleged fraud perpetrated by the corporation has affected the plaintiff directly, the cause of action is personal and individual.  422 A.2d 311, 321 (Conn. 1979).  The Yanow court concluded that exploiting the corporation and failing to disclose facts concerning corporate transactions gave rise to a direct claim for a shareholder of the corporation.  See id. at 321–22.  The Connecticut Supreme Court later narrowed its ruling in Yanow, holding that the shareholder must sustain an injury "separate and distinct" from that suffered by the corporation or other shareholder.  See Smith v. Snyder, 839 A.2d 589, 594–95 (Conn. 2004).  While the Connecticut Supreme Court has found narrow exceptions to the general bar against shareholders bringing direct claims, such as in Yanow, no Connecticut court has extended such exceptions to creditors.  In fact, the few times Connecticut courts have had the opportunity to do so, such as in Metcoff, All Metals, and Master-Halco, the courts placed much emphasis on the need to refrain from imposing additional—and perhaps conflicting—duties and burdens on corporate officers and directors.  See, e.g., Metcoff, 977 A.2d at 291.

> 'Recognizing that directors of an insolvent corporation owe direct fiduciary duties
> to creditors would create uncertainty for directors who have a fiduciary duty to
> exercise their business judgment in the best interest of the insolvent corporation.
> To recognize a new right for creditors to bring direct fiduciary claims against

these directors would create a conflict between those directors' duty to maximize the value of the insolvent corporation for the benefits of all those having an interest in it, and the newly recognized direct fiduciary duty to individual creditors.  Directors of insolvent corporations must retain the freedom to engage in vigorous, good faith negotiations with individual creditors for the benefit of the corporation.'

Id. (quoting Gheewalla, 930 A.2d at 103).  In addition, the availability of other remedies for creditors provides sufficient protection of creditors' interests: "[C]reditors are afforded protections through contractual agreements, fraud and fraudulent conveyance law, implied covenants of good faith and fair dealing, bankruptcy law, general commercial law and other sources of creditor rights."[35]  Id. (quoting Gheewalla, 930 A.2d at 99); see also Master-Halco, 2010 WL 1729172, at *3.

The District of Connecticut, Connecticut Superior Court, and Delaware Supreme Court have all held that creditors may not bring a direct action against a corporate director for breach of a fiduciary duty based upon actions taken while the corporation was insolvent.[36]  There is no

---

[35] Although creditors may not bring direct claims against corporate directors for a breach of fiduciary duty, creditors of an insolvent corporation may have standing to bring derivative claims against a director on behalf of the corporation for an alleged breach of fiduciary duty.  See Metcoff, 977 A.2d at 291–92; Master-Halco, 2010 WL 1729172, at *2; see also Gheewalla, 930 A.2d at 101–02 ("The corporation's insolvency makes the creditors the principal constituency injured by any fiduciary breaches that diminish the firm's value.  Therefore, equitable considerations give creditors standing to pursue derivative claims against the directors of an insolvent corporation." (internal quotations omitted)).  In its Sur-Reply in Opposition to the Defendant's Motion for Summary Judgment, Wells Fargo requests permission to restyle its claim in Count Five as a derivative claim.  Wells Fargo, however, has not formally moved to amend its Second Amended Complaint.  Therefore, the Court declines to address Wells Fargo's request at this time.

[36] The result would be the same even if KMC was in the "zone of insolvency" as opposed to being insolvent.  See Master-Halco, 2010 WL 1729172, at *3 ("'[T]he general rule is that whether a corporation is solvent or insolvent, directors of the corporation do not owe a fiduciary duty to a corporate creditor that would expose them to personal liability to the creditor for an alleged breach of such duty.'" (quoting Metcoff, 977 A.2d at 291)); Gheewalla, 930 A.2d at 103.

persuasive indication that the Connecticut Supreme Court would hold otherwise.  Accordingly, the defendant's motion for summary judgment as to Count Five is granted.

    D.      Count Six: Successor Liability

In Count Six, Wells Fargo seeks to hold defendants KDC, Blackboard, and Ripple (collectively, the "Successor Defendants") jointly and severally liable as the "mere continuation" of KMC.  From 2002 to 2003, the Portfolio Sales resulted in a significant reduction of KMC's annual revenue, assets, and workforce.  KMC, however, still had several property management contracts and real estate investments at the beginning of 2005, which it subsequently transferred to KDC, Blackboard, and Ripple.

Under Connecticut law, the general rule is that "a corporation that acquires the assets of another entity does not assume that entity's former liabilities." Collins v. Olin, Corp., 434 F. Supp. 2d 97, 102 (D. Conn. 2006).  There are four exceptions to the general presumption against finding successor liability.

> [A] corporation which purchases all the assets of another company does not become liable for the debts and liabilities of its predecessor unless: (1) the purchase agreement expressly or impliedly so provides; (2) there was a merger or consolidation of the two firms; (3) the purchaser is a 'mere continuation' of the seller; or (4) the transaction is entered into fraudulently for the purpose of escaping liability.

Ricciardello v. J.W. Gant & Co., 717 F. Supp. 56, 58 (D. Conn. 1989) (internal citations omitted).  Wells Fargo has only asserted the third basis for successor liability—the "mere continuation" exception.

In Peglar v. Professional Indemnity Underwriters Corp., then-Connecticut Superior Court Judge Chase T. Rogers[37] utilized a four-factor balancing test for determining whether a successor entity is the "mere continuation" of the predecessor entity.  See No. X05CV97016824S, 2002 WL 1610037, at *7 (Conn. Super. Ct. June 19, 2002)  The four Peglar factors are:

> (1) continuation of the enterprise of the seller corporation so that there is a continuity of management, personnel, physical location, assets and general business operations; (2) continuity of shareholders; (3) the seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible; [and] (4) the purchasing corporation assumes those liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.

Id.

In several recent decisions, courts have indicated that under Connecticut law there are two separate but related theories under which a court may analyze whether a purchaser is a mere continuation of the seller: (1) the "common law mere continuation" theory, which focuses on the continuity of ownership; and (2) the "continuity of enterprise" theory, which focuses on, among other things, the continuity of business operations, employees, and working conditions.  See Call Ctr. Techs., Inc. v. Grand Adventures Tour & Travel Publ'g Corp., No. 09-1224-cv, 2011 WL 832909, at *5 (2d Cir. Mar. 11, 2011) (citing Chamlink Corp. v. Merritt Extruder Corp., 899 A.2d 90, 93 (Conn. App. Ct. 2006); Kendall v. Amster, 948 A.2d 1041, 1051 (Conn. App. Ct. 2008)).  These two approaches, however, are not separate or new tests, but appear to be encompassed within the Peglar test as two of the four factors that courts should consider in determining whether a successor entity is the mere continuation of its predecessor.  This conclusion is supported by the application of the Peglar factors in several recent decisions.  See,

---

[37] Now Chief Justice of the Connecticut Supreme Court.

e.g., Collins, 434 F. Supp. 2d at 103–06 9 (applying the Peglar factors); Kuhns Bros., Inc. v.

Fushi Int'l, Inc., No. 3:06cv1917, 2008 WL 2167091, at *6–7 (D. Conn. May 21, 2008) (same);

Union Square Grill Hospitality Grp., LLC v. Blue Smoke Am. Bar & Grill LLC, No.

