**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

```
----------------------------------X
                                  :
WELLS FARGO BANK, NA              :
                                  :
          Plaintiff,              :
                                  :
v.                                :    Civ. No. 3:05CV1924(AWT)
                                  :
MICHAEL KONOVER,                  :
                                  :
          Defendant.              :
                                  :
----------------------------------X
```

**RULING ON MOTION FOR AWARD OF FEES, EXPENSES AND COSTS**

The jury found in favor of plaintiff Wells Fargo Bank, N.A. ("Wells Fargo") against defendant Michael Konover ("Konover") on the First and Second Counts of the Complaint, and Wells Fargo's claim for punitive damages.  The plaintiff has moved for an award of fees, expenses, and costs in accordance with: (1) the jury verdict on punitive damages; (2) Sections 22, 26, 36, and 55 of the Diamond Point Mortgage and Section 1.8 of the Guaranty and corresponding provisions of the Diamond Point Note; and (3) Rule 54 of the Local Civil Rules of the District of Connecticut. For the reasons set forth below, the plaintiff's motion is being granted in part and denied in part.

**I.   FACTUAL BACKGROUND**

The court assumes familiarity with the underlying facts of the case, and recounts only facts necessary to give a general

-1-

overview for purposes of the instant motion.

This action was initiated by the plaintiff in an effort to recover on a judgment entered by the Circuit Court for Baltimore, Maryland in Wells Fargo Bank Minnesota, N.A., Trustee v. Diamond Point Plaza Limited Partnership, et al., No. 03-C-03-002449 (the "Maryland Action").  During post-judgment discovery in the Maryland Action, the plaintiff discovered that entities under Konover's control, based in Connecticut, had drained funds away from the defendant organizations in the Maryland Action--which were also under Konover's control--when it became apparent that the circuit court intended to enter a substantial judgment in favor of the plaintiff.  These actions frustrated Wells Fargo's ability to collect on the judgment in the Maryland Action (the "Maryland Judgment"), requiring Wells Fargo to pursue an action against Konover and the Connecticut-based entities in order to recover on the Maryland Judgment.

In December, 2005, Wells Fargo filed a four-count complaint against Konover, Konover Development Corp. ("KDC"), Konover Construction Corp. ("KCC"), Konover & Associates, Inc. ("K&A"), Blackboard LLC ("Blackboard"), and Ripple, LLC ("Ripple"), seeking to hold them liable for the unpaid balance of the Maryland Judgment.  The complaint was amended twice and ultimately contained four counts against all defendants: (i) veil piercing under the instrumentality rule (First Count), (ii)

veil piercing under the identity rule (Second Count), (iii) fraudulent transfers (Third Count), and (iv) tortious interference (Seventh Count). It contained two counts against Konover individually: (i) tortious interference (Fourth Count), and breach of fiduciary duty (Fifth Count). Finally, it contained one count against KDC, Blackboard, and Ripple only: successor liability (Sixth Count). Summary judgment was granted in favor of KCC on the First and Second Counts, K&A on the First and Seventh Counts, and Konover on the Fourth and Fifth Counts. Subsequently, Wells Fargo voluntarily withdrew all remaining claims prior to trial except for the First and Second Counts as to Konover.

All aspects of the case have been aggressively defended by the defendant and vigorously litigated. As of the date of the jury verdict, the litigation had lasted seven years and had "resulted in the production of over a million documents, . . . 223 motions, 44 depositions, 45 hearing, 24 trial days, 20 trial witnesses, and 711 trial exhibits." (Pl.'s Mem. Supp. Mot. for Attorneys' Fees (Doc. No. 1069-1) ("Pl.'s Mem."), at 9.) At the conclusion of trial, the jury returned a verdict in favor of Wells Fargo, finding Konover liable under both veil piercing theories and also liable for punitive damages, the measure of which under Connecticut law is attorneys' fees.

## II.  DISCUSSION

### A. Availability of Attorneys' Fees

The defendant argues that the "plaintiff cannot obtain the extraordinary remedy of punitive damages based on piercing the corporate veil because veil piercing is not itself an independent cause of action, but rather, is a remedy", and that the plaintiff's argument for attorneys' fees "based on the Diamond Point loan documents is squarely foreclosed by a trilogy of Maryland appellate court decisions that [the p]laintiff has not even attempted to distinguish or discuss meaningfully." (Def.'s Mem. Opp. Mot. for Attorneys' Fees (Doc. No. 1078) ("Def.'s Mem."), at 3.)

However, as the court has explained in previous rulings, neither of these arguments is persuasive.  With respect to the availability of punitive damages for a veil piercing claim, the court has determined that "the holding in L.F. Pace & Sons, Inc. v. Travelers Indemn. Co., which involved a contract claim, suggests that under Connecticut law it is the nature of the defendant's conduct, rather than the label on the underlying claim, which controls whether punitive damages are appropriate . . . ."  (Order re Omnibus Motion for Relief in Connection with Entry of Judgment (Doc. No. 1118), at 4.)  Moreover, even if punitive damages were not available, "the court conclude[d] that the plaintiff has available a separate and independent ground

upon which to recover the litigation expenses, namely the underlying loan documents", because "the language in the loan documents is sufficiently clear to avoid the effect of merger under Maryland law." (Order re Defendant's Motion for Certification of Questions of law to the Supreme Court of Connecticut (Doc. No. 1117), at 3, 6.)

Specifically, the court concluded that the language of § 36 of the Amended and Restated Mortgage Security Agreement and Assignment of Leases and Rents (the "Mortgage Agreement") and § 1.8 of the Guarantee of Recourse Obligations (the "Guarantee") was sufficiently clear to avoid the effect of merger under Maryland law.  The pertinent portion of § 36 of the Mortgage Agreement, which is entitled "Indemnification", reads:

> In addition to any other indemnifications provided herein or in the Other Security Documents, Mortgagor covenants and agrees at its sole cost and expense to protect, defend, indemnify and save harmless Mortgagee, its directors, officers, shareholders, employees, agents, successors, assigns and attorneys from and against all . . . costs and expenses (including without limitation reasonable attorneys' fees and expenses, sums paid in settlement of claims and any such fees and expenses incurred in enforcing this Mortgage or collecting any sums due hereunder), actually imposed upon or actually incurred by or actually asserted against Mortgagee, its directors, officers, shareholders, employees, agents, successors, assigns and attorneys . . . .  The obligations and liabilities of Mortgagor under this Paragraph 36 shall survive any termination, satisfaction or assignment of this Mortgage and the exercise by Mortgagee of any of its rights or remedies hereunder including, but not limited to, the acquisition of the Mortgaged Property by foreclosure or a conveyance in lieu of foreclosure.

-5-

(Amended and Restated Mortgage Security Agreement and Assignment
of Leases and Rents "Mortgage Agreement", Pl.'s Ex. 29 (Doc. No.
1070-29), at *26.)   Similarly, the pertinent language of § 1.8
of the Guarantee, which is entitled "Payment of Expenses",
reads:

> In the event that Guarantor should breach or fail to
> timely perform any provisions of the Guaranty,
> Guarantor shall, immediately upon demand by Lender,
> pay Lender all reasonable costs and expenses
> (including court costs and reasonable attorneys' fees)
> incurred by Lender in the enforcement hereof or the
> preservation of Lender's rights hereunder.      The
> covenant contained in this Section shall survive the
> payment and performance of the Guaranteed Obligations.

(Guarantee of Recourse Obligations ("Guarantee"), Pl.'s Ex. 30
(Doc. No. 1070-30), at *5.)