3:06-CV-00976, 2007 WL 869024, at *2 (D. Conn. Mar. 19, 2007) (same); City of Waterbury v.

Phoenix Soil, LLC, No. UWYCV980146037S, 2009 WL 1055754, at*4–6 (Conn. Super. Ct.

Mar. 26, 2009) (same).

     The courts, however, have emphasized that the continuity of enterprise aspect of Peglar is

more important than continuity of ownership.  See Call Ctr. Techs., 2011 WL 832909, at *4.

But, both remain relevant factors under the Peglar balancing test.[38]  No single Peglar factor is

dispositive, nor is each factor required to establish successor liability.  See Kuhns, 2008 WL

2167091, at *5.  Rather, the court must "'examine the substance of the transaction to ascertain its

purpose and true intent.'"  Collins, 434 F. Supp. 2d at 102 (quoting Nat'l Grange Mut. Ins. Co. v.

Montgomery Elevator, No. CV-91-0501948S, 1994 WL 547747, at *4 (Conn. Super. Ct. Sept.

22, 1994)); see also Sav. Bank of Manchester v. Daly, No. CV020813164S, 2004 WL 3130581,

at *3 (Conn. Super. Ct. Dec. 23, 2004) (stating that an "[a]nalysis of the necessary factors should

be undertaken in a flexible, realistic manner, focusing on intent").  Thus, a successor entity might

---

[38] Although some courts appear to agree that the common law "mere continuation of ownership" test "requires the existence of a single corporation after the transfer of assets, with an identity of stock, stockholders, and directors between the successor and predecessor corporations," see Graham v. James, 144 F.3d 229, 240 (2d Cir. 1998) (applying New York law); Chamlink, 899 A.2d at 93, no court applying Connecticut law in recent years has applied this test this way.  Cf. Medina v. Unlimited Sys., LLC, No. 3:09cv1430, 2010 WL 5253530, at *7 (D. Conn. Dec. 15, 2010) ("Connecticut courts do not view continuity of ownership as an essential requirement for a business to be deemed a mere continuation.").  Instead, courts consider the identity of ownership in the context of the Peglar balancing test.

be found to be the mere continuation of its predecessor without fully satisfying the continuity of enterprise factor contained within the Peglar balancing test.

As to the first Peglar factor—the continuity of the enterprise—Wells Fargo has presented evidence of the continuity of management, personnel, and physical location between KMC and the Successor Defendants.  All share common office space in Farmington, Connecticut; Michael Konover (Chairman of the Board and Director), Michael Gorman (President), Alan E. Smith (Executive Vice President), and John J. Anderson (Senior Vice President and Executive Vice President) all held the same or similar positions at both KMC and KDC and James Ainsworth, KMC's Treasurer, was also the Treasurer of Ripple and Blackboard and was the Executive Vice President and Chief Financial Officer of KDC;[39] and all of KMC's remaining employees, as of 2004, transferred to KDC.[40]  Blackboard and Ripple, however, had no employees prior to receiving KMC's investment holdings and no KMC employees transferred to either entity.

---

[39] There were two KMC officers, however, who were not hired by KDC.

[40] The Successor Defendants urge the Court to analyze this prong over a three-year period, 2001 to 2004, rather than at the time KMC transferred its property management contracts to KDC in 2005.  For example, KMC had 54 employees in 2001 and only 5 employees in 2005.  The Successor Defendants allege that if the Court considers that the 49 employees who left KMC prior to 2005 did not transfer to KDC, that is significant evidence in determining continuity.  The Successor Defendants also make a similar argument with respect to the Court's analysis of the sale of KMC's assets and the cessation of its business under the third prong of the Peglar test.  The Court finds, however, that the relevant time period for the successor liability analysis is that beginning in 2005 when KMC began the sale and transfer of its remaining assets to the Successor Defendants.  See Chamlink, 899 A.2d at 93 (comparing the continuity of employees as of the time the selling corporation dissolved).  Even if the Court were to consider the evidence prior to 2005, there remain genuine disputes of material fact as to the continuity of enterprise, based on continuity of physical location, directors, and business operations, as well as the other Peglar factors.  Accordingly, this issue is not determinative of the Court's holding.

Despite the evidence of continuity in physical location, management, employees, and shareholders between KMC and the Successor Defendants, there has been less evidence presented of the continuity of general business operations between KMC and the Successor Defendants.  Prior to 2005, KDC's primary business was developing retail shopping centers—KDC had no property management functions.  In 2005, KMC transferred nearly all of its remaining property management contracts to KDC, which prompted KDC to begin operating a property management division.  While KDC added a management division to its existing development business, it appears that its corporate identity did not become management focused and its principal source of revenue continued to be development fees.  Thus, rather than preserving KMC's property management business, the evidence suggests that KDC integrated KMC's property management services into its existing property development business.[41]  See Beriguette, 2009 WL 2450773, at *3 (granting summary judgment in favor of the defendants in a successor liability case where the defendants purchased the selling entity's assets and integrated those operations into their pre-existing business operations); see also Mavel v. Scan-Optics, Inc., 509 F. Supp. 2d 183, 188 (D. Conn. 2007) ("[T]he court should determine whether the purchaser holds itself out to the world as the effective continuation of the seller.").  But see Call Ctr. Techs., Inc., 2011 WL 832909, at *5 (finding continuity in business operations where the purchasing entity shared "some, but not all, of the same services" as the selling entity).  Evidence also has been presented that could show that Blackboard and Ripple do not share the "same core business" as KMC.  See Call Ctr. Techs., 2011 WL 832909, at *5.  As previously discussed,

---

[41] In fact, KDC recreated itself as a "merchant developer," which is an identity KMC never claimed.

KMC was principally a property management entity and neither Blackboard nor Ripple has ever provided property management services.  Instead, Blackboard and Ripple's sole business operations appear to be holding KMC's previous investment interests.  Blackboard and Ripple also do not have employees and do not serve any of KMC's former customers.[42]

Shareholder continuity is the second factor in the Peglar test.  In this case, it is undisputed that Michael Konover is the sole equity owner or member of KMC, KDC, Blackboard, and Ripple.

The third Peglar factor addresses whether the selling corporation, KMC, ceased its ordinary business, liquidated, and dissolved as soon as legally and practically possible.  Under Connecticut law, this factor is not strictly construed.  See Collins, 434 F. Supp. 2d at 105–06 (finding evidence of successor liability under the third factor, notwithstanding the seller's three year wind-down period); Kuhns, 2008 WL 2167091, at *7 (finding a triable dispute of fact where the selling company legally existed, but had no active business operations).  Although KMC remains in existence as a Connecticut corporation, KMC's only asset is a one percent interest in American Way, which is a limited partner of DPPLP.  Further, the evidence indicates that

_____

[42] In Call Center Technologies, the Second Circuit noted that because the successor entity was incorporated specifically for the purpose of obtaining the selling entity's assets and had no assets, employees, or operations of its own prior to purchasing the selling entity's assets, an inference of continuity of enterprise may be drawn.  See Call Ctr. Techs., 2011 WL 832909, at *5.  While Blackboard and Ripple were formed by Michael Konover in 2005 for the sole purpose of receiving KMC's remaining minority partner and managing member interests in real estate investment assets and had no assets, employees, or business operations prior to purchasing KMC's assets, Blackboard and Ripple still do not have any employees and its business operations are limited to investment holdings.  This distinction is important to the successor liability analysis.  See Beriguette, 2009 WL 2450773, at *2 ("It is not the purpose of the [mere continuation] exception to expose to liability any company that merely purchases assets from another company.").