**B. Measure of Attorneys' Fees**

"'In diversity cases, attorney[s'] fees are considered
substantive and are controlled by state law.'"  Bristol Tech.,
Inc. v. Microsoft Corp., 127 F. Supp. 2d 64, 66 (D. Conn. 2000)
(quoting  United States v. One Parcel of Property Located at 414
Kings Highway, Civ. No. 5:91-CV-158, 1999 WL 301704, at *4 (D.
Conn. May 11, 1999)).

"Connecticut law has . . . established that where there is
a contractual provision for attorney's fees, the term
'reasonable' is implied by law."  Home Funding Grp., LLC v.
Kochmann, Civ. No. 3:06CV1234(HBF), 2008 WL 4298325, at *4 (D.

-6-

Conn. Sept. 18, 2008) (citing <u>Crest Plumbing and Heating, Co. v. DiLoreto</u>, 12 Conn. App. 468, 480 (1987)). Moreover, "under Connecticut law, . . . a court may award attorneys' fees as a component of punitive damages", and "'such expenses may include not only reasonable attorney[s'] fees, but also any other nontaxable disbursements reasonably necessary to prosecuting the action.'" <u>Ensign Yachts, Inc. v. Arrigoni</u>, Civ. No. 3:09-cv-209 (VLB), 2012 WL 4372002, at *2 (D. Conn. Sept. 24, 2012) (quoting <u>Berry v. Loiseau</u>, 223 Conn. 786, 832 (1992)). Thus, Wells Fargo may only be awarded attorneys' fees and expenses to the extent they are deemed "reasonable" regardless of whether they are being award pursuant to the jury verdict or pursuant to the loan documents.

In evaluating fees for reasonableness, "Connecticut courts traditionally examine the factors enumerated in [R]ule 1.5(a) of the Rules of Professional Conduct. . . ." <u>Simms v. Chaisson</u>, 277 Conn. 319, 332 (2006). These factors include:

(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
(2) The likelihood, if made known to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
(3) The fee customarily charged in the locality for similar legal services;
(4) The amount involved and the results obtained;
(5) The time limitations imposed by the client or by the circumstances;
(6) The nature and length of the professional

relationship with the client;
(7)  The experience, reputation, and ability of the
     lawyer or lawyers performing the services; and
(8)  Whether the fee is fixed or contingent.

Conn. R. of Prof. Conduct, Rule 1.5(a).

In addition, the Connecticut Supreme Court has "noted that 'courts have a general knowledge of what would be reasonable compensation for services which are <u>fairly stated and described</u>' and that '[c]ourts may rely on their general knowledge of what has occurred at the proceeding before them to supply evidence in support of an award of attorney[s'] fees.'"  <u>Smith v. Snyder</u>, 267 Conn. 456, 471 (2004) (quoting <u>Sapero v. Mercede</u>, 262 Conn. 1, 9 (2002); <u>Andrews v. Gorby</u>, 237 Conn. 12, 24 (1996)) (internal citations omitted) (emphasis and alterations in original).  "However, courts may not rely on their general knowledge alone" and "'a threshold evidentiary showing is a prerequisite to an award of attorney[s'] fees.'"  <u>Kochmann</u>, 2008 WL 4298325, at *4 (quoting <u>Smith</u>, 267 Conn. at 477).

Furthermore,

[u]nder Connecticut law, "the initial estimate of a
reasonable attorney's fee is properly calculated by
multiplying the number of hours reasonably expended on
the litigation times a reasonable hourly rate. . . .
The courts may then adjust this lodestar calculation
by other factors."  This is consistent with caselaw
from the circuit and Supreme Court, which "have held
that the lodestar--the product of a reasonable hourly
rate and the reasonable number of hours required by
the case--creates a 'presumptively reasonable fee.'"

<u>Cumulus Broadcasting v. Okesson</u>, Civ. No. 3:10CV315 (JCH), 2012

-8-

WL 3822019, at *4 (D. Conn. Sept. 4, 2012) (quoting Land Group, Inc. v. Palmieri, 123 Conn. App. 84, 98 (2010); Millea v. Metro-North R. Co., 658 F.3d 154, 166 (2d Cir. 2011)) (internal citations omitted).  Additionally, although the Second Circuit has recently cautioned that "[t]he meaning of the term 'lodestar' has shifted over time, and its value as a metaphor has deteriorated to the point of unhelpfulness", the analysis for reasonable attorneys' fees remains relatively unchanged in this circuit.  Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany and Albany County Bd. of Elections, 522 F.3d 182, 190 (2d Cir. 2007).  The court in Arbor Hill stated that the appropriate analysis

> and the one most consistent with attorney[s'] fees jurisprudence--is for the district court, in exercising its considerable discretion, to bear in mind all of the case-specific variables that we and other courts have identified as relevant to the reasonableness of attorney's fees in setting a reasonable hourly rate. The reasonable hourly rate is the rate a paying client would be willing to pay. In determining what rate a paying client would be willing to pay, the district court should consider, among others, the Johnson factors; it should also bear in mind that a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively. The district court should also consider that such an individual might be able to negotiate with his or her attorneys, using their desire to obtain the reputational benefits that might accrue from being associated with the case. The district court should then use that reasonable hourly rate to calculate what can properly be termed the "presumptively reasonable fee."

Id. (emphasis in original).[1]  A four-step method for calculating attorneys' fees that reflects the application of these principles was described by the court in Valley Housing Ltd. Partnership v. City of Derby, Civ. No. 3:06CV1319 (TLM), 2012 WL

---

[1] The "Johnson factors" referenced in the Arbor Hill decision are the twelve factors first announced in Johnson v. Georgia Highway Exp., Inc., 488 F.2d 714 (5th Cir. 1974) and are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.  See id. at 717-19, abrogated on other grounds by Blanchard v. Bergeron, 489 U.S. 87 (1989).  Under Connecticut law, the applicability of these factors to the attorneys' fees analysis is currently unsettled.  In Perdue v. Kenny A. ex rel. Winn, 559 U.S. 542 (2010), the Supreme Court stated that the Johnson factors "'gave very little actual guidance to district courts.  Setting attorney's fees by reference to a series of sometimes subjective factors placed unlimited discretion in trial judges and produced disparate results.'"  Id. at 551 (quoting Pennsylvania v. Delaware Valley Citizens' Counsel for Clean Air, 478 U.S. 546, 563 (1986)).  One Connecticut Appellate Court panel interpreted Perdue to mean that the Johnson test "has fallen out of favor even for . . . cases" with facts similar to those in Johnson, i.e. civil rights cases.  Electrical Wholesalers, Inc. v. V.P. Elec. Inc., 132 Conn. App. 843, 849 (2012).  The court went on to state that "[i]n Connecticut, the Johnson test has been applied exclusively in awarding attorney's fees for individuals filing actions under the Connecticut Unfair Trade Practices Act (CUTPA)", and refused to apply the factors to the case before it.  Id.  However, another panel during the same year applied the Johnson factors in a non-CUTPA case, stating that "'[f]or guidance in adjusting attorney's fees, Connecticut courts have adopted the twelve factors set forth in Johnson . . . ."  Conservation Com'n of Town of Fairfield v. Red 11, LLC, 135 Conn. App. 765, 787 (2012) (quoting Ernst v. Deere & Co., 92 Conn. App. 572, 576 (2005)).  Furthermore, Connecticut courts have pointed out that "the factors set out in Rule 1.5(a)[] of the Connecticut Rules of Professional Conduct . . . . generally follow those set forth in Johnson . . . and are used to adjust an initial 'lodestar' calculation . . . ."  Feinstein v. Keenan, No. FSTCV106007235S, 57 Conn L. Rptr. 44, 2013 WL 5969137, at *9 (Conn. Super. Oct. 17, 2013).  Finally, as the defendant has acknowledged, "the determination of a reasonable fee award is not [substantially] different under the lodestar approach than it is under Johnson.  'In practice . . . both considered substantially the same set of variables--just at different points in the fee-calculation process.'"  (Def.'s Mem., at 14 n.6 (quoting Arbor Hill, 522 F.3d at 187)).  Therefore, the court does not reach the issue of whether Connecticut courts still utilize the Johnson factors, but will consider them, along with other pertinent factors, in its determination of a reasonable fee.