KMC's only operations are the continuing litigation in this Court and its defunct role as property manager of Phase II of the Diamond Point Plaza, for which it receives no fees or revenues.

Finally, there is limited evidence before the Court as to the liabilities and obligations that the Successor Defendants assumed from KMC. In assuming KMC's remaining property management contracts, the evidence shows that KDC incurred the expenses and obligations of those contracts. This Court, however, has found that the mere assumption of executory contracts was insufficient evidence for proving successor liability under this prong. See Collins, 434 F. Supp. 2d at 106. But see Call Ctr. Techs., 2011 WL 832909, at *5 (drawing an inference that in assuming the selling entity's assets, the successor entity also assumed some of the selling entity's obligations and liabilities). Because Blackboard and Ripple only received investment interests from KMC, it is unclear what, if any, liabilities or obligations they assumed. Courts, however, have found that successor liability may be proven without satisfying this factor. See Sav. Bank of Manchester, 2004 WL 3130581, at *3.

Based on the evidence before the Court, the Court finds that there are genuine disputes of material fact as to whether the Successor Defendants are the "mere continuation" of KMC. The ultimate question of whether a purchasing entity is the mere continuation of its predecessor under the continuity of enterprise test is an issue of fact for the jury.[43] See Chamlink, 899 A.2d at 93. Accordingly, the Successor Defendants' motion for summary judgment as to Count Six is denied.

---

[43] This Court previously stated that it is the court's role to apply the balancing test where there are no genuine issues of material fact as to the elements of the Peglar test. See Collins, 434 F. Supp. 2d at 103 n.13. It appears, however, that the balancing test is for the jury. See Call Ctr. Techs., 2011 WL 832909, at *6.

E.     Count Seven: Tortious Interference with the KMC Guaranty

In Count Seven, Wells Fargo claims that the defendants tortiously interfered with the

KMC Guaranty by making improper appropriations of KMC's assets in violation of the

Guaranty's subordination provision, Section 3.6.[44]

When DPPLP sought to refinance its mortgage on the Diamond Point Plaza, Paine

Webber required KMC to provide a limited guaranty.  Under the KMC Guaranty, KMC agreed to

be liable for any of the "Guaranteed Obligations" that were set forth in Section 1.2 of the

Guaranty.[45]  KMC and Pinnacle signed the Guaranty on June 1, 2000.  The Guaranty included a

subordination provision in Section 3.6, "Subordination of Intercompany Payments," which

stated:

> As of the date hereof, and after giving effect to this Guaranty and the contingent
> obligation evidenced hereby, all payments (whether voluntary or mandatory),
> including without limitation, corporate allocation payments, made by [KMC] to
> any affiliate, subsidiary, division, or shareholder of [KMC] shall be subordinate to
> [KMC's] obligations under this Guaranty.

---

[44] Connecticut courts have held that a direct or indirect party to a contract cannot
tortiously interfere with the contract.  See Multi-Serv. Contractors, Inc. v. Town of Vernon, 447
A.2d 653, 655–56 (Conn. 1984).  The defendants claim that because Wells Fargo alleges in
Counts One and Two that the defendants are the alter ego of KMC, the defendants must be
considered an indirect party to the Guaranty for purposes of Count Seven.  The U.S. Court of
Appeals for the Second Circuit, however, has repeatedly recognized a party's right to plead in the
alternative or plead inconsistent claims under Federal Rules of Civil Procedure 8(d)(2) and
8(d)(3), respectively.  See, e.g., Nat'l W. Life Ins. Co. v. Merrill, Lynch, Pierce, Fenner & Smith,
Inc., 89 F. App'x 287, 289 (2d Cir. 2004).  Therefore, although Wells Fargo seeks to pierce
KMC's corporate veil in Counts One and Two and hold the defendants liable as KMC's alter
ego, it is not bound by that allegation in Count Seven.

[45] Section 1.2 of the Guaranty, in relevant part, stated "[a]s used herein, the term
'Guaranteed Obligations' means the obligations or liabilities of Borrower to Lender for any loss
. . . arising out of or in connection with the following: (a) fraud or intentional misrepresentation
by Borrower or any Guarantor in connection with the Loan; . . . ."

After signing the Guaranty, KMC made several payments to different entities within the Konover Organization.  The disputed transactions include, but are not limited to, the following: (1) a $ 2.7 million repayment to Konover; (2) diversion of $9.3 million in KMC's commissions and fees to KDC and Konover; (3) a $1.1 million cash distribution to Konover; (4) the transfer of KMC's assets to Blackboard and Ripple in 2005; (5) the transfers and payments of more than $12 million; and (6) the transfer of management contracts to KDC in 2007.  Wells Fargo claims that by making these payments and transfers, the defendants tortiously interfered with the Guaranty.

### 1.    *Choice of Law*

Absent bad faith, Connecticut courts generally give effect to the parties' contractual choice of law provision.  See Elgar v. Elgar, 679 A.2d 937, 942 (Conn. 1996).  The KMC Guaranty includes a "Governing law" provision, which states that the "Guaranty shall be governed by and construed in accordance with the laws of the State in which the real property encumbered by the Mortgage is located . . . ."  The mortgaged property in this case is the Diamond Point Plaza, which is located in Baltimore, Maryland, and neither party disputes the validity of the "Governing law" provision.  Accordingly, Maryland law controls the interpretation of the Guaranty.

Although Maryland law controls the interpretation of the Guaranty, Connecticut law governs Wells Fargo's tortious interference claim.[46]  As previously discussed in Count Four,

---

[46] The "Governing Law" provision in the KMC Guaranty does not include a choice of law provision that extends to all claims arising from the Guaranty.  Rather, the "Governing Law" provision only states that the Guaranty is "governed" and "construed" under Maryland law.  A claim of tortious interference does not fall within the scope of this "Governing Law" provision, and thus, Connecticut's choice of law rules must govern Wells Fargo's substantive claim in

Connecticut courts have recently utilized the "most significant relationship" test in determining which state law applies.  See U.S. Fid. & Guar. Co., 359 F. Supp. 2d at 206.  The four factors the Court must consider under this test are:

> (a) the place of the injury; (b) the place where the conduct causing the injury occurred; (c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (d) the place where the relationship, if any, between the parties is centered.

Id. (quoting Restatement (Second) Conflict of Laws, § 145(2)).  As to the first factor, the evidence weighs in favor of Maryland.  Because Wells Fargo is a trustee, the alleged injury could have occurred in any of the states in which the investors in the pool of loans managed by Wells Fargo are located.  Nonetheless, the default of the Diamond Point Plaza loan pertained to Maryland and the disputed Guaranty was signed and negotiated in Maryland.  As to the second factor, the location of the conduct causing injury, the alleged tortious transfers that are the subject of Count Seven occurred in Connecticut, where the Konover Organization's operations are managed.  The third factor also weighs in favor of Connecticut—Wells Fargo is incorporated in South Dakota and has offices throughout the country, whereas KMC and the relevant members of the Konover Organization involved in this case are domiciled and incorporated in Connecticut.  Finally, the relationship between the parties originated in Maryland, but the parties' relationship is centered in Connecticut because that is where the alleged tortious transfers and payments occurred.  Thus, while Maryland has some relationship to this tortious interference claim, Connecticut has the most significant relationship due to the location of the Konover Organization

---

Count Seven.  The parties do not contest this.

and the location of the conduct of the injury.  Accordingly, Connecticut law controls Wells

Fargo's tortious interference claim in Count Seven.