1077848 (D. Conn. Mar. 30, 2012) as follows: "'(1) determine the reasonable hourly rate; (2) determine the number of hours reasonably expended; (3) multiply the two to calculate the presumptively reasonable fee; and (4) make any appropriate adjustments to arrive at the final fee award.'"  Id. at *2.

### 1. Reasonable Hourly Rates

The defendant argues that the rates charged by all of the plaintiff's attorneys are unreasonable, and therefore should be reduced by various percentages to bring the rates into line with his expert's determination of reasonable rates.  Specifically, Konover argues that Attorney Nolan's rate should be reduced by 22.06%, and that Attorney Joyce's rate should be reduced by 17.93%.  In addition to these highest billing rates, Konover states that the rates for all of the less senior attorneys and the support staff from each firm should be reduced as well, and provides percentages for those reductions as well.  These proposed reductions are based on reasonable hourly rates as determined by Konover's expert, Attorney Jeffrey Tinley, and supported by the declaration of Konover's trial counsel as to prevailing hourly rates.

Under Arbor Hill, there is a strong presumption that the rate a paying client actually did pay during the course of the litigation is reasonable.  See Arbor Hill, 522 F.3d at 190 ("The reasonable hourly rate is the rate a paying client would be

willing to pay."). A similar presumption has been employed by Connecticut courts as well. The Connecticut Supreme Court

> ha[s] long held that in a claim for damages "'proof of the expenses paid or incurred affords some evidence of the value of the services, and if unreasonableness in amount does not appear from other evidence or through application of the trier's general knowledge of the subject-matter, its reasonableness will be presumed.' Carangelo v. Nutmeg Farms, Inc., 115 Conn. 457, 462, 162 A. 4 [1932]."

Markey v. Santangelo, 195 Conn. 76, 79 (1985) (quoting Flynn v. First National Bank & Trust Co., 131 Conn. 430, 436 (1944)). Similarly, the Connecticut Supreme Court has also found that "a contract clause providing for reimbursement of 'incurred' fees permits recovery upon the presentation of an attorney's bill, so long as that bill is not unreasonable upon its face and has not been shown to be unreasonable by countervailing evidence or by the exercise of the trier's own expert judgment." Storm Associates, Inc. v. Baumgold, 186 Conn. 237, 246 (1982). Thus, under Connecticut law, evidence of the fees and expenses Wells Fargo actually incurred creates a presumption that such costs were reasonable regardless of whether they are recovered as punitive damages or under the loan documents.

This is consistent with decisions from other courts in this circuit. For instance, consistent with Arbor Hill, the Second Circuit has held that "if the District Court . . . chooses to award fees, any evidence of the actual billing arrangement

between [the party seeking fees] and its counsel should be

considered a significant, though not necessarily controlling,

factor in the determination of what fee is 'reasonable' . . . ."

Crescent Publishing Group, Inc. v. Playboy Enterprises, Inc.,

246 F.3d 142, 144 (2d Cir. 2001).  In Diplomatic Man, Inc. v.

Nike, Inc., Civ. No. 08cv139(GEL), 2009 WL 935674, at *6 (Apr.

7, 2009), the court interpreted Arbor Hill as standing for the

proposition that "the reasonableness of an hourly fee may be

determined exclusively by 'the rate a paying client would be

willing to pay,'" and found that the rates sought were

reasonable because the defendant "ha[d] in fact . . . paid these

rates."  The court in Diplomatic Man went on to state that

> the fact that Nike, a highly sophisticated business
> client, has paid these bills presumably after careful
> review by its general counsel or other senior business
> executives is prima facie evidence of the
> reasonableness of the amount as a whole (beyond just
> the reasonableness of the hourly rates charged), since
> Nike could not have assumed that it would be
> reimbursed in full, or even in part.

Id. (emphasis added); see also Telenor Mobil-e Communications AS

v. Storm LLC, Civ. No. 07cv6929 (GEL), 2009 WL 585968, at *2

(S.D.N.Y. Mar. 9, 2009) ("[I]t must . . . be noted that Telenor,

a highly sophisticated business entity, has without complaint

paid the bills that Storm now contends are unreasonable . . . .

[R]egardless of the precise legal effect of this factor, it is

surely of some significance that Telenor has been willing to

incur these fees.  This is not a case in which Telenor can have
assumed that it was litigating on Storm's ticket.").

The presumption that what a client actually paid
constitutes a reasonable fee has also been endorsed by the
United States Supreme Court.  The Court has stated that "[t]he
presence of a pre-existing fee agreement may aid in determining
reasonableness.  '"The fee quoted to the client . . . is helpful
in demonstrating attorney's fee expectations when he accepted
the case."'"  Blanchard, 489 U.S. at 93 (quoting Delaware
Valley, 483 U.S. at 723)).  Thus, the cases demonstrate that
when a sophisticated client pays attorneys' fees that it does
not know it will necessarily recover, the rate paid is
presumptively reasonable.

The cases relied on by the defendant are not persuasive.
The defendant cites to Vigro v. Lyons, 209 Conn. 497, 503
(1988), for the proposition that "punitive damages may only
'consist of a reasonable expense properly incurred in the
litigation . . . less taxable costs.'"  Id. (quoting Markey, 195
Conn. at 80).  The language cited by the defendant appears in
the context of comparing punitive damages available in § 1983
actions with those damages available under Connecticut state law
claims, not in a discussion of how to calculate attorneys' fees.
Moreover, the case quoted by the court in Vigro is Markey v.
Santangelo, which, as discussed above, supports the argument

-14-

that attorneys' fees actually paid are presumptively reasonable.
Directly following the portion quoted in <u>Vigro</u>, the court in
<u>Markey</u> states:

> The plaintiff testified that he had agreed to an
> arrangement whereby in the event of a recovery his
> attorney would receive a fee of one third of the
> amount awarded. The defendant argues that absent
> evidence of the reasonableness of such fees they may
> not be awarded. We do not agree. We have long held
> that in a claim for damages "'proof of the expenses
> paid or incurred affords some evidence of the value of
> the services, and if unreasonableness in amount does
> not appear from other evidence or through application
> of the trier's general knowledge of the subject-
> matter, its reasonableness will be presumed.' . . . ."

<u>Markey</u>, 195 Conn. at 80.

In addition, neither of the Connecticut Appellate Court
decisions relied on by the defendant even discusses the
reasonableness of the hourly rates.  The court in <u>Esposito v.
Esposito</u>, 71 Conn. App. 744 (2002) only discussed the
reasonableness of the hours expended by the attorneys, not the
hourly rate paid by the client.  <u>See id.</u> at 749.  Similarly, the
court in <u>Crest Plumbing & Heating Co. v. DiLoreto</u>, 12 Conn. App.
468 (1987) makes no statement about how courts are to determine
a reasonable hourly rate for attorneys' fees, but merely states
that when a contract provision mentions "attorney's fees" the
requirement that they be "reasonable" is implied by law.  <u>See
id.</u> at 480.  This holding does not bear directly on the question
of whether a rate paid by a client is presumptively reasonable.