      2.    *Elements of a Tortious Interference Claim*

Under Connecticut law, to prove tortious interference with a contract, the plaintiff must

establish "(1) the existence of a contractual or beneficial relationship, (2) the defendants'

knowledge of that relationship, (3) the defendants' intent to interfere with the relationship, (4) the

interference was tortious, and (5) a loss suffered by the plaintiff that was caused by the

defendants' tortious conduct."  Appleton v. Bd. of Educ., 757 A.2d 1059, 1063 (Conn. 2000).

While the parties agree that a contractual relationship existed between KMC and

Pinnacle,[47] the parties dispute the remaining elements of the tortious interference test.

Specifically, the parties dispute whether the defendants must have had knowledge of the

Guaranty, in general, or if specific knowledge of the subordination provision contained within

the Guaranty is required.  The parties also dispute whether the defendants intended to interfere

with the Guaranty.

The parties also dispute whether defendant Michael Konover, as the sole shareholder of

KMC, may be liable for tortious interference with the KMC Guaranty.  The U.S. Court of

Appeals for the Second Circuit has held that the sole shareholder of a corporation generally

cannot be liable for tortiously interfering with his own corporation's contracts.  See Boulevard

Assocs. v. Sovereign Hotels, Inc., 72 F.3d 1029, 1036 (2d Cir. 1995) ("Because there is a

---

      [47] Pinnacle was the original lender on the Diamond Point loan.  Paine Webber, however,
had signed a commitment letter to purchase the loan from Pinnacle and was therefore heavily
involved in the negotiation of the Guaranty.  After purchasing the loan from Pinnacle, Paine
Webber subsequently assigned the loan and related documents to Wells Fargo.

significant unity of interest between a corporation and its sole shareholder . . . we do not believe that such a shareholder can be considered a third party capable of "interfering" with its own company's contracts.").  The Second Circuit, however, narrowed this view, stating that the sole shareholder of a corporation should only be afforded a "limited and qualified privilege."  See id. at 1037.  Although the court in Boulevard Associates did not reach the merits as to the scope of the limited privilege, it did state that "[m]ost states affording a privilege to sole shareholders have recognized that certain behavior may be sufficiently egregious to cross the line and become tortious."  Id.; see also Conn. Fin. Network v. Sav. Inst., No. 548013, 1996 WL 478709, at *1 (Conn. Super. Ct. Aug. 7, 1996) ("In Connecticut, an agent of a corporation can be held liable for interference 'if he did not act legitimately within his scope of duty but used the corporate power improperly for personal gain.'" (quoting Murray v. Bridgeport Hosp., 480 A.2d 610, 613 (Conn. Super. Ct. 1984)).  For example, if a corporate shareholder uses his corporate power improperly for personal gain, the shareholder may be liable for tortious interference.  See Bowman v. Grolsche Bierbrouwerij B.V., 474 F. Supp. 725, 733 (D. Conn. 1979); see also Curcio v. Hartford Fin. Corp., 472 F. Supp. 2d 239, 247 (D. Conn. 2007); Murray, 480 A.2d at 613.  In this case, it is undisputed that Michael Konover is the sole shareholder of KMC.  Therefore, absent a showing of egregious conduct or abuse of corporate power for personal gain, Konover cannot be liable for tortiously interfering with the Guaranty.  Wells Fargo, however, has raised a genuine dispute of material fact as to Konover's motive in permitting the inter-corporation allocations. Due to the substantial judgment entered against KMC in the Maryland Action and Konover's significant financial stake in the judgment, there is sufficient evidence to indicate that Konover had a substantial personal interest in limiting his financial exposure.  While Konover contends

-48-

that the transfer of KMC's assets was part of his larger plan to exit the property management

business, and not for his personal gain, there is at least a triable dispute of fact as to his motive.

The defendants assert that they must have had knowledge of the specific term or

provision of the contract disputed—here, the subordination provision in Section 3.6—not just

knowledge of the Guaranty to be held liable for tortious interference.  There does not appear to

be any Connecticut law to support such a broad assertion.[48]  It appears that Connecticut courts

only require mere knowledge of the contractual relationship, not knowledge of the specific term

or provision in question.[49]  See Appleton, 757 A.2d at 1063 (defining the second element of the

tortious interference test as "knowledge of [the contractual] *relationship*" (emphasis added)).

Wells Fargo has presented a genuine dispute of material fact as to whether Konover and the other

defendants knew of KMC's contractual relationship with Pinnacle.  Although Michael Konover

did not sign the Guaranty, there is evidence that he approved it.  In addition, although an

employee or director's knowledge is not necessarily imputed to the corporation, Konover's role

as shareholder and director of each of the corporate defendants and his strong presence in each of

the defendants' business affairs creates a genuine dispute of material fact as to the corporate

---

[48] The defendants' position is based on an apparently incorrect application of two
Connecticut cases with facts distinguishable from this case.  See generally Downes-Patterson
Corp. v. First Nat'l Supermarkets, Inc., 780 A.2d 967 (Conn. App. Ct. 2001); Waste Conversion
Techs., Inc. v. Midstate Recovery, LLC, No. AANCV044000948, 2008 WL 5481231 (Conn.
Super. Ct. Dec. 3, 2008).

[49] This conclusion is also supported by courts in other states.  See, e.g., Don King Prods.,
Inc. v. Douglas, 742 F. Supp. 741, 775 (S.D.N.Y. 1990) (requiring only "knowledge of the
existence of the contract"); CompuSpa, Inc. v. Int'l Bus. Machs. Corp., No. Civ.A. DKC
2002-0507, 2004 WL 1459272, at *6 (D. Md. June 29, 2004) ("For a tortious interference claim,
knowledge of the contract need not have been perfect or precise, nor must the third party . . . have
been aware of the legal particulars of the contract.  Indeed, it is enough that the allegedly
interfering third party have knowledge of the existence of the contract.").

defendants' knowledge of the Guaranty.  See E. Udolf, Inc. v. Aetna Cas. & Sur. Co., 573 A.2d

1211, 1214 (Conn. 1990) ("The knowledge of individual officers and employees at a certain level

of responsibility will be deemed the knowledge of the corporation; where the level or

responsibility begins must be discerned from the circumstances of each case." (internal

quotations omitted)).

Under the third prong of the tortious interference test, Wells Fargo must prove that the

defendants intended to interfere with the KMC Guaranty.  Connecticut courts have adopted the

standard set forth in the Restatement (Second) of Torts for determining  intent for tortious

interference claims.  See Waste Conversion, 2008 WL 5481231, at *6.