Furthermore, the defendant has not made a showing sufficient to overcome the presumption of reasonableness here. First, the defendant is not correct in stating that no court in this district has "crossed the $500 per hour threshold where the opposing party has contested the reasonableness of the rates." (Def.'s Mem., at 21.)  The defendant recognizes, in a footnote, that the court in <u>Innis Arden Golf Club v. Pitney Bowes, Inc.</u>, Civ. No. 3:06CV1352(JBA), 2012 WL 1108527 (D. Conn. Mar. 30, 2012, "awarded fees at a rate of $525 per hour", and his characterization of that case as one where "the reasonableness of the rate [was] unopposed" and "just a few hours of work" were performed at the $525 per hour rate is inaccurate. (Def.'s Mem., at 22 n.16.)  In fact, in <u>Innis Arden,</u> the plaintiff "objected to the hourly rates charged by defense counsel", and the court reduced the hourly rate from $580-$647 to $525 as a result. <u>Innis Arden</u>, 2012 WL 1108527, at *9.  Also, the court found that the attorney in question had reasonably billed 176.5 hours at this rate, resulting in $92,662.50 for his work alone, which constituted over one-third of the total fee award.  <u>See</u> <u>id.</u> at *37.

In addition to the presumption of reasonableness for the plaintiff's requested rates, factors outlined in Rule 1.5(a) of the Rules of Professional Conduct and/or those enumerated in <u>Johnson</u> favor a finding of reasonableness.  With respect to the

-16-

time and labor required (Rule 1.5(a)(1) and <u>Johnson</u> factor #1),
this case required an enormous amount of labor over a period of
seven years, as reflected by the large number of hours worked by
attorneys on both sides.

With respect to the novelty and difficulty of the questions
involved (Rule 1.5(a)(1) and <u>Johnson</u> factor #2), this case was
inarguably complex and difficult, and it presented novel and
difficult questions--ones that are particularly difficult to
address in a jury trial.  The defendant's own expert stated at
trial that veil piercing is "rare because for all the tens of
thousands of corporations and LLCs and LPs that exist, it's a
very limited universe of situations where you ese cases that
actually go and pierce."  (Pl.'s Mem., at 15 n.14 (internal
quotation marks omitted).)  In fact, he went so far as to call
veil piercing "an exception to the exception."  (<u>Id.</u>)
Additionally, veil piercing cases tried before juries are even
more rare than veil piercing cases generally, and thus present
their own particular difficulties.  Thus, this factor weighs in
favor of the reasonableness of the higher billing rates.

Similarly, the skill required to perform the legal services
properly and the experience, reputation, and ability of the
lawyer or lawyers performing the services (Rule 1.5(a)(1) and
(7) and <u>Johnson</u> factors #3 and #9) support higher billing rates.
This case required a high degree of skill to perform the legal

services properly, both because of the complex legal and factual issues it presented and because of the tenacity and ability of the defendant's counsel.  The plaintiff's counsel, who have an excellent reputation and are extremely experienced and able, demonstrated that they possessed the necessary skill to handle this case.

With respect to the nature and length of the professional relationship with the client (Rule 1.5(a)(6) and <u>Johnson</u> factor #11), Attorney Joyce has had a long-standing relationship with Wells Fargo and ORIX.  While such a relationship between counsel and the plaintiff could suggest that a lower hourly rate is warranted, the opposite is true here, given the particular circumstances of this case.  Attorney Joyce was lead counsel for Wells Fargo in the underlying Maryland Action and therefore had intimate, and irreplaceable, familiarity with that case that made him uniquely qualified.  It was apparent to the court that such familiarity was material to Wells Fargo prevailing on its veil-piercing claims against Konover.  Attorney Nolan, on the other hand, did not have a longstanding relationship with Wells Fargo.  He was taking on Wells Fargo and ORIX as new clients in an extremely complex and time consuming matter and the particular value he brought to the representation was his expertise in creditor's rights disputes and real estate litigation matters.  It is undisputed that Attorney Nolan

founded the corporate insolvency practice at a major Connecticut law firm in the early 1970s, and has spent over 40 years litigating cases involving fraudulent transfers, judgment avoidance, and issues of corporate insolvency.  Thus, the relative relationships of the two primary billing attorneys to Wells Fargo, although different, each favor a finding that higher billing rates for their work are reasonable, particularly in view of the deep understanding of the legal and factual issues plaintiff's counsel, working in tandem, demonstrated.

With respect to the amount involved and the results obtained (Rule 1.5(a)(4) and Johnson factor #8) the outcome of this case strongly suggests that the fees incurred by Wells Fargo were reasonable.  The plaintiff succeeded in every claim it brought to trial, and joint and several liability was imposed on Konover for the full balance of the Maryland Judgment--an amount in excess of $20 million--plus punitive damages.  This case involved millions of dollars from the beginning. Therefore, it was reasonable for Wells Fargo to retain counsel who charged higher rates, based on their experience and skills, because Wells Fargo had so much at stake in this case.

Finally, with respect to the fee customarily charged in the locality for similar legal services (Rule 1.5(a)(3), the defendants argue that "the hourly rates [the plaintiff] was charged exceed the prevailing hourly rates in this District for

lawyers of similar experience." (Def.'s Mem., at 20.)  The
defendant's expert, Tinley, opined that the range of prevailing
hourly rates is between $300 and $500 per hour.  However, the
court finds Tinley's analysis less than compelling for several
reasons.  First, Tinley compares the rates charged by the
plaintiff's lead counsel with those charged by the lead
Connecticut attorneys for the defendant, but the defendant's
attorneys agreed to a discounted rate.  While Tinley
acknowledges there was such a discount, and suggests that the
plaintiff's attorneys should have offered a similar discount, he
still relies on the discounted rates, rather than the rates
ordinarily charged by the defendant's attorneys to support his
conclusion regarding prevailing rates.  Additionally, in
comparing the rates of the plaintiff's and defendant's lawyers,
Mr. Tinley does not take into account the rates ordinarily
charged by other attorneys who worked on behalf of the defendant
such as Attorney Murphy ($825/hour nationally and $525/hour for
this case), Attorney Baldwin ($625/hour in a 2011 case), and
Attorney Albin ($635/hour in this case).

     Also, Tinley relies on the Tymetrix 2012 Real Rate Report
(the "Tymetrix Report") to generate his range for reasonable
hourly rates, and in doing so focuses on the mean reported
rates.  However, as the plaintiff points out, the Tymetrix
Report "notes that the third quartile rates for attorneys with

more than 21 years of experience is $621.14 in Bridgeport and
$500.00 in Hartford." (Pl.'s Reply, at 6.) Because this case
is one that clearly falls within the upper range of difficulty
and complexity, a rate no lower than the third quartile would be
more appropriate, and more reasonable, to charge than the mean
rate. [2] Furthermore, the "locality" to which the court should be
looking is more appropriately encompassed by the entire
district, rather than simply Hartford. See, e.g., Luciano v.
Olsten Corp., 109 F.3d 111, 115 (2d Cir. 1997) ("It is well-
established that the 'prevailing community' the district court
should consider to determine the 'lodestar' figure is 'the
district in which the court sits.'") (quoting Polk. V. New York
State Dep't of Correctional Servs., 722 F.2d 23, 25 (2d Cir.
1983)). Focusing on the entire district, the rates requested by
the plaintiff's most expensive attorneys fall below the third
quartile for certain parts of the district, such as Bridgeport.[3]
Finally, the range of hourly rates that Tinley puts forth as
reasonable would seemingly apply equally well to a run-of-the-
mill commercial case, and the instant case is inarguably not
such a case. Experience and common sense dictate that the