> The rule stated in this Section is applicable if the actor acts for the primary
> purpose of interfering with the performance of the contract, and also if he desires
> to interfere, even though he acts for some other purpose in addition. . . .  It applies
> also to intentional interference . . . in which the actor does not act for the purpose
> of interfering with the contract or desire it but knows that the interference is
> certain or substantially certain to occur as a result of his action.
>
> The fact that this interference with the other's contract was not desired and was
> purely incidental in character is, however, a factor to be considered in determining
> whether the interference is improper.  If the actor is not acting criminally nor with
> fraud or violence or other means wrongful in themselves but is endeavoring to
> advance some interest of his own, the fact that he is aware that he will cause
> interference with the plaintiff's contract may be regarded as such a minor and
> incidental consequence and so far removed from the defendant's objective that as
> against the plaintiff the interference may be found to be not improper.

Restatement (Second) of Torts § 766 cmt. j.  Here, Wells Fargo has presented sufficient

circumstantial evidence as to the defendants' intent to raise a genuine dispute of material fact.

After KMC agreed to be the guarantor on the Diamond Point Plaza loan, Michael Konover soon

was selling and transferring KMC's assets.  While Konover maintains that the transfers and sales

were part of a larger liquidation plan, rather than part of a scheme to interfere with the Guaranty,

Section 766 of the Restatement (Second) of Torts makes clear that even if Konover's purpose was something other than to interfere, Konover's knowledge that the transfers and sales were likely to interfere with the Guaranty is still a factor to consider.  Given Konover's active involvement in all of the defendants' business affairs, including his knowledge that Sam's Club was going to vacate its lease at the Diamond Point Plaza, and the timing of the transfers, there is a genuine dispute of material fact as to whether Konover knew that the interference with the Guaranty was "certain or substantially certain to occur" as result of the allocation of KMC's assets.  See Waste Conversion, 2008 WL 5481231, at *7.

"Although Connecticut courts 'long [have] recognized a cause of action for tortious interference with contract rights or other business relations . . . [the case law indicates, nonetheless,] that not every act that disturbs a contract or business expectancy is actionable. . . . [F]or a plaintiff successfully to prosecute such an action it must prove that the defendant's conduct was in fact tortious.  This element may be satisfied by proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation . . . or that the defendant acted maliciously.'"  Downes-Patterson Corp., 780 A.2d at 976–77 (alterations in original) (quoting Daley v. Aetna Life & Cas. Co., 734 A.2d 112, 135 (Conn. 1999)); see also Jackson Hill Rd. Sharon CT, LLC v. Town of Sharon, 561 F. Supp. 2d 240, 244–45 (D. Conn. 2008) (listing the factors, as set forth in the Restatement (Second) of Torts, Connecticut courts consider when determining whether alleged acts of interference are improper).  "A claim of tortious interference with business relations requires a plaintiff to 'plead and prove at lease some improper motive or improper means' that is 'beyond the fact of the interference itself.'"  Modis, Inc. v. Bardelli, 531 F. Supp. 2d 314, 322 (D. Conn. 2008) (quoting Blake v. Levy, 464 A.2d 52, 55 (Conn. 1983)).

Wells Fargo asserts that Konover and the other defendants engaged in tortious conduct by directing inter-company allocations among the Konover Organization entities—specifically, away from KMC—in violation of the subordination provision contained in Section 3.6 of the Guaranty.[50]  Generally, a guaranty provides a lender with an alternative source from which it may collect an outstanding debt.  See Allen v. Kaplan, 258 A.2d 211, 216 (Md. 1969) (noting that the "very purpose of [a] guaranty" is "protection against the principal's inability to pay (internal quotations omitted)); Gambo v. Bank of Md., 648 A.2d 1105, 1112 (Md. Ct. Spec. App. 1994) ("[T]he purpose of guaranty agreements is to facilitate the issuance of loans by ensuring that the lender has a ready source from which it can collect in the event of default by the debtor.").  In interpreting the KMC Guaranty, the Court must give the Guaranty, and the subordination provision contained therein, its plain meaning.  See Wells v. Chevy Chase Bank, 768 A.2d 620, 630 (Md. 2001).  Based on the language of the subordination provision itself, Section 3.6 of the Guaranty became legally operative "[a]s of the date hereof"—the date the Guaranty was signed; however, the applicability of Section 3.6 was also predicated on "giving effect to th[e] Guaranty."  Specifically, the Court interprets Section 3.6 as limiting the section's applicability to circumstances in which KMC became liable under one of the Guaranteed Obligations in Section 1.2 of the Guaranty.

---

[50] The parties disagree as to the scope of Wells Fargo's tortious interference claim.  The defendants contend that the tortious interference claim is limited to interference with Section 3.6 of the Guaranty, the subordination provision.  In contrast, Wells Fargo argues that Count Seven relates to the entire Guaranty, not just the subordination provision.  The parties' two positions are not necessarily mutually exclusive.  The tort recognized in Connecticut and other states is "tortious interference with a contract," not tortious interference with a *term* of the contract.  A term or provision of a contract is not a contract itself.  To prove tortious interference with a contract, however, the plaintiff necessarily must present evidence that some term or provision of the contract was interfered with.

Wells Fargo urges the Court to read Section 3.6 as prohibiting inter-company allocations from the "date hereof," its execution in 2000.  This interpretation of the subordination provision is inconsistent with the very purpose of subordination agreements.  A subordination provision, by its very definition, is an agreement as to priority among creditors for payment.  See C.J.S. Secured Transactions § 116.  In other words, a subordination agreement does not affect the current operations of a creditor; rather, a subordination agreement prioritizes payment at the time an obligation arises.  Wells Fargo claims that Section 3.6 must be harmonized with other sections of the Guaranty that include similar language ("As of the date hereof and after giving effect to this Guaranty").  For example, Section 3.4 of the Guaranty required KMC to remain solvent—an obligation that clearly begins from the time the Guaranty is signed and continues until all obligations under the loan have been satisfied.  Despite sharing the same introductory language with Section 3.4, Section 3.6 is a distinct term that must be given its plain meaning—Section 3.4 was a continuing obligation whereas Section 3.6 set forth terms for a potential future obligation. As applied in this case, Section 3.6 of the Guaranty did not *prohibit* inter-company transfers as of the date the Guaranty was signed.  Instead, Section 3.6 only subordinated inter-company transfers to any claims arising under the Guaranteed Obligations in Section 1.2.  This construction of Section 3.6 is further supported by the fact that, until there was an amount due under the Guaranty, there could not be any "Guarantor's obligation" that KMC's corporate allocations were subordinate to.

If the parties' intent was to prohibit KMC's corporate allocation payments, irrespective of any obligation arising under the Guaranty, they could have drafted the Guaranty accordingly. The evidence, however, shows that Paine Webber was aware of the corporate allocation

payments both during and after the Diamond Point loan negotiation process; however, Paine Webber did not include or seek to include any language in the Guaranty prohibiting the payments.  In effect, Section 3.6 provided the controlling terms for if and when there was an amount due under the Guaranty.