---

[2] The court notes that for purposes of determining the prevailing hourly rate,
the mean is a less reliable indicator than the median. Because the mean is
influenced to a greater degree by outliers, the result is more likely to be
skewed and give a less accurate representation of a rate close to that
charged by the majority of attorneys in the locality.
[3] It is happenstance that this case was tried in Hartford rather than
Bridgeport or New Haven because cases in this district are assigned randomly.
Thus, there does not appear to be a sound reason to view the "locality" as
being merely Hartford, rather than the entire District of Connecticut.

prevailing rate in this locality for attorneys who could capably handle only the run-of-the-mill commercial case would be lower than the rates charged by those handing a more challenging case. Tinley's analysis ignores factors such as these.[4]

The hourly rates charged by the less senior attorneys utilized by Wells Fargo are similarly not unreasonable, based on these same considerations.  The points discussed above with respect to the difficulty of the questions involved and the amount of time or the level of skill necessary to perform the legal services properly also favor the conclusion that higher billing rates for the less senior attorneys on the team headed by Attorney Joyce and Attorney Nolan is not unreasonable.  It was apparent to the court that it was essential that the leaders of Wells Fargo's legal team be supported by very capable less senior attorneys.  Similarly, the amount involved and the results obtained are the same with respect to the less senior attorneys, who inarguably contributed to the results obtained. Finally, the concerns described above with respect to Tinley's analysis apply equally with respect to the rates for the less senior attorneys.[5]

---

[4] The court notes that the closest analogue to this factor that appears in Johnson, the attorney's customary hourly rate (factor 5), also counsels in favor of the reasonableness of the rates requested.  The record indicates that the plaintiff's attorneys did not charge Wells Fargo any more than their normal hourly rates, and that in fact several of the attorneys agreed to cap their hourly rates.

[5] For substantially the same reasons just discussed, this reasoning is applicable to the rates of the paralegals as well.

Consequently, even though the billing rates of the plaintiff's counsel appear to be at the high end of the prevailing rates, the court concludes that there are compelling reasons why that is appropriate in this particular case. Therefore, because the defendant has not presented evidence sufficient to overcome the presumption that the rates paid by the plaintiff were reasonable, the attorneys' fees will be calculated using the hourly rates requested.

### 2. Reasonable Number of Hours

The second step Connecticut courts take in calculating an award of attorneys' fees is to determine the number of hours reasonably spent on the litigation.  The presumption of reasonableness under Markey and Storm Associates, discussed above, applies to the hours worked as well as the hourly rates charged.

The defendant argues that the hours claimed by the plaintiff's counsel should be reduced because they are "'excessive or insufficiently documented, or that time spent was wasteful or redundant . . . .'" (Def.'s Mem., at 33 (quoting Saunders v. New York, Civ. No. 07cv830 (SAS), 2009 WL 4729948, at *5 (S.D.N.Y 2009)).) "'Hours that are "excessive, redundant, or otherwise unnecessary," are to be excluded' from a fee award." Serricchio v. Wachovia Securities, LLC, 706 F. Supp. 2d 237256 (D. Conn. 2010).

The defendant contends that the hours billed for work
related to the Maryland Action, and to two actions in which
Wells Fargo sought to domesticate and enforce the Maryland
Judgment, should be eliminated.  The court disagrees.  Section
36 of the Mortgage Agreement and Section 1.8 of the Guarantee
specifically allow Wells Fargo to recover for attorneys' fees
incurred in enforcing the provisions of the mortgage.  It is
clear that these related actions were attempts to do just that.
Furthermore, there is no indication or argument that these fees
were not reasonably incurred in litigating those other actions,
just that they are independent of the instant case.  Therefore,
the time spent on these related actions will not be deducted
from the plaintiff's fee award.[6]

The defendant also argues that the plaintiff improperly
included hours spent on work that, while perhaps helpful, was
unnecessary for the successful litigation of this case
specifically: (i) conducting focus groups; (ii) conducting a
mock trial; (iii) conducting jury research; (iv) preparing trial

---

[6] The court notes that the award of fees related to the hours spent on the
Domestication Actions and the Maryland Action is premised exclusively on the
provisions of the Mortgage Agreement and the Guaranty.  The court agrees with
the defendant that the work performed in these actions was separate from and
not necessary to the successful litigation of this case.  Also, after
reviewing the parties' submissions with respect to the hours attributable to
these actions, the court finds the plaintiff's allocation of hours dedicated
to these unrelated cases to be persuasive.  Thus, but for the provisions of
the Mortgage Agreement and Guarantee, the plaintiff's requested attorneys'
fees would have been reduced by $102,453.00 to account for the hours spent on
these actions.  (See Ex. I of Pl.'s Reply Mem. Supp. Mot. for Award of Fees,
Expenses and Costs (Doc. No. 1082-9), at *18.)

graphics; and (v) briefing on the defendant's dilatory conduct.

With respect to the focus group and mock trial, the defendant cites to Shaw v. Greenwich Anesthesiology Assocs., P.C., 200 F. Supp. 2d 110, 115 (D. Conn. 2002), for the proposition that "such time is not seen as reasonably advancing Plaintiff's claims." However, the issue presented in Shaw was a relatively straightforward, run-of-the-mill employment discrimination claim, and that case does not appear to have had associated with it the complexity or challenges present here. While other district courts in this circuit have awarded fees and costs incurred in connection with a focus group or mock trial preparation in other instances, see, e.g. Guzman v. Bevona, Civ. No. 92cv1500 (RPP), 1996 WL 374144 (S.D.N.Y. 1996) (focus group); Dubin v. E.F. Hutton Group, Inc., 878 F. Supp. 616 (S.D.N.Y. 1995) (mock jury trial), the court has not located any Connecticut decision. However, based on the novelty and complexity of the questions involved in veil-piercing cases and the challenge of explaining the concepts and principles involved to lay persons--as evidenced by the defendant's retention of an expert to testify on piercing the corporate veil[7]--the court finds it was reasonable for the plaintiff's counsel to spend

---

[7] In arguing why he required an expert witness to testify, Konover explained that the issues "are complex matters well beyond the grasp of most jurors", that the trial "will center upon one of the most complicated and debated areas of the law", and that expert "testimony is helpful to the jury because piercing claims typically involve complex factual patterns . . . ." (Def.'s Mem. Opp. to Pl.'s Mot. in Limine (Doc. No. 851), at 2, 5, 10.)

time preparing for trial with the assistance of a focus group
and mock jury.  Thus, these hours will not be deducted.

However, the court agrees with the defendant that the time
the plaintiff spend conducting jury research should be excluded.
The defendants state that the time associated with these fees
appears to have been spent "conducting internet and other
research on the jury pool and jurors." (Def.'s Mem., at 36).
An expense must be "reasonably necessary" to the successful
litigation of the case to be reimbursable.  The jury selection
process affords counsel the opportunity to obtain the
information about the individuals who may comprise the jury that
is reasonably necessary to pick a jury.  While obtaining more
information by conducting research on jurors may be perceived as
useful, it is by no means reasonably necessary to equip counsel
to successfully participate in the jury selection process.
Therefore, fees for such work will not be awarded as either
punitive damages or pursuant to the Mortgage Agreement or
Guarantee, and the court will exclude these fees, which the
defendant has calculated to total $31,973, from the award.

The defendant contends that the time billed for trial
graphics preparation is "clear double dipping." (Def.'s Mem.,
at 36.)  The fact that the plaintiff's counsel hired a graphics
firm to assist in the preparation of trial exhibits does not
foreclose the need for work by the attorneys on those exhibits

as well.   In fact, a graphics firm would be poorly equipped to
prepare exhibits without meaningful input from the attorneys who
will actually be trying the case, and a review of the time
entries related to this work suggests that a majority of the
time billed was spent working with the graphics firm.   Thus,
these hours are not redundant and will be included in the final
award.