Having determined the actual meaning of Section 3.6, the Court must now consider whether the defendants' alleged interference with the Guaranty was actually wrongful.  See Boulevard Assocs., 72 F.3d at 1035 ("Although the district court correctly observed that an otherwise 'legitimate and commendable' purpose does not excuse the use of wrongful means to interfere with another's contractual rights, it erred in failing to consider whether [the defendant's] actions were wrongful in the first place." (internal citations and quotations omitted)).  Until a Guaranteed Obligation under the Guaranty was triggered and Wells Fargo sought payment from KMC under the Guaranty, the continuation of the defendants' inter-company allocations payments was not improper.  The allegations of fraudulent misrepresentation against DPPLP, as the borrower on the Diamond Point loan, were added to the Maryland Action on February 24, 2004, in the plaintiff's Second Amended Complaint.  KMC's liability under the Guaranty as a result of the fraudulent misrepresentations was determined by the Maryland court on July 26, 2007.[51]  Absent knowledge of pending liability under the Guaranty, any corporate allocations made by the defendants cannot constitute tortious conduct.  While the Circuit Court in Maryland found that DPPLP engaged in fraudulent activity beginning around the time that the Diamond Point Plaza loan was originated in 2000, KMC was only held liable for breach of the Guaranty.

_____

[51] The Court of Appeals of Maryland determined on July 26, 2007, that DPPLP had made actionable misrepresentations in connection with the Loan, thereby triggering a Guaranteed Obligation under Section 1.2(a) of the Guaranty.

Based on this evidence, it is unclear at what point KMC became aware or substantially certain that it was going to be liable under the Guaranty.  Thus, a factual question remains and the Court is unable to determine at this time which of the disputed allocations could or could not constitute tortious conduct.

Accordingly, Wells Fargo has presented a genuine dispute of material fact as to the wrongfulness of the defendants' actions.  Nonetheless, there is no evidence of any tortious allocations made by KMC to KCC or K&A with respect to the Guaranty.  Therefore, the defendants' motion for summary judgment as to Count Seven is granted with respect to KCC and K&A, and denied as to Michael Konover, KDC, Blackboard, and Ripple.

F.      Affirmative Defenses

The defendants have offered several affirmative defenses to Wells Fargo's claims.[52] Wells Fargo now moves for summary judgment as to nine of the defendants' affirmative defenses—Five, Six, Eight, Ten, Eleven, Twelve, Thirteen, Seventeen, and Eighteen.[53]

In the defendants' affirmative defenses, the defendants allege that Wells Fargo was improperly awarded damages in the Maryland Action and therefore should be precluded from

---

[52] While each defendant has individually filed an Answer with Affirmative Defenses to Wells Fargo's Second Amended Complaint, the defendants' affirmative defenses substantially overlap.  Each affirmative defense that Wells Fargo has moved for summary judgment on in this motion applies to each defendant.

[53] Because the Court has granted the defendants' motions for summary judgment as to Counts Four and Five, and granted in part the defendants' motions for summary judgment as to Counts One and Two, the Court will only consider the applicability of the defendants' affirmative defenses with respect to the remaining defendants in Counts One and Two (Michael Konover, KDC, K&A, Blackboard, and Ripple), all of the defendants in Counts Three, the Successor Defendants in Count Six (KDC, Blackboard, and Ripple), and the remaining defendants in Count Seven (Michael Konover, KDC, Blackboard, and Ripple).

recovering the outstanding balance in this suit.  In essence, the defendants seek to relitigate

issues that were already decided by several state courts in Maryland that had jurisdiction over the

matters.[54]

There were four separate lawsuits brought and decided in Maryland regarding the

Diamond Point Plaza.  The first, the "Receiver Action," was brought by Wells Fargo in 2002

seeking the appointment of a receiver to manage the Diamond Point Plaza.  On November 26,

2002, the Maryland Circuit Court appointed a receiver.  That receiver was terminated on May 16,

2006, following the foreclosure sale of the Diamond Point Plaza.  See Wells Fargo Bank Minn.,

N.A., No. 03-C-02-012947 (Md. Cir. Ct. May 16, 2006).

In January 2003, Wells Fargo filed a foreclosure action against DPPLP in the Circuit

Court for Baltimore County (the "Foreclosure Action").  The foreclosure sale was held over two-

and-one-half years later in November 2005.  DPPLP filed exceptions to the foreclosure sale due

to, among other claims, the long delay in the foreclosure sale.  The Circuit Court found in favor

of Wells Fargo, see Wells Fargo Bank Minn., N.A. v. Diamond Point Plaza L.P., No. 03-C-03-

000604 FC (Md. Cir. Ct. Feb. 10, 2006), and DPPLP appealed.  The Court of Special Appeals

subsequently affirmed the Circuit Court's decision.  See Diamond Point Plaza L.P. v. Wells

Fargo Bank Minn., N.A., No. 116 (Md. Ct. Spec. App. May 8, 2007).

---

[54] Affirmative Defense Ten appears to be the lone exception.  In Affirmative Defense
Ten, the defendants claim that Wells Fargo's "action and recovery are barred by the doctrine of
estoppel."  This Court, however, has previously held that Wells Fargo is not precluded from
raising issues litigated in Maryland for purposes of proving its veil-piercing claims in Counts
One and Two.  See Wells Fargo Bank, N.A., 2008 WL 762195, at *2–4.  The Court also
explained its holding in more detail in n.22 of this Opinion.

In March 2003, Wells Fargo initiated a lawsuit in the Circuit Court for Baltimore County (the Maryland Action) seeking to hold DPPLP, DMPC, and Oriole liable under the mortgage for fraud, intentional misrepresentation, and gross negligence based on misrepresentations made by DPPLP near the time the loan closed.  Wells Fargo also sought to hold KMC liable for breach of the Guaranty.  The Maryland Circuit Court subsequently entered a $22.8 million judgment for Wells Fargo, but denied Wells Fargo's claim for attorneys' fees.  See Wells Fargo Bank Minn., N.A. v. Diamond Point Plaza L.P., No. 03-C-03-002449 (Md. Cir. Ct. Nov. 16, 2005).  All parties to the Maryland Action appealed.  In September 2006, the Court of Special Appeals affirmed the monetary judgment awarded by the Circuit Court, reversed the Circuit Court's denial of attorneys' fees, and remanded for further consideration of the attorneys' fees.  See Wells Fargo Bank Minn., N.A. v. Diamond Point Plaza L.P., 908 A.2d 684 (Md. Ct. Spec. App. 2006).  The Court of Appeals granted certiorari and affirmed the Circuit Court's monetary judgment and remanded the case for consideration of the attorneys' fees claim.  See Diamond Point Plaza L.P. v.Wells Fargo Bank, N.A., 929 A.2d 932 (Md. 2007).  On remand, the Maryland Circuit Court awarded Wells Fargo $753,097 in attorneys' fees against the Wal-Mart defendants. The court also found over $1.4 million in attorneys' fees against the Diamond Point defendants, but denied recovery because the court found that Wells Fargo was "overcompensated" by $3.5 million in the Maryland Action by way of a prepayment premium it was not entitled to.  See Wells Fargo Bank Minn., N.A., No. 03-C-03-002449 (Md. Cir. Ct. May 21, 2008).  The defendants did not contest the prepayment premium in the original action, only on remand.  On appeal, the Court of Special Appeals reversed and remanded the Circuit Court's holding, instructing the Circuit Court to award Wells Fargo the $1.4 million in attorneys' fees it was due.

See Wells Fargo Bank, N.A. v. Diamond Point Plaza L.P., 971 A.2d 360 (Md. Ct. Spec. App.),

cert. denied Diamond Point v. Wells Fargo, 979 A.2d 707 (Md. 2009).