Finally, the defendant argues that all time spent on the
issue of the defendant's dilatory conduct should be excluded as
being "unnecessary" because the plaintiff never raised the issue
at trial.   However, a review of the time entries related to this
issue suggests that much of the time spent was in response to a
motion in limine filed by the defendant to preclude such
evidence at trial.   The plaintiff successfully argued in
opposition to that motion in limine.   In the order denying the
defendant's motion in limine, the court observed that "the
evidence is relevant to the plaintiff's effort to refute a
defense it appears the defendant will raise at trial . . . ."
(Order re Def.'s Mot. in Limine (Doc. No. 957), at 3.)
Therefore, in order for the plaintiff to preserve the option of
presenting this evidence to the jury, it was necessary for its
counsel to spend the time researching and briefing the issue in
response to the motion in limine.   As will be addressed more
fully below, the fact that the plaintiff chose not to pursue a

particular strategy at trial does not mean that all of the work that counsel undertook based on that strategy was unnecessary. In preparing for trial, especially a complex and hard-fought trial like the one here, the plaintiff's counsel did not have the benefit of knowing in advance exactly how the trial would unfold.  Being prepared for scenarios that could reasonably be expected to present themselves was, therefore, necessary in order to represent the client fully.  The court's ruling denying the motion in limine reflects that the court was persuaded that the plaintiff needed to be prepared with respect to this topic. This same reasoning is applicable to the other "unnecessary work" the defendant highlights in his memorandum, including time spent on arguments that were ultimately abandoned or proved to be unsuccessful.

In addition to claiming that certain hours should be deducted as excessive or unnecessary, the defendant also argues that hours should be reduced because they were not properly documented, either because time entries are redacted or because they are too vague.  Connecticut appellate courts have upheld attorneys' fees awards that were based on partially redacted records in at least two instances.  See Antogiovanni v. America's Homes and Communities Real Estate, LLC, 130 Conn. App. 286 (2011); Federal Deposit Ins. Corp. v. Owen, 88 Conn. App. 806 (2005).  Additionally, in Dembroski v. Despins, No. FST FA

10 4018828 S, 2012 WL 386623, at *2 (Conn. Super. Ct. Jan. 13, 2012), the court held "that the plaintiff [was] within her rights to make redactions of attorney work product and[/]or attorney client privilege in the affidavit in support of . . . attorneys['] fees."  Also, "'[c]ourts in this circuit have awarded attorneys' fees despite the redaction of privileged information in attorneys' contemporaneous time records.'" Cabala v. Morris, Civ. No. 3:09-cv-651 (VLB), 2012 WL 3656364, at *3 (D. Conn. Aug. 24, 2012) (quoting Sidley Holding Corp. v. Ruderman, No. 08 Civ. 2513 (WHP) (MHD), 2009 WL 6047187, at *24 (S.D.N.Y. Dec. 30, 2009)).

Neither of the cases cited by the defendant compels a different result.  The court in Home Funding Group, LLC, for instance, held only that there would be no award for hours that "were so thoroughly redacted that the Court could not reasonably review them."  Home Funding Group, LLC v. Kochmann, Civ. No. 3:06CV1234 (HBF), 2008 WL 4298325, at *6 n.7 (D. Conn. Sept. 28, 2008).  In addition, in Shukla v. Sharma the court found that there should be no award with respect to the redacted time entries only because they "were not relevant to the subject matter of the sanctions award."  Shukla v. Sharma, Civ. No. 07CV2972 (CBA), 2010 WL 8435857, at *6 (E.D.N.Y. Dec. 15, 2010). Here, it is apparent that the work related to the redacted entries was relevant to the litigation and the entries were

redacted for privilege reasons, and the entries are not so heavily redacted that the court cannot reasonably review them. Therefore, no hours will be deducted due to redactions.

Similarly, no hours will be deducted on account of vagueness.  Although the defendant is correct that this district has on previous occasions held time entries like "prepare for trial" or "attention to" some matter to be impermissibly vague, under the particular circumstances of this case, the court will not exclude such entries from the calculation of the fee award. As was discussed above, the contemporaneous time records of the plaintiff's counsel in this case were already reviewed by a sophisticated paying client.  The individual responsible for reviewing the bills was Greg May, current Deputy General Counsel at ORIX and former Director and Senior Litigation Counsel. May's job duties throughout the period this matter was litigated included overseeing litigation and the work of outside counsel. These duties encompassed approximately 75% to 100% of May's time during this time period.  May reviewed the invoices submitted by the plaintiff's counsel, and approved them for payment at or near the time that the services were rendered--not after a verdict was rendered in the plaintiff's favor.  Furthermore, May made adjustments to the invoices as necessary, and did not merely pay them as submitted.  In addition, the court has become familiar with how this litigation has proceeded and has a sense

of the time that was reasonable to expend at certain stages of the case.  In light of the review conducted by May and based on the court's familiarity with the case, the court sees no reason to disturb the presumption of reasonableness, despite the fact that the descriptions of how the time was spent are in some instances not as specific as they could be.

Therefore, the defendant has not demonstrated that the hours already billed to and paid for by ORIX are unreasonable, and thus the court will not deduct any of the requested hours from the final calculation of the fee award, except for the hours spent on internet research on jurors.

### 3. Other Adjustments

Ordinarily the next step in the fee analysis is multiplying the reasonable rate by the reasonable hours to establish the presumptively reasonable fee.  However, as there is already a presumptively reasonable fee based on what the plaintiff paid-- and the defendant has not demonstrated that this fee is unreasonable--the court moves on to the final step: determining if the fee should be adjusted.

The defendant contends that the fee should be significantly reduced to account for the dismissal or withdrawal of the majority of the plaintiff's claims before trial.  Connecticut courts follow the U.S. Supreme Court's decision in <u>Hensley v. Ekerhart</u>, 462 U.S. 424 (1983) with respect to when a fee award

-31-

should be reduced because of unsuccessful claims.  See, e.g.,

Russell v. Dean Witter Reynolds, Inc., 200 Conn. 172, 195

(1986).  Under Hensley district courts should address two

questions when considering whether to reduce a presumptively

reasonable fee where a party did not succeed on all if its

initial claims: "First, did the plaintiff fail to prevail on

claims that were unrelated to the claims on which [it]

succeeded?  Second, did the plaintiff achieve a level of success

that makes the hours reasonably expended a satisfactory basis

for making a fee award?"  Hensley, 462 U.S. at 435.  In Hensley

the Court explained that

> [w]here a plaintiff has obtained excellent results,
> [its] attorney should recover a fully compensatory
> fee.   Normally  this  will  encompass  all  hours
> reasonably expended on the litigation, and indeed in
> some  cases  of  exceptional  success  an  enhanced  award
> may  be  justified.   In  these  circumstances  the  fee
> award  should  not  be  reduced  simply  because  the
> plaintiff  failed  to  prevail  on  every  contention  raised
> in  the  lawsuit.   Litigants  in  good  faith  may  raise
> alternative  legal  grounds  for  a  desired  outcome,  and
> the  court's  rejection  of  or  failure  to  reach  certain
> grounds  is  not  a  sufficient  reason  for  reducing  a  fee.
> The result is what matters.

Id. (internal citations and footnotes omitted).  This

description of "excellent results" can be contrasted with those

situations where "a plaintiff has achieved only partial or

limited success," and thus where "the product of hours

reasonably expended on the litigation as a whole times a

reasonable hourly rate may be an excessive amount.  This will be

true even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith." Id. at 436. Therefore, as the Court emphasizes at the end of the discussion, "the most critical factor is the degree of success obtained." Id.