The fourth lawsuit brought in Maryland was the "Phase II Action."  On November 11,

2005, Diamond Point Plaza Phase II brought suit claiming a violation of the Phase II Declaration

of Easements due to Wells Fargo's proposed offer to allow The Wire to remain in the vacant

Sam's Club store in the Diamond Point Plaza.  On May 9, 2007, the Phase II Action was

dismissed with prejudice.  See Diamond Point Plaza Phase II, LLC v. Wells Fargo Bank N.A.,

No. 03-C-05-012167 CN (Md. Cir. Ct. May 9, 2007).

*Res Judicata*

Pursuant to the Full Faith and Credit Act, "judicial proceedings of any court of any [ ]

State . . . shall have the same full faith and credit in every court within the United States . . . as

they have by law or usage in the courts of such State . . . from which they are taken."  28 U.S.C. §

1738.  "To determine the [preclusive] effect of a state court judgment, federal courts, including

those sitting in diversity, are required to apply the preclusion law of the rendering state.  Federal

courts may not employ their own rules . . . in determining the effect of state judgments, but must

accept the rules chosen by the State from which the judgment is taken."  Conopco, Inc. v. Roll

Int'l, 231 F.3d 82, 87 (2d Cir. 2000) (internal quotations and citations omitted).  Accordingly,

Maryland's preclusion law applies to Wells Fargo's motion for summary judgment as to the

defendants' affirmative defenses.

"The doctrine of res judicata bars the litigation of a cause of action or claim after it has

already been or could have been decided."  Gertz v. Anne Arundel Cnty., 661 A.2d 1157, 1161

(Md. 1995).  Under Maryland law, the elements of *res judicata* are:

> (1) the parties in the present litigation should be the same or in privity with the parties to the earlier case; (2) the second suit must present the same cause of action or claim as the first; and (3) in the first suit, there must have been a valid final judgment on the merits by a court of competent jurisdiction.

Id.; see also Colandrea v. Wilde Lake Cmty. Ass'n, Inc., 761 A.2d 899, 908 (Md. 2000).

The factual basis of each of the defendants' affirmative defenses that Wells Fargo has moved for summary judgment on relates to four issues that were each fully litigated and decided in the previous litigation in Maryland: (1) whether Pinnacle was told of Sam's Club's intent to vacate the Diamond Point Plaza; (2) whether Wells Fargo improperly delayed the foreclosure sale of the Diamond Point Plaza; (3) whether Wells Fargo harmed the Diamond Point Plaza by not evicting The Wire sooner from the Sam's Club space; and (4) whether Wells Fargo improperly obtained an award of the prepayment premium in the Maryland litigation. Each of these issues were conclusively decided by the Maryland Court of Special Appeals or the Maryland Court of Appeals in the Maryland Action.

First, both the Maryland Court of Special Appeals and Maryland Court of Appeals affirmed the Maryland Circuit Court's finding in the Maryland Action that DPPLP intentionally concealed from Pinnacle that Sam's Club intended to vacate its space at the Diamond Point Plaza. See Wells Fargo Bank Minn., 908 A.2d at 714–15. Next, as to the Foreclosure Action, the Maryland Court of Special Appeals stated that it was "not persuaded that [it] should reverse the award of damages [to Wells Fargo] based on [DPPLP's] assertion that Wells Fargo failed to mitigate its damages and delayed foreclosing on the property." Id. at 722. As to whether Wells Fargo harmed the Diamond Point Plaza by not evicting The Wire sooner, the Maryland Circuit

Court found in favor of Wells Fargo.[55]  Finally, on the issue of Wells Fargo's entitlement to the

prepayment premium, the Judgment Debtors did not contest the issue at the trial level or on

appeal.  The Judgment Debtors first contested the issue on remand in the Maryland Action.

Although the Maryland Circuit Court found in favor of the Judgment Debtors, the Court of

Special Appeals reversed, finding that the Judgment Debtors were estopped from relitigating

Wells Fargo's entitlement to the premium.[56]  Wells Fargo Bank, N.A., 971 A.2d at 366.

As described above, the issues that the defendants wish to litigate in their affirmative

defenses have already been litigated in Maryland and a final judgment has been entered on each

issue.  Therefore, both the second and third prongs of the res judicata test are satisfied.[57]

For res judicata to bar the defendants' affirmative defenses, Wells Fargo must also prove

that the defendants were parties to or in privity with the Judgment Debtors.  Of the defendants

remaining in this action, only Michael Konover was a named defendant in any of the Maryland

litigation.[58]  Wells Fargo claims, however, that because the remaining defendants are the alleged

alter ego of the Judgment Debtors, they were in essence "parties" to the Maryland Action.  In

---

[55] In addition, this issue was raised in the Phase II Action, which was later voluntarily dismissed with prejudice.

[56] Maryland Circuit Court Judge Daniels opined that he did not think that the defendants would be foreclosed from relitigating this issue in a separate action; however, Judge Daniels' statement was strictly dicta and was not supported by any legal authority.

[57] The defendants argue that because DPPLP was the only party to the Foreclosure Action, only those defendants who are found to be the alter ego of DPPLP should be bound.  All of the issues the defendants seek to relitigate in this case, however, were fully litigated and decided in the Maryland Action, and all of the Judgment Debtors were parties to that action.

[58] A $633,000 judgment was entered against Konover in the Maryland Action for fraudulent transfer of rent.  Konover, however, was not a defendant to the claims that defendants seek to relitigate in their affirmative defenses.

other words, if Wells Fargo successfully pierces the corporate veil (Counts One and Two) as to the remaining defendants or successor liability is imposed (Count Six), then the defendants necessarily would be considered the alter ego of the Judgment Debtors, and consequently must also be considered to have been "parties" to the Maryland litigation.

Relying on Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100 (1969), and its progeny, the defendants contend that because they were not given notice of potential liability during the Maryland litigation, they have a constitutional due process right to contest the judgment that Wells Fargo is now trying to enforce against them.  In Zenith, a subsidiary stipulated that the subsidiary and its parent should be treated as one entity for purposes of discovery, despite the parent not being a party to the action, and the district court subsequently entered a judgment against the subsidiary and its parent.  Id. at 109–10.  The United States Supreme Court reversed, holding that a parent company cannot be held liable for a previously rendered judgment against its subsidiary when the district court did not have jurisdiction over the parent.  See id. at 111.  Zenith, however, is distinguishable from this action.  In Zenith, the parent company never had the opportunity to contest the issue of piercing the corporate veil; a fact that was significant to the Supreme Court's holding.  See id. ("[The subsidiary] may have executed the stipulation to avoid litigating the alter ego issue, but this fact cannot foreclose [the parent], which has never had its day in court on the question of whether it and its subsidiary should be considered the same entity for purposes of this litigation.").  In contrast, the defendants in this action are not being bound to the judgment rendered in Maryland without first having an opportunity to prove that they are not the same entity as the Judgment Debtors.