Here, it is very clear that Wells Fargo obtained the best possible result it could have. The jury found Konover to be personally liable for the outstanding amount of the Maryland Judgment under both corporate veil piercing theories presented to it. Because Konover controlled the entire enterprise, including the finances of each entity, a judgment directly against Konover put Wells Fargo in the best possible position to collect on the Maryland Judgment. In other words, a judgment against the entity defendants would not have given the plaintiff any better options for recovery, since the money was controlled by Konover anyway. Thus, the jury's finding, which resulted in the imposition of liability in excess of $20 million and an award of punitive damages against Konover, was the best possible result Wells Fargo could have obtained.

Wells Fargo could not have obtained a better result despite the fact that it brought certain claims on which it lost at the summary judgment phase, or that it voluntarily withdrew before trial. The plaintiff correctly points out that the claims that it lost or withdrew were akin to "lesser included offenses" with

respect to the veil-piercing claims on which it proceeded to trial.  The two claims that Wells Fargo tried to the jury subsumed all of the other claims that were either previously lost on summary judgment or withdrawn.  Therefore, while the specific claims may have been out of the case, the facts and theories underlying those claims remained throughout.

Turning specifically to the two questions the court must ask under Henlsey, first the claims that Wells Fargo did not prevail on were not unrelated to the claims on which it did prevail.  Every claim set out in the amended complaint was aimed toward ultimately holding Konover responsible for the Maryland Judgment.  Although Wells Fargo began the litigation with a number of separate legal theories for achieving this goal, all of the claims were interconnected and related.  Second, as discussed above, the degree of success achieved by Wells Fargo provides a clearly satisfactory basis for making a fee award of the magnitude requested.  Although the fee award requested here is quite substantial, it is reasonable under the totality of the circumstances: the liability sought to be imposed was with respect to an amount in excess of $20 million, this was a hard-fought and hotly-contested litigation that lasted nearly a decade, and in the end the plaintiff achieved the best possible result while spending less money on the litigation than did the defendant.  In fact, the plaintiff's total fees and expenses for

-34-

this case through February 15, 2013 totaled $11,034,429.15, whereas those of the defendant totaled $15,398,447.73; in terms of number of hours, the plaintiff's firms billed a total of 26,898.00 hours through December 31, 2012, while the defense firms working just on Konover's case (i.e. not accounting for the time billed with respect to the entity defendants) billed 35,813.02 hours, and the number of hours billed by the defense firms with respect to all defendants was 57,028.74.  Thus, while the plaintiff's counsel may have charged higher hourly rates than the defendant's counsel, the plaintiff's counsel was clearly more efficient and more economical overall.

Therefore, like the Connecticut Supreme Court found with respect to plaintiff in Russell, because "the amounts [Wells Fargo] expended on litigation, including the dollars spent on [its] unsuccessful claims, were devoted to the pursuit of a goal that was achieved," Wells Fargo is entitled to full compensation of its reasonable attorneys' fees despite not prevailing on every claim.  Russell, 200 Conn. at 195.

The defendant's arguments to the contrary are not persuasive.  First, as discussed above, this is not a case where "'the relief, however significant, is limited in comparison to the scope, of the litigation as a whole.'"  (Def.'s Mem., at 44-45 (quoting Hensley, 461 U.S. at 440).)  Although Wells Fargo may have succeeded against only one defendant, this defendant

-35-

was the primary focus of the litigation and holding him responsible for the Maryland Judgment was the primary goal. Wells Fargo included the other defendants and causes of action as alternate means to achieving this goal, but that does not diminish the fact that Wells Fargo obtained the best possible result.  As the Supreme Court has pointed out, the crucial factor is "the degree of success obtained."  <u>Hensley</u>, 461 U.S. at 436; (<u>see also</u> Def.'s Mem., at 44).

Similarly, fee award should not be reduced because Wells Fargo "succeeded as to only two of its seven legal theories" against Konover.  (Def.'s Mem., at 47.)  Again, as the Supreme Court stated in <u>Hensley</u>, "[l]itigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee.  The result is what matters."  <u>Hensley</u> 461 U.S. at 435.  The Court elaborated on this point in a footnote, stating

> We agree with the District Court's rejection of "a mathematical approach comparing the total number of issues in the case with those actually prevailed upon."  Such a ratio provides little aid in determining what is a reasonable fee in light of all the relevant factors.  Nor is it necessarily significant that a prevailing plaintiff did not receive all the relief requested. . . . a fee award based on all hours reasonably expended [may be recovered] if the relief obtained justified that expenditure of attorney time.

<u>Id.</u> at 435 n.11 (internal citations omitted).  Thus, it is

immaterial that Wells Fargo achieved its requested relief, i.e. holding Konover responsible for the Maryland Judgment, based on only two of the seven legal grounds on which it commenced for sound reasons the litigation.  As explained above, Wells Fargo achieved the best possible result through its success on these two claims.  In fact, because of the degree of success Wells Fargo achieved in this case, it would not have been unreasonable for it to make an argument pursuant to <u>Hensley</u> that "an enhanced award may be justified."  <u>Id.</u> at 435.

Finally, although the degree to which all of Wells Fargo's original claims were "intertwined" with one another may be debatable, it is clear that the claims were not "unrelated". Each claim related to Konover's conduct with respect to the Maryland Action and the Maryland Judgment, and each claim was aimed toward holding Konover ultimately responsible for the outstanding payments on that judgment.  The question <u>Hensley</u> instructs district courts to answer is not the degree to which the unsuccessful claims are intertwined with the successful ones, but whether the plaintiff failed to prevail on any <u>unrelated</u> claims.  That is not the case here and therefore no reduction is warranted for claims on which Wells Fargo was unsuccessful.

### C. Other Fees and Expenses

In Connecticut, "[l]itigation expenses may include not only

reasonable attorney's fees, but also any other nontaxable disbursements reasonably necessary to prosecuting the action." Berry v. Losieau, 223 Conn. 786, 832 (1992).  Therefore, Wells Fargo is able to recover expenses it reasonably incurred in litigating this case beyond the fees paid to its attorneys. Such expenses claimed by Well Fargo "include costs and expenses for an accounting firm, jury consultant, and trial graphics firm." (Pl.'s Mem., at 19.)  Konover challenges the amounts requested by Wells Fargo in each of these categories.

With respect to the amount requested for the accounting expert, Konover argues that it is unreasonable because: (i) the hourly rate is too high; (ii) much of the work performed by the accounting expert was for claims that were eventually abandoned; and (iii) Wells Fargo never called its accounting expert to testify.  These arguments are unpersuasive.  For the reasons discussed above, the accounting rates are presumed to be reasonable as they were approved and paid by a sophisticated client.  Additionally, because the plaintiff achieved complete success, no amount should be deducted for work done by the accountant on unsuccessful claims.  For similar reasons, no amount should be deducted because the accounting expert did not testify.  It was not unreasonable for Wells Fargo to have its accounting expert prepared to testify at trial if needed, and it was similarly not unreasonable for it to choose not to call its

expert to testify.  Therefore, no amount will be deducted from the expenses requested as they relate to the accounting expert.

With respect to the expenses associated with the trial graphics firm, Konover provides no argument as to why these are unreasonable beyond his point that because other fees are associated with creating the trial graphics, these consulting fees must be redundant or duplicative.  However, as discussed above, it is entirely reasonable that attorneys spent time working with the trial graphics firm, thereby incurring both consulting fees and attorneys' fees for that activity.  Konover does not provide any other argument as to why these fees are unreasonable.  They will be awarded in full.