The defendants also cite a District of Rhode Island case, in which the court, relying on Section 59 of the Restatement (Second) of Judgments, held that notice and a fair opportunity to defend the action resulting in the judgment must be present in order to hold an alter ego liable for the judgment rendered in an earlier litigation.  See N. Atl. Distrib., Inc. v. Teamsters Local Union No. 430, 497 F. Supp. 2d 315, 323 (D.R.I. 2007).  The court's holding in North Atlantic Distribution was premised on the fact that the original judgment in that case was a default judgment and, thus, neither the original party nor the alter ego had the opportunity to litigate the judgment on the merits.  See id. at 325.  Due process concerns are understandably higher when the judgment being enforced against an alter ego is the product of a default judgment.  No such due process concerns exist, however, when the original judgment results from a full and fair litigation on the merits.  In fact, courts in other jurisdictions, including the U.S. Court of Appeals for the Second Circuit, have held that a defendant who was not a party to the original litigation may be bound by a judgment rendered in the original litigation against its alter ego, if the original judgment was not a default judgment.  See, e.g., Wm. Passalacqua Builders v. Resnick Developers S., Inc., 933 F.2d 131, 142–43 (2d Cir. 1991) ("[I]f the plaintiffs in this case can prove the defendants are in fact the *alter ego* . . . the previous judgment is then being enforced against entities who were, in essence, parties to the underlying dispute; the *alter egos* are treated as one entity." (emphasis in original)); Dudley v. Smith, 504 F.2d 979, 982–83 (5th Cir. 1974) (holding that a jury's alter ego finding against the appellant precluded the appellant, based on *res judicata*, from relitigating the substantive issues of liability and damages from the underlying action); JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., 295 F. Supp. 2d 366, 380 (S.D.N.Y. 2003) (finding that if a defendant is adjudged to be the alter ego of

another from a prior proceeding, then the defendant becomes a party to that prior proceeding);

McCarthy v. State Five Indus. Park, Inc., No. CV054015888, 2006 WL 829684, at *2 (Conn.

Super. Ct. Mar. 15, 2006) ("Actions to pierce the corporate veil to enforce a judgment, however,

do not violate due process" because alter egos are treated as parties to the original litigation);

Imagineering, Inc. v. Lukingbeal, No. 94 CIV. 2589, 1997 WL 363591, at *5 n.11 (S.D.N.Y.

June 30, 1997) ("It is true that a judgment cannot be enforced against an alleged alter ego who

has not had an opportunity to litigate whether or not such a relationship did exist.  Nonetheless,

[w]hen the alleged 'alter ego' is a party to the action where the 'alter ego' status is litigated, due

process will be satisfied." (internal citations and quotations omitted)); see also Sys. Div., Inc. v.

Teknek Elecs., Ltd., 253 F. App'x 31, 37 (Fed. Cir. 2007) ("The exercise of jurisdiction over an

alter ego is compatible with due process because a corporation its alter ego are the same *entity*

. . . ." (emphasis in original)).[59]  In the Maryland litigation, Wells Fargo and the Judgment

Debtors engaged in a full litigation of the issues, on the merits, resulting in the outstanding

judgment.  Consequently, if Wells Fargo ultimately prevails in its alter ego allegations against the

defendants in Counts One, Two, or Six, the defendants should be considered to have been

"parties" to the Maryland litigation.

　　　　If Wells Fargo successfully pierces the corporate veil of the defendants in Counts One or

Two or successor liability is imposed in Count Six, each of the three elements of *res judicata*

under Maryland law would be satisfied and the defendants would be precluded from relitigating

the substantive issues pertaining to liability and damages from the Maryland Action.  If, however,

---

[59] There does not appear to be any Maryland law directly on point.  Maryland law, however, does recognize corporate veil-piercing.  See Bart Arconti & Sons, Inc. v. Ames-Ennis, Inc., 340 A.2d 225, 234 (Md. 1975) (describing Maryland's law for piercing the corporate veil).

the defendants prevail in Counts One, Two, and Six, and thus are not held to be the alter ego of the Judgment Debtors, the defendants would not be liable for the outstanding judgment from the Maryland Action and it would be unnecessary to relitigate the factual issues that the defendants raise in the affirmative defenses. Thus, whether or not the defendants are found to be the alter ego of the Judgment Debtors in Counts One or Two, or successor liability is imposed in Count Six, there is no instance in which relitigation of the factual issues from the Maryland Action is appropriate.[60] Accordingly, the Court grants Wells Fargo's motion for summary judgment as to the defendants' affirmative defenses for Counts One, Two, Six, and Seven.

Wells Fargo's only other remaining claim is Count Three. In Count Three, Wells Fargo alleges that the defendants violated the Connecticut Uniform Fraudulent Transfer Act, Conn. Gen. Stat. § 52-552a. Count Three appears to include allegations related to the Maryland Action—Wells Fargo alleges that, among other transfers, the $1.1 million transfer to Michael Konover in December 2002; KDC's receipt of the leasing renewal commissions from the Portfolio Sales; the transfers from the Judgment Debtors to the defendants via the Common Cash Account; and the transfers of KMC's assets to Blackboard, Ripple, and Michael Konover were fraudulent. Because the parties have not moved for summary judgment on the merits of Count Three and thus, the precise scope of Count Three has not yet been determined, the Court finds that it is premature to rule on the applicability of the defendants' affirmative defenses as to Count

---

[60] This includes Wells Fargo's tortious interference claim in Count Seven. The issues pertaining to the Judgment Debtors' underlying liability in the Maryland Action are separate and distinct from the factual issues that remain in Count Seven. Wells Fargo's tortious interference claim in Count Seven does not require the parties to relitigate the Maryland Action. Instead, only questions of the defendants' intent and knowledge are relevant to the resolution of Count Seven.

Three at this time.  Accordingly, Wells Fargo's motion for summary judgment as to the defendants' affirmative defenses for Count Three is denied without prejudice.

**IV.**      **Conclusion**

Accordingly, the defendants' motion for summary judgment as to Counts One and Two [Dkt # 699] is GRANTED IN PART AND DENIED IN PART; the defendant's motion for summary judgment as to Count Four [Dkt # 688] is GRANTED; the defendant's motion for summary judgment as to Count Five [Dkt # 690] is GRANTED; the defendants' motion for summary judgment as to Count Six [Dkt # 702] is DENIED; the defendants' motion for summary judgment as to Count Seven [Dkt # 695] is GRANTED IN PART AND DENIED IN PART; and the plaintiff's motion for summary judgment on the defendants' affirmative defenses [Dkt # 703] is GRANTED IN PART AND DENIED IN PART.

The following causes of action from Wells Fargo's Second Amended Complaint remain: Count One (with respect to KMC) against Michael Konover, KDC, Blackboard, and Ripple; Count Two (with respect to KMC) against Michael Konover, KDC, K&A, Blackboard, and Ripple; Count Three against all of the defendants; Count Six against KDC, Blackboard, and Ripple; and Count Seven against Michael Konover, KDC, Blackboard, and Ripple.  The following affirmative defenses remain: as to Counts One, Two, Six, and Seven, all of the defendants' affirmative defenses remain, except for affirmative defenses Five, Six, Eight, Ten, Eleven, Twelve, Thirteen, Seventeen, and Eighteen; as to Count Three, all of the defendants' affirmative defenses remain.

SO ORDERED this <u>28th</u> day of March 2011, at Hartford, Connecticut.


/s/ Christopher F. Droney
**CHRISTOPHER F. DRONEY**
**UNITED STATES DISTRICT JUDGE**