With respect to the fees paid to the jury consultant, the plaintiff has explained that these charges relate primarily to two major efforts: the focus group in 2010 and the mock trial held in 2011.  The plaintiff argues that these charges were necessary because "[t]here are very few corporate veil piercing claims that are actually tried at all, much les[s] to a jury." (Fitzgerald Report, Attch. to Fitzgerald Decl. (Doc. No. 1069-7), at 16.)  Additionally, the plaintiff's expert avers that "[m]ajor strategic decisions, such as whether or not to pursue the intermediate Konover entities at trial, were informed by this research."  (Id.)  The court finds this explanation persuasive.  Konover cites to several cases for the proposition

that such expenses are not recoverable.  However, none of these cases is persuasive authority.  The majority of the cases discuss the ability to recover these costs under fee-shifting statutes, and discuss recovery in terms of reimbursing attorneys for their time, not for the costs paid to the consultants.  The only case that applies Connecticut law, Shaw v. Greewich Anesthesiology Assocs., P.C., states that "the 26.8 hours billed by Attorney Victoria de Toledo for time spent in a focus group . . . . are not allowed."  Shaw, 200 F. Supp. 2d at 115 (emphasis added).  These cases did not address reimbursement for costs associated with jury consultants under either Connecticut punitive damages jurisprudence or contractual provisions providing for full reimbursement of fees and costs incurred.  However, given that these fees were paid upfront by a sophisticated client (who contemporaneously reviewed the bills and disallowed certain charges), they are presumed to be reasonable.  Konover has provided no support for an argument that the charges were unreasonable; as discussed above with respect to attorneys' fees, the nature of the case warranted the focus group and the mock trial; and the plaintiff achieved the best possible result.  Thus, there will be no deduction for the expenses associated with the jury consultants.

    Finally, Konover argues that a number of "miscellaneous fees" were either unreasonably incurred or cannot be reimbursed.

For instance, Konover argues that $87,328.10 "relating to travel expenses for ORIX employees . . . for attendance at hearings and the depositions of other witnesses" are not recoverable as they were not reasonably necessary to prosecute the action. (Def.'s Mem., at 60.)  However, the language of both the Mortgage Agreement and the Guarantee provides that the defendant must indemnify the plaintiff for "costs and expenses []<u>including without limitation</u> reasonable attorneys' fees and expenses . . . ." (Mortgage Agreement, at *26 (emphasis added); <u>see also</u> Guarantee, at *5.)  Therefore, the plaintiff is entitled to recover costs associated with its enforcement of its rights under the loan documents beyond attorneys' fees and costs and expenses incurred by attorneys.  These costs include the costs incurred by ORIX employees in traveling to attend hearings and depositions related to this case.  Such costs would not be awarded, however, if the only basis for an award were punitive damages.

Also, although the defendant is correct that the Special Master fees are not recoverable as part of a fee award as they are taxable, Wells Fargo has also moved for reimbursement of taxable costs pursuant to Local Rule 54, which are discussed below.  Furthermore, the costs the plaintiff incurred in connection with third party discovery are properly included in the award, despite the fact that the plaintiff was ordered by

the court to pay this cost.  This is inarguably an expense
incurred in the prosecution of this litigation, and the presence
of a court order requiring the plaintiff to pay this fee does
not mean that it was incurred unreasonably.  Instead, it simply
means that the plaintiff had to advance the funds and bear the
risk with respect to this expense.  The defendants provide no
other argument as to why the plaintiff cannot recover this
amount.  Finally, for the reasons explained above, no deduction
will be made for dismissed claims or parties.

**D. Taxable Costs**

In addition to the attorneys' fees and nontaxable costs
discussed above, the plaintiff also seeks reimbursement for
taxable costs pursuant to Local Rule 54.  Under Connecticut law,
punitive damages awards may include, in addition to attorneys'
fees, only "'nontaxable disbursements reasonably necessary to
prosecuting the action.'"  Ensign Yachts, Inc. v. Arrigoni,
Civil no. 3:09-cv-209 (VLB), 2012 WL 4372002, at *2 (D. Conn.
Sept. 24, 2012) (quoting Berry v. Loiseau, 223 Conn. 786, 832
(1992)) (emphasis added).  Thus, Wells Fargo moves for these
costs to the extent the court finds that it can recover fees and
costs only under a theory of punitive damages.

However, as didscussed above, Wells Fargo has two
independent grounds for recovery: punitive damages and the
contractual provision.  These taxable costs are covered by the

contractual provision entitling Wells Fargo to all reasonable litigation expenses.  In addition, Konover provides no argument against awarding these costs pursuant to Local Rule 54, and the costs described appear to be reasonable.  Therefore, under either theory, Wells Fargo may recover these costs as well.

### E. Future Fees and Expenses

Wells Fargo cites to several cases suggesting that fees and expenses associated with both the motion for attorneys' fees and defending an appeal should also be awarded under Connecticut law.  (See Pl.'s Mem., at 34).  Thus, the plaintiff has reserved the right to supplement its attorneys' fees application with respect to future expenses and the defendant has reserved its right to object to these expenses.  Such supplemental applications and objections will be ruled on when they are submitted.

### F. Summary

Wells Fargo achieved the best possible result in this litigation, where the degree of novelty and difficulty of the factual and legal issues was high, and it went to trial on a theory not often presented to, and difficult to try before, a jury.  It achieved this result after seven years of litigation against a determined adversary who vigorously contested the case at every step.  Moreover, Wells Fargo obtained this best possible result while expending less for attorneys' fees and

expenses than did the defendant.  In fact, the defendant's own expenditures for attorneys' fees and expenses shows that the plaintiff's counsel were more efficient and more economical overall than the defendant's counsel.  Consequently, particularly in view of these case-specific variables (see Hensley, 462 U.S. at 435), the court concludes that the fees, expenses, and costs paid by the plaintiff in pursuing this litigation are reasonable, with the exception of the attorneys' fees associated with internet research on the jury pool.

Accordingly, a total of $10,601,355.07 in fees and expenses is awarded, based on the instant motion, as follows:

| Billing Entity | Fees | Expenses | Deductions | Total |
|---|---|---|---|---|
| Winstead | $1,159,274.00 | $62,632.72 | | $1,221,906.72 |
| Jeff Joyce; Joyce McFarland; and Joyce, McFarland + McFarland | $2,489,583.53 | $122,182.30 | | $2,611,765.89 |
| Day Pitney | $4,403,647.45 | $144,437.60 | $31,973.00 | $4,516,112.05 |
| Proctor & McKee | $229,513.00 | $2,359.23 | | $231,872.23 |
| Bloom Strategic Consulting, Inc. | $153,112.50 | $23,006.78 | | $176,119.28 |
| David Belt | $0.00 | $126,302.72 | | $126,302.72 |
| Other experts and consultants | $1,417,348.90 | $7,952.59 | | $1,425,301.49 |
| Other expenses | $0.00 | $291,974.69 | | $291,974.69 |
| Subtotals | $9,852,479.38 | $780.484.63 | $31,973.00 | $10,601,355.07 |

## III. CONCLUSION

For the reasons set forth above, the plaintiff's Motion for

-44-

Award of Fees, Expenses and Costs and for Entry of Final

Judgment on the Jury's Verdict and the Findings of the Court on

Fees, Expenses and Costs (Doc. No. 1069) is hereby GRANTED in

part and DENIED in part.

It is so ordered.

Dated this 8th day of August, 2014, at Hartford,

Connecticut.

_____/s/_____
Alvin W. Thompson
United States District Judge
